UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LAURIE LABONIA,                          :
          Plaintiff             :       Civil Action No.
                             :       301CV2399(MRK)
v.                                       :

DORAN ASSOCIATES, LLC, et al             :
          Defendants            :       October 31, 2003



## AFFIDAVIT OF NICOLE J. ANKER IN SUPPORT OF COMPASS GROUP'S AND DANIEL PELLECHIA'S MOTION FOR SUMMARY JUDGMENT

I, Nicole Anker, being first duly sworn, hereby depose and say that:

1.      I am over the age of eighteen years and understand the obligations of an oath.

2.      I am an associate at the law firm of Bingham McCutchen LLP at its offices located at One State Street, Hartford, Connecticut 06103.

3.      Attached hereto as Exhibit A is a true and accurate copy of the transcript of the deposition of Lauri Labonia taken on March 26, 2003 and July 30, 2003.

4.      Attached hereto as Exhibit B is a true and accurate copy of the deposition of Daniel Pellechia taken on October 3, 2003.

5.      Attached hereto as Exhibit C is a true and accurate copy of the contract between Doran Associates, LLC and Compass Group USA, Inc. through Bateman dated August 18, 1999.

CTDOCS:1566137.1

6.    Attached hereto as Exhibit D is the Declaration of Christian Shelton dated

October 31st, 2003.

Dated at Hartford, Connecticut this 31st day of October, 2003

_Nicole Anker_

Nicole J. Anker

Subscribed and sworn to before me
this 31st day of October, 2003.

Commissioner of the Superior Court
Notary Public  _Robert Dennhiff_
**My Commission Expires:** _____

2

## **CERTIFICATION**

I hereby certify that a copy of the foregoing has been sent this 31st day of October,

2003 via first class mail, postage prepaid, to the following counsel of record:

John Williams, Esq.
Dawne Westbrook, Esq.
Williams and Pattis, LLC
51 Elm Street - Suite 409
New Haven, CT  06510

Andrew Cohen, Esq.
Letizia, Ambrose & Cohen, P.C.
One Church Street
New Haven, CT  06510

_____
Nicole J. Anker

CTDOCS:1566137.1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Case 3:01-cv-02399-MRK     Document 58     Filed 11/03/2003     Page 4 of 31

Sheet (1) of (52)

BEECHER & HORVATH

COPY

---------------------------------x

LAURI LABONIA,                    :

      Plaintiff          :

      VS              : 3:01 CV 02399 (RNC)

DORAN ASSOCIATES, LLC, ET AL,    :

      Defendants          :

---------------------------------x

    Deposition of LAURI LABONIA, taken pursuant to the Rules of Practice held at the Law Offices of Bingham McCutchen, One State Street, Hartford, CT, before Debra A. Chasse, LSR, License No. 00055, a Notary Public in and for the State of Connecticut, on Wednesday, March 26, 2003, at 10:03 a.m.

BEECHER & HORVATH REPORTING ASSOCIATES
73 Millbrook Road
North Haven, CT 06473
(203) 230-0010

**A P P E A R A N C E S :**

THE LAW OFFICES OF LETIZIA, AMBROSE & FALLS, P.C.
Attorneys for the Defendants Doran Associates and
Christian B. Shelton
One Church Street
New Haven, CT 06510
BY:  ANDREW A. COHEN, Esquire

THE LAW OFFICES OF BINGHAM MCCUTCHEN, LLP
Attorneys for the Defendants Compass Group d/b/a Bateman
Food Service and Daniel Pellecchia
One State Street
Hartford, CT 06103-3178
BY:  NICOLE J. ANKER, Esquire

THE LAW OFFICES OF WILLIAMS & PATTIS, LLC
Attorneys for the Plaintiff
51 Elm Street, Suite 409
New Haven, CT 06510
BY:  DAWN WESTBROOK, Esquire

Also Present:  Christian Shelton

---

    IT IS HEREBY STIPULATED AND AGREED BY and among counsel representing the parties that all formalities in connection with the taking of this deposition, including time, place, sufficiency of notice, and the authority of the officer before whom it is being taken may be hereby waived.

    IT IS FURTHER STIPULATED AND AGREED BY and among counsel representing the parties that objections other than as to form are reserved to the time of trial.

    IT IS FURTHER STIPULATED AND AGREED BY and among counsel representing the parties that the deposition transcript will be read and signed.

    IT IS FURTHER STIPULATED AND AGREED BY and among counsel representing the parties that proof of the qualification of the Notary Public before whom the deposition is being taken is hereby waived.

---

1    (Whereupon, LAURI LABONIA, having first been
2 duly sworn, was examined and testified as follows:)
3    THE COURT REPORTER:  Could you state your
4 name and address for the record.
5    THE WITNESS:  Lauri LaBonia, 411 Mansfield
6 Grove Road, East Haven, Connecticut.
7    MR. COHEN:  We've agreed to end at 3:00 today
8 and we're going to reconvene next week pursuant
9 to the notice from Attorney Anker's firm, and,
10 as I understand it, we'll make sure to have a
11 full day that day.  Is that acceptable?
12    MS. WESTBROOK:  Sounds good.
13          DIRECT EXAMINATION
14 BY MR. COHEN:
15   Q   Good morning, Mrs. LaBonia.  As you know, my name
16 is Andy Cohen and I represent Doran Associates and
17 Gardenside Terrace and Mr. Shelton in this proceeding.  If
18 you don't understand any of my questions, please let me
19 know that.  If you don't say anything to that effect, I'm
20 going to assume that you've understood the question.  Does
21 that sound fair?
22   A   Yes.
23   Q   Your name Lauri is spelled L-a-u-r-i?
24   A   Yes.

41

1    A    No.
2    Q    Were you in state or federal court? Do you
3  remember?
4    A    I don't remember.
5    Q    Do you remember who the judge was?
6    A    A judge out of New York.  That's all I know.
7    Q    Out of New York?
8    A    Yes.
9    Q    Let me just make sure I understand.  These
10  proceedings for the sexual harassment claim, then, were in
11  New York City or New York state?
12    A    No, you asked me if I knew the judge.  The only
13  thing I know about the judge is they called him in from
14  out of New York to come to do the -- to listen, whatever.
15    Q    The proceedings were in Connecticut?
16    A    Right, but I don't remember the judge's name.
17    Q    And in that case you actually testified in court,
18  as far as you remember?
19    A    Yes.
20    Q    Other than today and the divorce and that, have
21  you testified on any other occasion?
22    A    No.
23    Q    Other than the lawsuit we're here for today and
24  that sexual harassment claim and the divorce proceeding,

42

1  have you ever been a party to any other lawsuit?
2    A    No.
3    Q    Have you filed any other claims, other than a
4  lawsuit, for example, a workers' compensation claim, a
5  claim against an employer, any claims like that that
6  you're aware of?
7    A    I don't understand the question.
8    Q    Sometimes people can file claims that don't become
9  lawsuits; for example, a workers' compensation.
10    A    No.
11    Q    Is there any other claim that you ever filed
12  against anyone that you're aware of that you haven't told
13  me about today?
14    A    No.
15    Q    Mrs. LaBonia, is it your contention that you are
16  disabled?
17    A    No.
18    Q    Is it your contention that while you worked at
19  Gardenside Terrace you were disabled?
20    A    As I worked? Repeat the question, please.
21    Q    Sure.  Is it your contention that during the
22  period of time that you worked at Gardenside Terrace that
23  you were a disabled person during that time?
24    A    While I worked there?

43

1    Q    Yes.
2    A    A particular time was I disabled while working
3  there?
4    Q    At any time during your period of employment by
5  Gardenside Terrace, were you a disabled person, in your
6  own view?
7    A    Yeah.  When he had me up against the wall, I was
8  pretty disabled.
9    Q    Was there any other time when you worked at
10  Gardenside Terrace that you considered yourself to be
11  disabled?
12    A    No.
13    Q    Could you briefly tell me your educational
14  background, just generally, high school?
15    A    What grade I went up to?
16    Q    Yes, generally.
17    A    Junior year; sophomore, beginning of junior.
18    Q    What high school was that?
19    A    Jonathan Law.
20    Q    Where is that?
21    A    Milford.
22    Q    Did you graduate?
23    A    No.
24    Q    Did you ever graduate from high school?

44

1    A    No.
2    Q    Why not?
3    A    I don't know why.  I was pretty stupid, I guess.
4  I don't know.
5    Q    Did you just decide to drop out?
6    A    I can't recall why I didn't graduate.  I --
7    Q    Were you ever expelled from high school?
8    A    No.
9    Q    Were you ever expelled from any school?
10    A    No.
11    Q    Were you ever suspended?
12    A    No.
13            (Whereupon, an Employment Application was
14       marked as Defendants' Exhibit Number 2 for
15       Identification by the court reporter.)
16    Q    Mrs. LaBonia, I'm handing your attorney a
17  document that's been marked Defendants' Exhibit 2.  Can
18  you take a look at that, please, and tell me if you
19  recognize it.  Do you recognize the document?
20    A    Yes.
21    Q    Is this your signature on the last page?
22    A    Yes.
23    Q    And do you see above your signature where it says
24  you agree that false statements or omissions can result in

73

1    A  Mr. Shelton wasn't too crazy about some of his
2  displays, or I don't know how do put that in words.
3    Q  Try.
4    A  He just wasn't too happy about -- we had an
5  incident once. I was supposed to do, after Natalie left,
6  the hiring and the firing, and Robert Plaumann brought in
7  his friend.
8    Q  You mean partner?
9    A  I don't know what it was at that time. He wanted
10  to hire him at $10 an hour, and he brought him in the
11  office and basically we really didn't need help at that
12  time and I said, "No, we're not going to hire him at $10
13  an hour because none of the other girls are making $10 an
14  hour," and he said, "This is my friend," blah, blah, blah,
15  blah, blah, blah.
16    Q  The others were making less than $10?
17    A  Yes. Actually, he wanted to give him 10.50, and I
18  said, "No, you can't do that because of the other
19  employees," blah, blah, blah, blah, blah, and I went to
20  Mr. Shelton and I explained to him and there was a guy
21  prior to him, another friend of Robert's, that he wanted
22  to hire, and he just wanted to pay them more than the
23  others, and that's basically -- I just went to Mr. Shelton
24  and told him. He ended up getting hired but not for what

74

1  Robert Plaumann was going to hire him for.
2    Q  Is there any connection between that and Mr.
3  Plaumann's firing from Gardenside that you're aware of?
4    A  As far as I understood, the only reason I thought
5  he got fired was because of the credit card theft.
6    Q  You were promoted to dining room manager, if I'm
7  correct, in April of 2000. Does that sound about right to
8  you?
9    A  I think so.
10    Q  And you received a raise at that time?
11    A  I don't think right at that time. I think I had
12  to -- I don't recall if it was that time. I'm not sure.
13    Q  You remember you were making about $9 as a
14  waitress?
15    A  Right.
16    Q  As a dining room manager, at least, or shortly
17  afterwards do you remember making $10.25 an hour?
18    A  That was far after. No, I didn't jump the ladder
19  that fast.
20    Q  How did your job change when you became the dining
21  room manager?
22    A  I was in charge of the hiring and writing people
23  up, and if I wanted to fire someone, I had to inform Chris
24  and my reasons why and supervising the girls, doing the

75

1  time cards.
2    Q  The staff that you supervised was waitresses or
3  anyone else, as well?
4    A  There was one male, Robert Lord.
5    Q  And what was -- was he a waiter or something else?
6    A  Yes.
7    Q  And about how many people did you supervise?
8    A  Probably 6 or 7, maybe more. I'm not sure. I
9  wrote down all the names. If you want accurate, I'll
10  write down the names.
11    Q  And these people reported directly to you?
12    A  Mm-hmm.
13    Q  You need to say yes or no for the record.
14    A  Yes. Sorry.
15    Q  At that time you still reported to Robert
16  Plaumann; correct?
17    A  Basically, no, because after the hiring situation,
18  Chris gave me the okay to do everything on my own, and
19  Robert Plaumann was not allowed to hire anybody or
20  interview anybody after that situation and that was all up
21  to me.
22    Q  That situation you're talking about, that was Mr.
23  Plaumann's problems?
24    A  No, that was the problem that me and him had about

76

1  hiring his friend at a higher rate, and it was causing
2  problems and I didn't think it was fair to my girls that
3  someone was getting hired just because it was his friend.
4  So then I went to Mr. Shelton. He didn't get that pay
5  rate, but he did get hired, but then Mr. Shelton said,
6  "That's it. Lauri is in control of all the hiring. You
7  have nothing to do with it," because it would have caused
8  a problem because there was other males he wanted to bring
9  in that were his friends.
10    Q  So Mr. Plaumann wanted to bring in more males?
11    A  He had another male friend that he wanted to bring
12  in, a waiter, at more money again and it wasn't happening,
13  not as long as I wasn't going to let it happen because it
14  was -- we didn't need any help at that present time, and I
15  didn't think it was fair that they get more money, but
16  basically Mr. Shelton was on my side for that one.
17    Q  When you became a dining room manager in April,
18  April of 2000, at that point in time did you still report
19  to Robert Plaumann?
20    A  For a very short time. Well, I really didn't have
21  to report to him because we worked in the same vicinity.
22  We had the same office, so it was really nothing to report
23  to him because we seen -- we worked as a team then until
24  everything went crazy.

Page 73 to Page 76

77

1    Q   Wasn't he one step above you, though, in the chain
2    of command?
3    A   Yeah, but there was nothing I really had to report
     to him. Everything was going smoothly at the time,
5    everybody was getting along. There was no really major
6    problems for people to sit down and report at that time.
7    Q   If you had a direct supervisor, it was Robert
8    Plaumann, though; true?
9    A   Not really because I always went to Mr. Shelton,
10   so I really never went to Robert Plaumann, I always went
11   to Mr. Shelton.
12   Q   Do you know if Mr. Plaumann was supposed to be
13   your direct supervisor in any way?
14   A   Yeah, he was supposed to be, but if there was a
15   major problem or any -- we really didn't have any major
16   problems at that time. I mean, I didn't have any major
17   problems to go to Mr. Plaumann about at that time.
18   Q   Do you know who else Mr. Plaumann supervised
19   during that time after you became a manager?
20   A   He basically supervised the dishwashers and the
21   chefs, and I took care of the dining room staff.
22   Q   And the dishwashers and chefs, about how many
23   people where there?
24   A   There was so many people in and out of there, I

78

1    don't know how many.
2    Q   Were they both male and female?
3    A   While I was working there, there was only males in
4    the kitchen.
5    Q   Going back to the promotion when you were promoted
6    to dining room manager, did you have to go through any
7    kind of process, interview for that? How did it happen?
8    A   Mr. Shelton interviewed me and asked me if I
9    wanted the job.
10   Q   Did the interview go well?
11   A   Yes. He was very happy with my performance,
12   thought I'd make a good manager. I think he gave me 35
13   cents more.
14   Q   Do you know if there were any other candidates for
15   the job?
16   A   At that point, no. Well, there could have been
17   one more, Joanne. She was there longer than me. But, I
18   don't know, she just wasn't -- I don't think they went by
19   seniority as far as that goes.
20   Q   As far as you know, Mr. Shelton made that decision
21   to promote you; true?
22   A   Yes.
23   Q   Do you know if your gender, the fact that you're a
24   woman, played any role in his decision to promote you?

79

1    A   I don't know. I don't think so.
2    Q   During the interview for the promotion, did he say
3    anything about your gender that you felt was
4    inappropriate?
5    A   No.
6    Q   You were talking about some of Mr. Plaumann's
7    changes or problems later on when he was there. Did you
8    ever see him drunk or under the influence at work?
9    A   I witnessed major changes with him and Patty, the
10   nurse, on many occasions when they would lock themselves
11   in the office. They would go out and then come back and,
12   I don't know if they were drunk, high. They were probably
13   all of the above, basically. I mean, if I wanted to put
14   money on it, they were probably all of the above. They
15   had a very close relationship. I mean, they lived
16   together. I don't -- I just noticed, like I said, he was
17   here, and then when he started living with the nurse, he
18   was there. (Witness indicating.)
19        There was a lot of craziness. She would call the
20   office looking for him all the time. He would call
21   upstairs looking for her. She'd be down in the office,
22   he'd be up in that office. There was just a noticeable --
23   even like with his appearance, he was like coming into
24   work -- he used to be like a very neat, clean-cut neat

80

1    person, and then when they started living together, he'd
2    come in, his hair wasn't combed, he didn't shower. They
3    both basically looked a little weathered.
4    Q   Did you feel that Mr. Plaumann should be fired as
5    director?
6    A   Well, Mr. Shelton was aware of all this. He knew
7    they were living together. He seen him and talked to him
8    on a daily basis. He seen his appearance, he witnessed
9    his personality on that particular day when he talked. He
10   was telling him he was getting Bateman out of there and he
11   was going to take over. I don't know what happened except
12   that. He said he got fired because he stole Patty
13   Sullivan's credit card, and he found out he used Compass's
14   credit card to go to Rhode Island.
15   Q   Given Mr. Plaumann's performance, did you think he
16   should stay on or leave at the time?
17   A   I thought it was up to him. He knew he was late,
18   he knew I was cooking. He'd come in the kitchen, and he'd
19   say, "What are you doing back here?"
20   Q   Who?
21   A   Chris Shelton. Patty Sullivan a couple of times
22   was late with him. He witnessed that. He probably
23   witnessed more of Robert's overall appearance more so than
24   me because he had more direct longer conversations with

**Page 77 to Page 80**

85

1   and we said okay.
2       Q   You said Mr. Shelton said Mr. Pellecchia was
3   strict. Did he say anything more specific than that?
4       A   He didn't say strict. He said he's a tough one.
5   Bite your tongue and yes him to death.
6       Q   Anything else you remember more specific about
7   what Mr. Shelton said about that subject?
8       A   He said he's not going to be here long and blah,
9   blah, blah. I remember one thing he did. He went off on
10  one of the dishwashers, and I went to Mr. Shelton and told
11  him --
12      Q   You're talking about later on?
13      A   This was a couple of days after he was there.
14      Q   Let's put this aside for a minute. I just want to
15  talk about the conversation with you and Mr. Shelton. Is
16  there anything else that you remember him saying about Mr.
17  Pellecchia at that point?
18      A   No, just that he was going to be down.
19      Q   Do you remember what you said to Mr. Shelton about
20  that?
21      A   Nothing, because I didn't know Dan Pellecchia.
22  Occasionally, he popped down to get a pan or something
23  from Branford Hills, but I didn't know him personally.
24      Q   Did you hold a meeting with your staff about that?

86

1       A   When everybody came to work, I just explained to
2   him about what Mr. Shelton said. Everybody was up in the
3   air and didn't know what was going to happen.
4       Q   Anything else you remember telling them about what
5   you expected to happen?
6       A   I just told them what Mr. Shelton told me.
7       Q   Were there any specific changes that Mr. Shelton
8   discussed with you that would take place in the dining
9   room?
10      A   He informed me I was still in charge of hiring and
11  the discipline, and Dan was there to take care of the --
12  nothing has changed; the kitchen staff, the dishwashers
13  and the chefs, and that nothing's changed and that was
14  that.
15      Q   And Dan Pellecchia actually arrived pretty soon
16  after that as far as you remember, maybe a day?
17      A   Yeah. I think it was a couple of days.
18      Q   When he first arrived, did he have any kind of
19  meeting with you or your staff?
20      A   No.
21      Q   Did he on his first day sit down to talk to you
22  about anything, about how things were run?
23      A   No. He thought we were doing a fine job and he
24  said if he seen anything he didn't like, he would inform

87

1   us and blah, blah, blah.
2       Q   Did his style differ from Mr. Plaumann's? At some
3   point did you become aware of that?
4       A   He was rude.
5       Q   How so?
6       A   I don't know. He just didn't know how to talk to
7   people. He was just was loud, rude. I can't explain it.
8   He was just like -- he just didn't know how to talk to
9   people.
10      Q   Was he loud and rude to everybody?
11      A   Yeah, like -- yeah, he was pretty loud and rude
12  to -- the poor dishwasher had a problem with him, made fun
13  of him because he was a dishwasher, called him a loser,
14  and I went to Mr. Shelton about that and Dave Goodman did.
15  He just didn't have a way with words.
16      Q   Do you remember the name of that dishwasher?
17      A   Dave Goodman.
18      Q   Did you actually witness this?
19      A   Dave had come up to me and asked me what he should
20  do and what Dan said to him. He said, "Can I talk to
21  Dan?" And I said, "Personally, I think you need to go to
22  Mr. Shelton with this and have Mr. Shelton handle it,"
23  because I didn't think it was my position to confront Mr.
24  Pellecchia because of that. I think it should go to Mr.

88

1   Shelton and have him take care of it.
2       Q   Dave told you that Dan was being mean and rude to
3   him?
4       A   Yeah, he was pretty upset about it, very upset
5   about it.
6       Q   Did anyone else -- let's start with the
7   dishwashing staff. Dave was a dishwasher; is that
8   correct?
9       A   Yes.
10      Q   Were you ever aware of Mr. Pellecchia being rude
11  or mean to others in the dishwashing staff?
12      A   I don't think it just stayed in the dish -- he was
13  just rude to everybody. He was just rude.
14      Q   And mean to everybody?
15      A   He just didn't know how to speak to people. Like
16  the younger girls would be like -- he scared them. He
17  just -- I can't explain it. He just didn't know how to
18  talk to people. That's all I can say. I don't know. You
19  might want to ask them.
20      Q   Do you remember anybody, besides Dave, anyone at
21  all, coming to you and complaining about Mr. Pellecchia's
22  treatment of them?
23      A   They all came to me and complained, and then I
24  would tell Mr. Shelton and Mr. Shelton would say, "Tell

**Page 85 to Page 88**

89

1  them Another 3 weeks. We're trying to get out of the
2  contract. Bite your tongue. I know, I know, I know, bear
3  with me." And I would go back and tell them and that's
4  what we would do.
5  Q  Did other dishwashers complain?
6  A  I have no idea after that. I think he took
7  control of that whole situation. It wasn't my department
8  to get involved in, so I tried to stay out of it as much
9  as I could.
10  Q  Do you remember any chefs complaining about Mr.
11  Pellecchia's behavior?
12  A  They all had their comments and said things but,
13  like I said, I didn't get involved. It was up to them to
14  go to Mr. Shelton.
15  Q  Generally, what kind of comments and things were
16  said from the chefs about Mr. Pellecchia?
17  A  "He's rude, I don't like what he says to me, I
18  don't like what he just said," just catching it in my ear.
19  It was up to them to go to Mr. Shelton. It wasn't my
20  department.
21  Q  Would it be fair to say that as far as you were
22  aware pretty much everybody who worked in the dining hall
23  perceived Mr. Pellecchia as rude and mean?
24  A  I would say yeah.

90

1  Q  Was Mr. Pellecchia more strict in his enforcement
2  of rules than Mr. Plaumann had been?
3  A  As far as the rules changing, Mr. Pellecchia, for
4  one, was not a smoker. So that aggravated him. Basically
5  that was the only rule he tried to change was everybody
6  going out for smoking breaks.
7  Q  What did he do about that rule?
8  A  He cut them down for like a half hour with the two
9  hour down time. He told us to punch out and go somewhere
10  and then punch back in, but a lot of people needed those 8
11  hours, so they would just break for a half hour and go
12  back and clean and try -- we'd do whatever, fold
13  clothes, we started washing laundry, just whatever we
14  could to let them keep their 8 hours.
15  Q  Mr. Pellecchia was cutting down on the breaks that
16  Mr. Plaumann allowed?
17  A  Yeah, it was, you know. And he wouldn't let like
18  the nurses go back there and smoke or the aids anymore.
19  It wasn't basically just the kitchen staff or the dining
20  room staff. He was telling Mr. Shelton that too many
21  people go out and have a cigarette, so everybody -- we
22  took turns. That's the compromise we all came to. We
23  took turns. Three would go out for a half hour, three
24  would come back, not everybody at once anymore.

91

1  Q  What was your reaction to that change?
2  A  I didn't have a problem with it.
3  Q  What about the people, generally, as far as you
4  know?
5  A  I don't think anybody had a problem with it.
6  Q  Did that system work okay, the new break system?
7  A  Yes, as long as we didn't go all out as a group
8  and one aid could come down, not all the aids, because
9  people that needed to be in the kitchen to answer the
10  phone, someone needed something --
11     MS. WESTBROOK:  Just answer the question.
12  Q  Did Mr. Pellecchia change any rules about
13  eating on the job? I want to clarify that. I don't mean
14  just formal rules written on a piece of paper. I mean the
15  way things worked.
16  A  Basically not really. He wouldn't let the staff
17  drink soda, which was a good thing, or he would limit
18  them.
19  Q  That was a change from Mr. Plaumann?
20  A  I guess. I mean --
21  Q  So he cut down on the soda drinks?
22  A  Limited it, yeah.
23  Q  Did people seem to have any reaction to that, good
24  or bad?

92

1  A  No, it was fine.
2  Q  It was accepted?
3  A  Mm-hmm.
4  Q  You need to say yes or no.
5  A  Yes, it was accepted.
6  Q  Did Mr. Pellecchia change any rules about lateness
7  or absences?
8  A  He didn't have any part in that as far as the
9  dining room staff because Mr. Shelton said I was in charge
10  of that and he was in charge of the kitchen, so he had no
11  say in that.
12     (Whereupon, a recess was taken from 12:10
13  p.m. until 12:16 p.m.)
14  Q  What do you --
15     MR. COHEN:  Are you ready?
16     MS. WESTBROOK:  Can I just say something
17  on the record? She'd like to amend one of her
18  previous answers.
19     MR. COHEN:  Well, you can do that with
20  cross-examination. That would be fine.
21  Q  What else, if anything, changed when Mr.
22  Pellecchia arrived?
23  A  I don't understand your question. As far as what?
24  Q  The dining room had a new person who was there

93

1    taking Mr. Plaumann's place.
2        A    He didn't have anything to do with the dining
3    room.  He had something to do with the kitchen.
4        Q    So as far as you were concerned on a day-to-day
5    basis, Mr. Pellecchia's rules didn't govern you?
6        A    There was one day I had the coffee cups on the
7    tables and he wanted me to remove the coffee cups on the
8    tables, and I told him, "No, there's too many walkers and
9    canes.  I don't want the girls walking out with the tray
10    of coffee because of the walkers and the canes."  He ran
11    to Mr. Shelton and said I'm not setting the table the way
12    he wants.  He said, "Lauri, do you have to have the coffee
13    cups on the table?"  I had a very good reason for having
14    the coffee cups on the tables; walkers, canes and he said,
15    "I'll talk to him," and that was it.
16       Q    Are there any rules that Mr. Pellecchia tried to
17    impose that you thought might affect you or your staff,
18    anything else?
19       A    No, just the smoking, each taking turns.  That was
20    it.
21       Q    Did Mr. Pellecchia's arrival affect you and your
22    job in any way, then?
23       A    No, because, like I said, he was -- I was not
24    to -- I had my dining room, he had his kitchen, and as far

94

1    as I knew he was only there for 3 weeks, and the contract
2    was over, so it wouldn't have affected my job.
3        Q    Did people ever indicate that they felt Mr.
4    Pellecchia was a so-called control freak?
5        A    I don't think control freak more than rude.
6        Q    Or micromanager, somebody who had to try to
7    control every decision made?
8        A    I don't know, you can ask his chefs and
9    dishwashers.
10       Q    Were you aware of people saying that about him?
11       A    No, just that he was rude.
12       Q    So the rudeness was really the big complaint?
13       A    I don't think they called him -- I don't know what
14    the guys in the kitchen called him.  I just heard them say
15    rude, nasty.
16       Q    Did you cooperate with Mr. Pellecchia?
17       A    I really didn't have to cooperate with him, except
18    for that one incident with the coffee cups and he went to
19    Mr. Shelton, and Mr. Shelton asked me why we couldn't
20    remove the coffee cups and I explained why.  It was a
21    safety hazard, as far as I was concerned.
22       Q    So in your workday you really didn't have to
23    interact with Mr. Pellecchia at all?
24       A    Well, I did.  One time the dishwasher -- all the

95

1    dishes were coming out dirty and I did say to Mr.
2    Pellecchia, "What's wrong with the dishes?  They're
3    filthy,"  And he said, "We have no soap."  And I said,
4    "You have no soap?"  And he said, "No, it's coming."  And
5    probably a week and a half went by and we didn't have no
6    soap.
7        Q    And the dishes were still dirty?
8        A    They were disgusting.  We were doing them by hand,
9    that's how gross they were.  And that was the other thing
10    we interacted with.  We had a little argument about I
11    said, "You can't" -- over the soap and I told Mr. Shelton
12    the Health Department was coming right after that, so he
13    got a little nervous and got the soap because I knew what
14    day she was coming and that was about it.
15       Q    Other than those, say, your typical day after Mr.
16    Pellecchia arrived there, you had a typical day on the
17    job, would you interact with Mr. Pellecchia much at all?
18       A    I would sit in the office -- no, he really wasn't
19    in the office much.  He was always bopping around or doing
20    something.
21       Q    Would you talk to him much during the workday?
22       A    He wasn't really a talker.  He didn't have
23    conversations like "Hey, how was your night" or "how was
24    your weekend," no.

96

1        Q    So it sounds like really you and Mr. Pellecchia
2    worked separately?
3        A    That's what we were told to do, I guess.
4        Q    And as to the wait staff, you decided how they did
5    their work and what they did?
6        A    Yes.  And then, like I said, with the coffee cups
7    that was just that's it.
8        Q    But, generally, you were the one who controlled
9    the wait staff; true?
10       A    Yes.
11       Q    And, generally, he was the one that controlled the
12    kitchen staff; true?
13       A    Yes.
14       Q    Do you remember somebody named Chris Marcisz?  I'm
15    not sure I'm pronouncing that right.
16       A    The guy with the long hair and pony tail?  Last
17    names I'm not good with.  You might have to explain that
18    to me.
19       Q    It sounds like you're talking about the same
20    person I'm asking about.  Who was he?
21       A    He was a chef or still is a chef.
22       Q    So he would have worked for Mr. Pellecchia, I take
23    it?
24       A    He was there from day one.  That was the one that

Page 93 to Page 96

**97**

1  was fighting with -- he was there from when I came in.
2  Q  He was one of the people that was working for Mr.
3  Pellecchia?
4  A  And he was there before that with Plaumann and
5  Natalie.
6  Q  Do you know if Chris had any problems with Mr.
7  Pellecchia?
8  A  Well, obviously they did in the beginning, the
9  three of them, Natalie, Chris and Plaumann, over the
10  fighting in the beginning.  I don't know.
11  Q  Just to clarify the record.  We're not talking
12  about Chris Shelton, we're talking about Chris Marcisz.
13  A  You asked me if he had a problem with Plaumann?
14  Q  No, did he have a problem with Mr. Pellecchia?
15  A  He wasn't too crazy about him.  He had his
16  opinions about him.
17  Q  What do you remember Chris saying about that?
18  A  "This guy's rude, this guy's nasty."  Chris told
19  me, "He's going to be gone in 3 weeks.  I'll just bite my
20  tongue."
21  Q  Did you ever tell Chris Marcisz that you were
22  going to drive Dan Pellecchia out of there or words to
23  that effect?
24  A  No.

**98**

1  Q  Did you ever tell Chris Marcisz that you were
2  going to do what you could do to be insubordinate to Dan
3  Pellecchia?
4  A  No, because Chris knew once Dan was gone he was
5  going to get the whole job.
6  Q  Do you ever tell Chris Marcisz anything to that
7  effect?
8  A  No.
9  Q  Did you tell Chris Marcisz that you would be
10  anything, less cooperative with Mr. Pellecchia?
11  A  No.
12  Q  Do you ever remember talking to Mr. Marcisz about
13  that subject generally, about interacting with Mr.
14  Pellecchia?
15  A  He did call me in the office one day and tell me
16  that, "This guy's rude, he's nasty, what's going on here?"
17  And I said, "Mr. Shelton said we have to bite our tongues,
18  he's going to be out of here in 3 weeks and the contract's
19  going to be over."  And then a few days later Chris said,
20  "I talked to Mr. Shelton and I'm going to get the job once
21  they're out of here."  We didn't talk about it after that.
22  Q  Did anybody have any nicknames for Mr. Pellecchia?
23  A  Not that I'm aware of.
24  Q  Did anybody refer to him as Hitler?

**99**

1  A  Oh, yeah, a lot of the dishwashers, in fact.  Dave
2  Goodman.
3  Q  He called Mr. Pellecchia Hitler?
4  A  Yes.
5  Q  Do you remember where, when, why?
6  A  I guess it was after his incident with him.
7  Q  Anything else you remember about that comment,
8  what was said?
9  A  Well, Dave was very upset on what he said to him,
10  and I guess he didn't get any results from the front
11  office, so he said, "I've got to deal with this Hitler."
12  He only said it a few times.
13  Q  Did you know somebody named Fred Moore?
14  A  Mm-hmm.
15  Q  You need to say yes or no for the record.
16  A  Yes.
17  Q  Who was Fred Moore?
18  A  A dishwasher and a cook.
19  Q  He worked for Mr. Pellecchia also?
20  A  Yes.
21  Q  Did he ever use any kind of nicknames that you're
22  aware of about Mr. Pellecchia?
23  A  Fred's a very quiet guy, no, but he didn't like
24  him.

**100**

1  Q  What leads you to say that?
2  A  Because he came to me and told me that he didn't
3  know if he could take much more of him, and I explained to
4  him, because I guess he was avoiding him, I explained to
5  him, "Calm down, Mr. Shelton said everything's going to be
6  all right."  Okay, okay.  He just sort of -- because well
7  what I witnessed, he would do the dishes, then he would
8  sometimes make the cold side of things, and then Dan had
9  him -- the kid was running back and forth.  He didn't know
10  what the heck was going on.  He was riding him.  So I
11  guess he wasn't too crazy about that.
12  Q  And when you say Dan was riding Fred, what do you
13  mean?
14  A  That's what Fred said.  He didn't know how much
15  longer he could take it.  "Mr. Shelton said it was only a
16  few weeks," I told him.
17  Q  Did Robert Lord work for Mr. Pellecchia at all?
18  A  Yes.
19  Q  And how, in what capacity did Robert Lord work for
20  Mr. Pellecchia?
21  A  He didn't work for Mr. Pellecchia, he worked under
22  me.  He was my wait staff when Mr. Pellecchia was there.
23  Q  Did he work for Mr. Pellecchia at all?
24  A  No.  Like I said, I was in control of the wait

101

1 .staff, and Mrs. Pellecchia was in control of kitchen
2 staff.
3    Q   I'm only asking because you initially said yes.
4    A   Sorry, no.
5    Q   Did Mr. Lord ever talk to you about his own
6 perceptions about Mr. Pellecchia?
7    A   Yeah.  The whole wait staff said he was rude and
8 nasty.
9    Q   Did Mr. Lord share that opinion, as far as you
10 know?
11    A   Yes.
12    Q   Did you ever complain to anybody about Mr.
13 Pellecchia's behavior?
14    A   Yes.
15    Q   To whom did you complain?
16    A   I went up to -- it was the day over the dishwasher
17 with the soap and everything and he was pointing in my
18 face and yelling at me, and that's when I went to Mr.
19 Shelton and told him, "The Health Department's coming, we
20 need soap.  It's been almost a week and a half here with
21 no soap."  And he was yelling at me and I told him, and I
22 went up to the nurse's office because I was having like an
23 anxiety attack because he was screaming and pointing in my
24 face telling me we didn't need soap.

102

1    Q   You went to the nurse's office for treatment, in
2 other words?
3    A   Yeah, to calm down.  I thought I was going to have
4 a heart attack because I was so nervous with him yelling
5 at me.  It's an anxiety attack because I get those.  Mary
6 Beth and the other nurse calmed me down.  "We'll get Chris
7 to get soap and everything will be all right.  Calm down,"
8 because the Health Department was coming.  She said, "You
9 need to go down and tell Kim Maturo so she can have this
10 on record."  So I went and told Kim and she sent me home
11 for a half day to calm down.  She said, "Don't worry about
12 it, Chris is on it about the soap."
13    Q   Were you paid for the half day?
14    A   Yep.
15    Q   Did you have any problem being sent home for that
16 half day, or was that okay with you?
17    A   That day I didn't get paid for.  Excuse me.
18    Q   Did you want to go home?
19    A   Yes.
20    Q   Because you felt you were having an anxiety
21 attack; is that right?
22    A   I was a little nervous of the way he yelled at me
23 and pointed in my face and told me we didn't need soap.
24    Q   Tell me everything you remember telling Kim Maturo

103

1 about that.  Was there anything, besides what you
2 described to her, that you told Kim Maturo that day?
3    A   I told her I didn't appreciate him pointing in my
4 face and screaming at me over soap.  I knew when the
5 Health Department would come, they would come between the
6 1st and 3rd and this was on the 2nd, and I didn't
7 appreciate him pointing and screaming in my face over the
8 soap.  He was like a mad dog saying we didn't need soap,
9 don't worry about it, it's his kitchen, which I
10 probably -- the dishes were filthy.  We were doing them by
11 hand.
12    Q   Who was doing them, the wait staff?
13    A   We couldn't put them on the table.  They
14 were filthy, rotten dirty.  And the dishwasher was broke.
15 I guess the water wasn't -- I don't know.  It was a big
16 mess.  Supposedly, I found out after from Mr. Shelton that
17 the dishwasher was broke, too.
18    Q   Did you ever complain to Kim Maturo about Mr.
19 Pellecchia on any other occasion?
20    A   Yes.
21    Q   Tell me about that.
22    A   I went in on several occasions and told her I
23 didn't like the way he talked to people.  He was nasty and
24 rude.

104

1    Q   What did Kim say to you?
2    A   "Chris told you bite your tongue, it will only be
3 a few more weeks."  That's over and over and over again.
4    Q   Did you ever complain to Chris Shelton about Mr.
5 Pellecchia's --
6    A   Yes.
7    Q   It sounds like more than once.
8    A   Yes.
9    Q   Ballpark, about how many times do you remember
10 complaining?
11    A   A lot, about nine, ten.
12    Q   What do you remember telling Chris, generally?
13    A   The way he talked to people, just he was nasty,
14 and Chris gave us that famous line.  "Bite your tongue,
15 they're out of here, I got a contract, I'm dealing with
16 it.  I know, I had problems with him up the hill.  Don't
17 worry about," blah, blah, blah, "everything will be okay,
18 bear with me," and that was that.
19    Q   It sounds like you told Kim and Chris very much
20 the same things about Dan; true?
21    A   Yes.
22    Q   Were there any other specific complaints that you
23 told Kim or Chris about in terms of Dan's behavior, other
24 than what you described already, the dishwasher, the

105

1  setting the table, anything else specific you complained
2  about?
3      A  I don't recall.  Just his nastiness.
4      Q  Just the general nastiness?
5      A  Yes.
6      Q  Do you know if any of your wait staff directly
7  complained to Ms. Maturo or Chris Shelton about Mr.
8  Pellecchia?
9      A  I don't know.  If they did it, they would have
10  done it on their own.  I never stopped them from going to
11  Mr. Shelton or Kim.
12      Q  Did you complain to anyone else, besides Kim or
13  Mr. Shelton, about Mr. Pellecchia's behavior, anyone in
14  management?
15      A  Just the nurse.
16      Q  Mary Beth?
17      A  Mary Beth.
18      Q  Anyone else?
19      A  Chris, occasionally Chris's father if I caught
20  him, and that's about it.
21      Q  And when you complained to Chris's father, Charles
22  Shelton, do you remember if you told him essentially the
23  same thing you described so far?
24      A  Yeah, and he told me they were out of there and

106

1  blah, blah, blah.
2      Q  No specific complaints that you gave to Charles
3  Shelton that you can recall?
4      A  No, because he was always in and out of the
5  building.  It was when you would catch him.
6      Q  Did you ever submit anything in writing
7  complaining about Mr. Pellecchia's behavior?
8      A  No, I just went to Mr. Shelton and Kim, too.
9          MS. WESTBROOK:  Is this a good time to
10  take a break?
11          MR. COHEN:  Yes.
12          (Whereupon, a luncheon break was taken
13  from 12:33 p.m. until 1:10 p.m.)
14      Q  Mrs. LaBonia, do you know if Gardenside Terrace
15  had any authority to discipline Mr. Pellecchia?
16      A  I don't know if Chris was supposed to go to his
17  boss.  I really don't know.
18      Q  Do you know if Mr. Shelton or Gardenside had any
19  authority to fire Mr. Pellecchia?
20      A  I don't know what their policy is on that.  No, I
21  don't know.
22      Q  The incident that occurred with Mr. Pellecchia
23  that's given a rise to a lot of this, do you remember when
24  it occurred?

107

1      A  Yes, we need to correct the date.  It was November
2  3rd on a Friday.
3      Q  And your complaint in this case had distinctly
4  said it was December?
5      A  And he says December 1st.  (Witness indicating.)
6      Q  Who's he?
7      A  Mr. Shelton.
8      Q  Says December 1st when?
9      A  He says the date happened December 1st.
10      Q  In what context did he say that?
11      A  In some of the paperwork that I noticed, and I
12  said it was November 3rd.
13      Q  You're confident now that it was November 3, 2000
14  when this incident happened with Mr. Pellecchia?
15      A  It was a Friday.
16      Q  Are you confident, as you sit here today, that it
17  was November 3rd?
18      A  Yes, it was a Friday.
19      Q  Are you --
20      A  Yes, I'm confident.
21          (Whereupon, an Affidavit was marked as
22  Defendants' Exhibit Number 3 for Identification
23  by the court reporter.)
24      Q  Mrs. LaBonia, I've given your attorney a document

108

1  marked Defendants' Exhibit 3.  Do you recognize that
2  document?
3      A  What is this?  Oh, this is the --
4      Q  Do you recognize the document?
5      A  Yep.
6      Q  What is it?
7      A  It's a complaint, I guess.
8      Q  With the Commission on Human Rights?
9      A  Yes.
10      Q  Do you know how it is that this complaint in
11  paragraph 13 alleges that the incident in question took
12  place on December 3, 2000?
13      A  I don't know where they got December 3rd from.
14      Q  Who's the they?  When you say they got it, who are
15  you talking about?
16      A  When I first went to the attorney -- what was his
17  name?  Robert?
18      Q  Just to be clear, and your attorney knows this, I
19  don't want you to tell me about any confidential
20  conversations --
21      A  I know.
22      Q  I want to make it clear in fairness to you.
23  That's not something I'm asking you.  When you were
24  referring to the they, was it the attorneys that you were

**Page 105 to Page 108**

121

1   couldn't because he's too tall.
2       Q   Did he tell you to get off the phone before he
3   actually touched you?
4       A   He didn't tell me to hang up the phone until I was
5   like spun around. When he was poking me, that's when he
6   told me to hang up the phone. I said, "Wait a minute,"
7   and that's when he spun me around and the phone was like
8   this, and he hung it up for me. (Witness indicating.)
9       Q   What was he saying?
10      A   "Get in the office goddamnit. You're a stupid
11  idiot. Don't tell me you know what's going on with the
12  ventilation. You're a goddamn stupid idiot. Get in the
13  office."
14      Q   Nothing about the phone at that point?
15      A   No.
16      Q   Did you say anything back to him at that point?
17      A   I just told him to get his hands off me. I didn't
18  say anything but I --
19      Q   Before he touched you do you remember what you
20  said?
21      A   I said, "Dan, open the door, let some ventilation
22  in." I figured if you opened the door there would be cool
23  air coming through and it would cool it off. At that
24  point it was so hot in there anything would have worked.

122

1   I was trying to make everybody comfortable.
2       Q   The way you described it he was poking you in the
3   shoulders; correct?
4       A   At first, yes.
5       Q   Left shoulder?
6       A   Well, I was like this. (Witness indicating.)
7       Q   Let me get this straight. Where the wall is.
8       A   Yeah.
9       Q   Left shoulder?
10      A   Yeah.
11      Q   Then he grabbed you by both shoulders by the way
12  you described it?
13      A   He spun me around.
14      Q   You said, I think, he was poking you some more?
15      A   After he had my shoulders and the phone was like
16  this, I was screaming, "Get your hands off me," and he
17  hung up the phone right over my head, and then he was
18  poking me right here, "Get in the office now, get in the
19  office," and I wasn't going anywhere with him. (Witness
20  indicating.)
21      Q   Just for the record, I want to identify when you
22  said he was poking you right here --
23      A   I don't know what side. All I know is I was up
24  against the wall and he was poking me with one finger to

123

1   get in after he let go of my arms.
2       Q   Was he poking you around the collarbone?
3       A   Like right here. (Witness indicating.)
4       Q   For the record, is that fair to say that's around
5   your collarbone?
6       A   It's probably more here, I guess. (Witness
7   indicating.)
8       Q   Tell us for the record what you're saying.
9       A   Not up here, right here. (Witness indicating.)
10      Q   The high part of your chest?
11      A   Right. Not to my throat. He wasn't at my throat.
12      Q   So maybe you're saying just below your collarbone?
13      A   Right.
14      Q   At the time did you feel that his conduct toward
15  you was sexual?
16      A   No.
17      Q   As you sit here today, do you feel that the
18  conduct of Mr. Pellecchia on November 3, 2000 was sexual?
19      A   No.
20      Q   It was angry, mean, but it wasn't sexual?
21      A   No.
22      Q   Did Mr. Pellecchia ever act in an inappropriate
23  sexual way to you?
24      A   No. I mean, he didn't say any sexual things to

124

1   me.
2       Q   Or touch you in a sexual way?
3       A   No.
4       Q   Has anyone at Branford Hills ever behaved in an
5   inappropriate sexual way to you?
6       A   No.
7       Q   And I said Branford Hills, I apologize. I meant
8   Gardenside Terrace. Sometimes I interchange them, so let
9   me ask you the question again.
10          Has anyone at Gardenside Terrace during your
11  employment there done anything inappropriate in a sexual
12  manner to you?
13      A   No.
14      Q   When this was happening with Mr. Pellecchia on
15  November 3rd, who else was present that you can remember
16  today?
17      A   Dave Goodman, the dishwasher.
18      Q   When I mean present, who could see or hear as far
19  as you knew.
20      A   Right. Dave Goodman, the dishwasher, Fred Moore,
21  Chris, I forgot his last name again --
22      Q   The one we talked about before with long hair?
23      A   Yes. Robert Lord.
24      Q   Marcisz?

**Page 121 to Page 124**

125

1    A    Yes. Robert Lord and Darcy. I'm just saying who
2    was in the kitchen area. There was other people in the
3    dining room but that's it.
4        Q    Who's Darcy?
5        A    She was one of the wait people and there was one
6    more, too, Veronica Gage.
7        Q    So, as far as you know, those six people were the
8    people who could see or hear what Mr. Pellecchia was
9    doing?
10       A    What happened, right.
11       Q    Did any of them react in a way that you can
12   describe for me, any of those six people say or do
13   anything that you can tell me about?
14       A    Veronica and Marcy ran out of the kitchen.
15       Q    Was it Marcy or Darcy?
16       A    Darcy. And Robert Lord was screaming, "Dan, calm
17   down, get your hands off her, calm down," and then Dave,
18   the dishwasher, was like, "Dan, cut it out, calm down."
19   Everybody was trying to tell him to calm down.
20       Q    Was he still touching you at that point when
21   people were saying calm down?
22       A    When he had me pinned, that's when they were
23   saying calm down, and when he was poking me and saying
24   calm down.  Maybe they thought and I thought when he

126

1    grabbed me he was going to hit me or what. I was thankful
2    he didn't hit me. Everybody was just trying to calm him
3    down. I wasn't saying a word. I didn't want to set him
4    off anymore than he already was.
5        Q    Did anybody physically intercede with this, stop
6    him, grab him, anything like that?
7        A    Robert Lord came close, but then he backed off
8    because he was a little scared, I think.
9        Q    What happened next?
10       A    Then the next thing I know Linda, the
11   receptionist, and Kim Maturo, the office manager, came
12   flying in the kitchen doors, thank God.
13       Q    What happened after that? What did you do, what
14   did Mr. Pellecchia do?
15       A    I was still standing in the corner and he was like
16   right in front of my face and Kim was like, "Dan, get in
17   the office, get in the office," and he was trying to tell
18   her what happened. I was saying, "I'm calling the cops on
19   him. I want him away from me." And she's like, "Wait,
20   wait, wait, let me get him into the office." She was
21   trying to coax him into the office, and then they went
22   into the office.
23       Q    So they went into the office, that means Kim --
24       A    And Dan.

127

1        Q    And Dan?
2        A    Yes.
3        Q    And you were still in the kitchen?
4        A    No.
5        Q    Where were you?
6        A    Linda took me to the front office where Kim's
7    office was, like the receptionist where Kim's office was.
8        Q    What were you doing there and how long did you
9    stay?
10       A    She was trying to calm me down and she just wanted
11   me to sit in the chair and I was crying and she was just
12   calming me down, and then Kim Maturo came out and she told
13   me she had to wait for Mr. Shelton to come in before she
14   could do anything. I said to her, "I want to call the
15   cops now," and she said, "No, you can't do that until I
16   speak to Mr. Shelton. I have to tell him what happened."
17   And I said, "Well, I'm afraid of him. I don't even want
18   him in this building now." And she said wait and next
19   thing I know Mr. Shelton came in.
20       Q    About how long elapsed before Chris Shelton came
21   in?
22       A    After the incident it wasn't long.
23       Q    Minutes?
24       A    Maybe 10, maybe 15. It wasn't long after.

128

1        Q    Did you have any further contact with Mr.
2    Pellecchia that day?
3        A    No.
4        Q    You were apart from each other?
5        A    Yes.
6        Q    Why was that? Do you know why you were apart from
7    each other? Were you kept apart?
8        A    Yes. Like I said, I was in the front office and
9    Dan was in the -- when I left the kitchen, Dan was in the
10   office in the kitchen, and then right at that office
11   there's a door and Mr. Shelton's office is right off that
12   door. Maybe they went in there and I was still at the
13   front desk, but I didn't see Mr. Pellecchia go out the
14   front way, so I don't know where he went. He might have
15   went out the back way or the side door of Mr. Shelton's
16   office.
17       Q    Is that what you wanted, that you would be kept
18   separate at that point?
19       A    I didn't want to be kept separate. I didn't know
20   what was going on. I was so shooken up I couldn't think.
21   I just did what I was told. I was sitting there. There
22   was Linda, Ethel, and Rita, and they were just trying to
23   calm me down.
24       Q    Did you want to be in the same room as Mr.

**Page 125 to Page 128**

**133**

1  get to the bottom of this. I'm going to let you know what
2  happens and, believe me, Dan Pellecchia will be
3  disciplined for this."
4      I said, "Chris, I'm scared now.  If he gets fired,
5  he can come kill me.  No, no, he won't do that.  I'm
6  telling you everything will be all right.  He'll never be
7  back.  I told him he admitted putting his hands on you.
8  I'm going to his office, I'm going to straighten the whole
9  thing out," blah, blah, blah, and then I got home --
10     Q  Before you get home, what was Mr. Shelton's tone
11  of voice like during this conversation?
12     A  He felt bad and he was sincere about it, too.
13     Q  He was sympathetic towards you?
14     A  Yeah, he felt bad and I believed he really felt
15  bad.
16     Q  Was he saying anything to blame you for this in
17  any way?
18     A  No, I was trying to tell him how it started and he
19  was like no, I don't care how it started.  Nobody should
20  put their hands on anybody.
21     Q  He was talking about Mr. Pellecchia in this
22  instance?
23     A  Yes, and he was very upset about what Mr.
24  Pellecchia did.

**134**

1      Q  Did Mr. Shelton during that conversation say
2  anything that you perceived to be discriminatory towards
3  you about your being a woman?
4      A  I don't understand the question.  Who?  Mr.
5  Shelton?
6      Q  Yes.  In that conversation did he say anything bad
7  about you as a woman?
8      A  No.
9      Q  You said he let you go home with pay; true?
10     A  He told me go home and I'd be paid for the day.
11     Q  Am I correct that you were given 3 days off with
12  pay?
13     A  After I talked to Mr. Shelton, I went up to get my
14  stuff and Kim said, you know, "I talked to Chris and you
15  go home today and he feels you should take a couple of
16  days off because obviously you're very upset."  And I
17  said, "Okay," and she said, you know, she said, "Take
18  Monday, Tuesday, and Wednesday off."  And I said, "Okay."
19  And she said, "Don't worry.  We'll pay you.  Mr. Shelton's
20  very sorry and I'm sorry for what happened but go relax,
21  and we'll see you back in a few days."
22     Q  Did you have any problem with that, being given 3
23  days off with pay?
24     A  I was a little nervous because I didn't know why,

**135**

1  but then I thought that he just felt really bad and I
2  figured well, he's doing the best he can to resolve this
3  and I figured he wanted to get to the bottom of it before
4  I came back and solve everything as far as Bateman, or
5  whoever they were, and get everything.  With me being
6  there it would probably be best I wasn't.
7      Q  Did you feel that Mr. Shelton was being
8  sympathetic towards you, giving you 3 days off with pay?
9      A  He was very sympathetic.
10     Q  Do you know of anybody else at Gardenside that's
11  been given 3 days off with pay?
12     A  Not that I know of.
13     Q  Were you physically injured in this incident?
14     A  As far as bruises?
15     Q  Anything, whatever you consider an injury.
16     A  Well, the poking didn't tickle and the pushing
17  around didn't tickle.  I had a couple of tiny marks on my
18  arms just for a while, like red marks.  I didn't have
19  black and blues, just red marks.  I had poking just little
20  red marks, nothing that turned black and blue.  But I
21  couldn't move.  If God forbid I wasn't on the phone with
22  my mother, I don't know what could have happened.  I
23  couldn't move, so that's all I think of is God, thank God
24  I was on the phone because I couldn't expect any of the

**136**

1  kitchen people to jump in and help me.  I was just pinned.
2  I didn't like feeling -- I couldn't move.  He was so tall,
3  I just didn't like that feeling.  I was scared to death.
4      Q  But other than -- physically, other than the red
5  marks, you didn't suffer any physical injury in this
6  incident; did you?
7      A  No.
8      Q  You didn't seek any medical treatment as a result
9  of this incident?
10     A  No.
11     Q  Did you go home when I think it was Kim told you
12  to take the day off with pay?
13     A  Mm-hmm.
14     Q  You went home then?
15     A  Yeah, I made her walk me outside because I was
16  petrified, which she did.
17     Q  Did you drive home yourself?
18     A  Yes.
19     Q  What did you do when you went home?
20     A  I call my husband and I told him what happened,
21  and he told me to go directly to the police department and
22  have him arrested and, you know, "Don't fool around with
23  something like that because, you know, if he got fired and
24  if he did that to you, maybe he'll come after you.  I want

**Page 133 to Page 136**

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|

LAURI LABONIA    4

### EXHIBITS

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 1 | Computer Printout | 14 |
| 2 | Employment Application | 44 |
| 3 | Affidavit | 107 |
| 4 | Incident Report | 147 |
| 5 | Packet of Statements | 162 |
| 6 | Memo dated 12/13/00 | 179 |

---

206

STATE OF CONNECTICUT  :

                S.S. Wallingford

COUNTY OF NEW HAVEN    :

      I, Debra A. Chasse, a Notary Public for the State

of Connecticut, do hereby certify that the deposition of,

LAURI LABONIA, a witness, was taken before me pursuant to

Section 242, et seq., of the Connecticut Practice Book, at

The Law Offices of Bingham McCutchen, One State Street,

Hartford, CT, commencing at 10:03 a.m., on Wednesday,

March 26, 2003.

      I further certify that the witness was first sworn

by me to tell the truth, the whole truth, and nothing but

the truth, and was examined by counsel, and her testimony

stenographically reported by me and subsequently

transcribed as herebefore appears.

      I further certify that I am not related to the

parties hereto or their counsel, and that I am not in any

way interested in the event of said cause.

      Dated at New Haven, Connecticut, this 27th day of

March, 2003.

                        _____

                         Notary Public

My Commission Expires:  June 30, 2006
License No. 00055

Bonia vs Doran Associates, LLC, et al

7/30/2003

Laurie LaBonia

1          UNITED STATES DISTRICT COURT
              DISTRICT OF CONNECTICUT
2
           VOLUME III - Page 313 to 407
3

4    - - - - - - - - - - - - - -                    COPY
     LAURIE LABONIA
5    vs.                              No. 301CV2399(RNC)
     DORAN ASSOCIATES, LLC, et al
6    - - - - - - - - - - - - - -
7
8
9
10            DEPOSITION OF:  LAURIE LaBONIA
              DATE:  July 30, 2003
11            HELD AT:  FEDERAL COURTHOUSE,
              141 Church Street, New Haven, CT
12
13
14
15
16
17
18
19
20
21
22          Jayne Ciccotelli, LSR
       Brandon Smith Reporting Service, LLC
23            44 Capitol Avenue
            Hartford, CT  06106
24            (860) 549-1850
25

99d27928-4941-4b84-b2c6-5b622a0eb043

7/30/2003

LaBonia vs Doran Associates, LLC, et al

Laurie LaBonia

Page 319

1      A.    Okay.

2      Q.    -- so you want to give him time.  Third, and

3  really most importantly, at the end of this process, I

4  want to be certain and I want you to be certain that

5  you've had a chance to reflect carefully on every

6  single question that I put to you and --

7      A.    Okay.

8      Q.    -- you understand it, you hear it, you are

9  not distracted or angry or upset or confused and the

10  like and that your answer to each of my questions is

11  thoughtful and responsive.  Okay?

12      A.    Okay.

13      Q.    Finally, and to the same manner, if at any

14  point you need a break, other than when a question is

15  pending, please tell me.  I don't want you to be trying

16  to answer questions when you're fatigued or annoyed or

17  you have to use the ladies' room or the like.  Okay?

18      A.    Yes.

19      Q.    I want to go back in time to the commencement

20  of your employment with Garden Side Terrace.  I

21  understand that you began working for Garden Side in

22  January of the year 2000, correct?

23      A.    Yes.

24      Q.    How did you come to apply for employment with

25  Garden Side?

99d27928-4941-4b84-b2c6-5b622a0eb043

Laurie LaBonia

Page 322

1 A. Yes.

2 Q. With whom?

3 A. First Natale and then Robert Plaumann.

4 Q. And who is Robert Plaumann?

5 A. He was director of dining services at that

6 time.

7 Q. And by whom was he employed?

8 A. I think Bateman or Compass.

9 Q. And what was Bateman?

10 A. It was a food service.

11 Q. What, as of January of 2000, was your

12 understanding as to the relationship between Garden

13 Side and Bateman?

14 A. Just a food service people.

15 Q. Bateman was the food service people?

16 A. Right.

17 Q. Did you understand that you were going to be

18 employed by Garden Side?

19 A. Yes.

20 Q. As opposed to Bateman?

21 A. Yes.

22 Q. And were you employed by Garden Side?

23 A. Yes.

24 Q. Were you ever employed by Bateman?

25 A. No.

99d27928-4941-4b84-b2c6-5b622a0eb043

LaBonia vs Doran Associates, LLC, et al

7/30/2003

Laurie LaBonia

Page 323

1     Q.    Okay.  Who paid you for the work that you

2  performed while you were at Bateman, was it Bateman?

3     A.    No.  Garden Side Terrace.

4     Q.    Garden Side paid you.

5     A.    Or Doran Doran or whoever.

6     Q.    And who determined whether you would work

7  overtime or not, was it Garden Side?

8     A.    Chris Shelton, basically.

9     Q.    Who was the principal of Garden Side?

10    A.    Right.

11    Q.    Who determined whether you could have

12  vacation time?

13    A.    I guess Garden Side, Chris Shelton.

14    Q.    Who determined whether or not you'd be

15  promoted?

16    A.    Chris Shelton.

17    Q.    Who evaluated you both on a day-to-day basis

18  and formally?

19    A.    Chris Shelton.

20    Q.    Who, if anyone, was responsible for

21  disciplining you?

22    A.    Chris Shelton.

23    Q.    Who maintained the records of your hours

24  worked?

25    A.    I guess Garden Side Terrace.

Brandon Smith Reporting Service

Laurie LaBonia

Page 324

1      Q.    Who provided training, if anyone, while you

2    were employed there?

3      A.    Well, I didn't really need any training.

4      Q.    Okay.  So to your knowledge, you were

5    supervised and evaluated and ultimately promoted by

6    Garden Side Terrace and Bateman had nothing to do with

7    that, correct?

8      A.    Correct.

9      Q.    At some point in time, a man by the name of

10   Dan Pellechia commenced employment with Bateman and was

11   assigned to the Garden Side facility; is that correct?

12     A.    Mm-hmm.  It was supposed to be temporary.

13     Q.    When was he first assigned to that facility?

14     A.    I know he worked up the hill at Branford

15   Hills and he was just coming to fill in down the hill,

16   that's what I was told.

17     Q.    Now, recalling that you had an altercation

18   with Mr. Pellechia on November 3 of 2000, correct?

19     A.    Right.

20     Q.    How many days or weeks prior to that

21   confrontation did he start his assignment at the Garden

22   Side facility?

23     A.    I'm not sure, it could have been the

24   beginning of October, I don't know.  At that point, I

25   don't know.

99d27928-4941-4b84-b2c6-5b622a0eb043

Laurie LaBonia

Page 326

1    they had paper work every month they had to do.

2         Q.    Related to the ordering of food --

3         A.    Right.

4         Q.    -- the supervision of the kitchen staff?

5         A.    What went out in the kitchen, how many meals,

6    I guess, or whatever.

7         Q.    And I take it that Pellechia did the same

8    thing as Plaumann?

9         A.    I guess.

10        Q.    Their roles were no different, as far as you

11   could observe?

12        A.    I don't think so.  I never really paid

13   attention.

14        Q.    Pellechia did not supervise you, did he?

15        A.    No.

16        Q.    Do you know who Pellechia's supervisor was at

17   Bateman?

18        A.    I know he's out of Rhode Island.  I can't

19   remember his name.

20        Q.    Did you ever meet him?

21        A.    Yes.  I can't remember his name.

22        Q.    On how many occasions did you meet him?

23        A.    I'm not sure how many.  He popped in and out.

24   A lot.  George, George Sulliulite [phonetic].  I don't

25   know.  Begins with an "S," maybe.  I can't remember his

Brandon Smith Reporting Service

99d27928-4941-4b84-b2c6-5b622a0eb043

Case 3:01-cv-02399-MRK    Document 58    Filed 11/03/2003    Page 24 of 31
7/30/2003
LaBo    vs Doran Associates, LLC, et al

Laurie LaBonia

Page 326

1    they had paper work every month they had to do.

2        Q.    Related to the ordering of food --

3        A.    Right.

4        Q.    -- the supervision of the kitchen staff?

5        A.    What went out in the kitchen, how many meals,

6    I guess, or whatever.

7        Q.    And I take it that Pellechia did the same

8    thing as Plaumann?

9        A.    I guess.

10        Q.    Their roles were no different, as far as you

11    could observe?

12        A.    I don't think so.  I never really paid

13    attention.

14        Q.    Pellechia did not supervise you, did he?

15        A.    No.

16        Q.    Do you know who Pellechia's supervisor was at

17    Bateman?

18        A.    I know he's out of Rhode Island.  I can't

19    remember his name.

20        Q.    Did you ever meet him?

21        A.    Yes.  I can't remember his name.

22        Q.    On how many occasions did you meet him?

23        A.    I'm not sure how many.  He popped in and out.

24    A lot.  George, George Sulliulite [phonetic].  I don't

25    know.  Begins with an "S," maybe.  I can't remember his

99d27928-4941-4b84-b2c6-5b622a0eb043

Page 330

1          Q.     You were terminated by Garden Side on or

2     about December 14 of the year 2000, correct?

3          A.     Right.

4          Q.     How did you first learn of that?

5          A.     On the telephone.

6          Q.     Who called you?

7          A.     Jean Raveis.

8          Q.     By whom was she employed at that time?

9          A.     Bateman.

10         Q.     Bateman or Garden Side?

11         A.     Bateman.

12         Q.     And what was her role at Bateman?

13         A.     She did the same thing Dan Pellechia did and

14    Robert Plaumann.

15         Q.     So she succeeded Pellechia?

16         A.     Yes.

17         Q.     What did she say to you in that telephone

18    conversation?

19         A.     Her exact words, Hi, Laurie, how ya doin',

20    how ya feelin'.  Fine.  I was sleeping.  Well,

21    something you don't need to come to work today because

22    you've been terminated.  I don't know the exact things,

23    your paychecks, your monies -- and I asked her why I

24    got terminated and she said that I would get a

25    registered letter in the mail telling me why, and that

99d27928-4941-4b84-b2c6-5b622a0eb043

Case 3:01-cv-02399-MRK  Document 58  Filed 11/03/2003  Page 26 of 31
7/30/2003
LaBonia vs Doran Associates, LLC, et al

Laurie LaBonia

Page 354

1      A.   Right.

2      Q.   You and he have some conflict, right?

3      A.   I, I don't know if you want to call it

4  conflict, just he was -- I was in charge of the wait

5  staff, he was in charge of the kitchen.

6      Q.   You and he had some interaction that in part

7  caused you some anxiety?

8      A.   Right.

9      Q.   After you had that anxiety, did either

10  Compass Group or Bateman take any adverse employment

11  action toward you because of your anxiety?

12      A.   No.

13      Q.   Did Pellechia take any adverse employment

14  actions against you because of your anxiety?

15      A.   Well, he couldn't, he wasn't in charge of me.

16      Q.   Did Dan Pellechia compel or require anybody

17  to discriminate against you in any fashion?

18      A.   Discriminate me?  I...

19      Q.   Treat you badly because of your physical or

20  mental circumstances or because of your gender.  Did he

21  compel anybody or put anybody up to treating you badly

22  because of either of those factors?

23      A.   No, I think he did that all by himself.

24      Q.   During the period of time, which is to say

25  the last month or so of your employment when you had

Brandon Smith Reporting Service



99d27928-4941-4b84-b2c6-5b622a0eb043

Case 3:01-cv-02399-MRK   Document 58   Filed 11/03/2003   Page 27 of 31
7/30/2003
LaBot vs Doran Associates, LLC, et al

Laurie LaBonia

Page 360

1    you have a nice day, I mean.

2        Q.   And that caused you extreme emotional upset?

3        A.   Yeah, I thought it was rude.

4        Q.   I'm not asking you if you thought it was

5    rude, did it cause you extreme emotional upset?

6        A.   Yes, I thought it was very unprofessional and

7    very sarcastic and, yes, it bothered me a lot.

8        Q.   Did you seek any kind of psychiatric,

9    mental-health treatment as a result of that

10   conversation with Jean Raveis?

11       A.   No.

12       Q.   Did you ever engage any kind of mental health

13   clinician to treat anything that you might be

14   experiencing after December 14 of 2000?

15       A.   No.

16       Q.   So you have not seen any kind of mental

17   health clinician -- I'm sorry, strike that.

18            You have not seen or communicated with any

19   kind of mental health clinician since --

20       A.   Doctors, you're talking about?

21       Q.   Any -- have you sought any kind of treatment

22   for any kind of emotional or psychiatric upset since

23   December 14 of 2000?

24       A.   After December 14, yes, I was having anxiety

25   attacks and I seen my doctor, was on medication for

99d27928-4941-4b84-b2c6-5b622a0eb043

LaBonia vs Doran Associates, LLC, et al

7/30/2003

Laurie LaBonia

Page 361

1    them.

2        Q.    Okay.   Other than getting medication from

3    your general practitioner for the anxiety attacks, did

4    you seek any other kind of treatment for any other

5    emotional upset after December 14 of 2000?

6        A.    No.

7        Q.    And your general practitioner's name, again,

8    please.

9        A.    I have to give you a whole list because it's

10   whoever's at Yale Health Plan at the time.

11       Q.    Did you ever speak with anybody at the Yale

12   Health Plan specifically about the conversation you had

13   with Jean Raveis when she communicated to you your

14   termination?

15       A.    No.   Oh, my doctor.

16       Q.    You did?

17       A.    Yes.

18       Q.    You told your doctor about that conversation?

19       A.    Yeah.

20       Q.    You sure about that?

21       A.    Yeah.   I told my doctor a lot of things.

22       Q.    That would be recorded in his or her notes?

23       A.    I don't think they write everything down.

24       Q.    But you're certain that --

25       A.    He'd have to be there a long time.

99d27928-4941-4b84-b2c6-5b622a0eb043

Laurie LaBonia

Page 374

1    treatment for the weight loss?

2        A.    No.

3        Q.    Did the sleep deprivation lead to any other

4    harm or injury in your life?

5        A.    Well, I wasn't very well-rested in the course

6    of my day with a child, a husband and a house.  I mean,

7    when someone doesn't sleep, your day isn't very good.

8        Q.    And that went on for a couple of months

9    before it abated, before it stopped?

10       A.    Right.  And I probably will tonight after

11   this, remembering all this will probably be another two

12   weeks.  And the last deposition was about the whole

13   month after that one.

14       Q.    With respect to the incident that occurred

15   where you allege that Mr. Pellechia put his hands on

16   you at the workplace on November 3 of the year 2000, do

17   you have any evidence, do you have any reason to

18   believe that Mr. Pellechia had planned to have that

19   physical confrontation with you that day?

20       A.    No.  If I did, I wouldn't have gone to work

21   that day.

22       Q.    But in retrospect, do you believe that that

23   was something he planned to do or that he just got

24   angry and did it?

25       A.    I think -- I don't think he planned it.  How

Brandon Smith Reporting Service

LaBonia vs Doran Associates, LLC, et al

7/30/2003

Laurie LaBonia

Page 375

1    would I know if he planned it?  I can't read minds.  I

2    mean, I don't know if he --

3         Q.    No, but just listen.  If -- and this is what

4    lawyers do, we try to find out what your case is.  I'm

5    just trying to find out what your case is.  It's

6    possible, theoretically possible that someone came to

7    you and said I saw a letter that Dan Pellechia sent to

8    a friend and the friend brought me the letter and I

9    recognized Pellechia's handwriting and he talked about

10   how he planned to attack you, you could have evidence

11   that he planned to attack you, and I'm asking you, do

12   you have any evidence --

13        A.    No.

14        Q.    -- that leads you to believe that Dan

15   Pellechia planned to attack you on that day?

16        A.    No.

17        Q.    And you don't believe he did plan it, right?

18        A.    No.  I would hope not.

19        Q.    Just so your answer is clear in relation to

20   my question, it is your testimony that you don't

21   believe Dan Pellechia planned to attack you, correct?

22        A.    Correct.

23        Q.    You don't believe that anybody at Bateman or

24   Compass asked him or encouraged him to attack you,

25   correct?

Brandon Smith Reporting Service

LaBonia vs Doran Associates, LLC, et al

7/30/2003

Laurie LaBonia

Page 379

1    decision, correct?

2         A.   Right.

3         Q.   And you don't know exactly why the decision

4    was made to terminate you, correct?

5         A.   Yeah, I have a letter stating why they

6    terminated me, a registered letter.

7         Q.   Other than what's contained in that letter,

8    do you know why you were terminated?

9         A.   I think it was because I called the cops,

10   that's my opinion.

11        Q.   With respect to Mr. Pellechia's putting his

12   hands on you on that day in November of the year 2000,

13   you testified in your last deposition that you didn't

14   seek any medical treatment for that, correct?

15        A.   After the physical, after he touched me, no.

16        Q.   And you've never sought any kind of treatment

17   for or arising from his confrontation with you,

18   correct?

19        A.   Just from the anxiety.

20        Q.   You've had anxiety at different points in

21   your life stemming from different reasons, correct?

22        A.   Yes.

23        Q.   You were treated for anxiety before you had

24   any confrontation with Mr. Pellechia, correct?

25        A.   Yes.

99d27928-4941-4b84-b2c6-5b622a0eb043