LaBonia vs Doran Associates, LLC, et al

7/30/2003

Laurie LaBonia

Page 379

1    decision, correct?

2        A.    Right.

3        Q.    And you don't know exactly why the decision

4    was made to terminate you, correct?

5        A.    Yeah, I have a letter stating why they

6    terminated me, a registered letter.

7        Q.    Other than what's contained in that letter,

8    do you know why you were terminated?

9        A.    I think it was because I called the cops,

10   that's my opinion.

11       Q.    With respect to Mr. Pellechia's putting his

12   hands on you on that day in November of the year 2000,

13   you testified in your last deposition that you didn't

14   seek any medical treatment for that, correct?

15       A.    After the physical, after he touched me, no.

16       Q.    And you've never sought any kind of treatment

17   for or arising from his confrontation with you,

18   correct?

19       A.    Just from the anxiety.

20       Q.    You've had anxiety at different points in

21   your life stemming from different reasons, correct?

22       A.    Yes.

23       Q.    You were treated for anxiety before you had

24   any confrontation with Mr. Pellechia, correct?

25       A.    Yes.

Brandon Smith Reporting Service

99d27928-4941-4b84-b2c6-5b622a0eb043

LaBonia vs Doran Associates, LLC, et al

7/30/2003

Laurie LaBonia

Page 381

1      A.    They're all different so I don't -- every
2   anxiety attack is different whether it's -- I don't --
3   I mean, I can't say I had good ones prior to the year
4   2000, bad ones --

5      Q.    I'm not asking that.  When last were you
6   treated in any fashion for an anxiety issue?

7      A.    Last winter I was treated, awhile back, a
8   couple months ago.

9      Q.    And what caused that anxiety, do you have any
10  sense?

11     A.    They say it's from stress or nervousness or.

12     Q.    What was the life situation that precipitated
13  that anxiety attack, what was going on in your life
14  that caused that anxiety attack a couple months ago?

15     A.    Mr. Cohen.

16     Q.    The deposition?

17     A.    Yes.  Just everything and.

18     Q.    But prior to that --

19     A.    And you, too, because you were there.  You
20  were whispering in each other's ears so it was you,
21  too, just to let you know that.

22     Q.    Just focusing on the anxiety issue now, prior
23  to your being deposed by Mr. Cohen, when last before
24  that did you have any kind of anxiety issue that
25  required treatment?

LaBonia s Doran Associates, LLC, et al

Page 382

1        A.    I don't know.   I don't keep track of them.

2    I'm sure I had a couple.   I don't keep track of them.

3    You'd have to get that on my medical records, but I've

4    had them.   I can't tell you how many, what month, what

5    day, but they're all on my medical records, I think.

6        Q.    Generally speaking, was the year 2001 a

7    healthy year for you?

8        A.    I don't know what you consider "healthy"?

9        Q.    I'm asking you.

10        A.    Did I get diagnosed with cancer or anything,

11    no, so I guess yes.

12        Q.    Was your life fairly normal and good in the

13    year 2001?

14        A.    Except for anxiety attacks, stressful, I'm

15    not dying or anything so I guess -- I just, I don't

16    know what you mean by that, actually.

17        Q.    Well, was your life generally healthy and

18    good in the year 2002?

19        A.    I think 2002, yeah, I still get -- yeah, I

20    guess.

21        Q.    Was your life better in terms of health,

22    emotional and physical health, was your life better in

23    2002 than it had been in 2001?

24        A.    I don't know.   What do you mean, physically?

25    mentally?

99d27928-4941-4b84-b2c6-5b622a0eb043

LaBonia vs Doran Associates, LLC, et al

7/30/2003

Laurie LaBonia

Page 383

1    Q.    Both.

2    A.    I don't know.  I still, I still don't

3    understand the question.

4    Q.    It's just a very general question of the

5    state of your physical and emotional health in the year

6    2002 as compared to physical and emotional health in

7    the year 2001.  Were they about the same, were they

8    different, which year was better?

9    A.    They're getting better.  I don't, I don't

10   know if this year is better.  Not after today it's not,

11   though.

12   Q.    Did the experience you had with

13   Mr. Pellechia, and I mean the entire experience

14   including the physical confrontation, cause you

15   physical problems of any kind?

16   A.    Yeah, I, I fear, fear --

17   Q.    Physical problems, not emotional, did it

18   cause you any physical problems.

19   A.    Oh.  No.

20   Q.    Did it cause you any emotional problems?

21   A.    Yes.

22   Q.    What were they or are they?

23   A.    Well, I fear conflict, anybody who raises

24   their voice or I tend to, I should say, not have a

25   backbone.  I fear like confrontation -- I can't explain

99d27928-4941-4b84-b2c6-5b622a0eb043

LaBonia vs Doran Associates, LLC, et ar

7/30/2003

Laurie LaBonia

```
 1                    C E R T I F I C A T E

 2

 3            I, Jayne Ciccotelli, duly qualified Notary

 4    Public, in and for the State of Connecticut, do hereby

 5    certify that pursuant to notice there came before me on

 6    the 30th day of July 2003, the following named person,

 7    to wit:  LAURIE LaBONIA, who was by me duly sworn to

 8    testify to the truth and nothing but the truth; that

 9    she was thereupon carefully examined upon her oath and

10    her examination reduced to print under my supervision;

11    that this deposition is a true record of the testimony

12    given by the witness.

13            I further certify that I am neither attorney

14    nor counsel for nor related nor employed by any of the

15    parties to said action, in which this deposition is

16    taken.  And further, that I am not a relative or

17    employee of any attorney or counsel employed by the

18    parties hereto, or financially interested in this

19    action.

20            IN WITNESS THEREOF, I have hereunto set my

21    hand and affixed my seal this 6th day of August, 2003.

22

              Jayne Ciccotelli, LSR No. 215

23            Court Reporter - Notary Public

              My Commission expires: 3/31/06

24

25
```

Brandon Smith Reporting Service

99d27928-4941-4b84-b2c6-5b622a0eb043

1

1    UNITED STATES DISTRICT COURT

2    DISTRICT OF CONNECTICUT

3

4

5    ------------------------x

6    LAURIE LABONIA,                :

7              Plaintiff,      :

8        -versus-             : No. 3:01CV2399(MRK)

9    DORAN ASSOCIATES, ET. AL.,:

10             Defendants.   :

11   ------------------------x

12

13             Deposition of DAN PELLECCHIA, taken

14   pursuant to Federal Rules of Civil Procedure, at the

15   law offices of Williams and Pattis, LLC, New Haven,

16   Connecticut, before Jacqueline McCauley, RPR/CSR, a

17   Notary Public in and for the State of Connecticut, on

18   October 3, 2003, at 11:00 a.m.

19

20

21

22

23

24

25

2

1    **A P P E A R A N C E S:**

2            <u>For the Plaintiff:</u>

3        WILLIAMS AND PATTIS, LLC
         51 Elm Street, Suite 409
4        New Haven, Connecticut 06510
         By:  JOHN R. WILLIAMS, Esq.
5

6            <u>For the Defendant Bateman Food Service &</u>
         <u>Mr. Pellecchia:</u>
7

8        BINGHAM DANA LLP
         One State Street
         Hartford, Connecticut 06103-3178
9        By:  DAVID CASEY, Esq.

10

11           <u>For the Defendants Gardenside Terrace &</u>
         <u>Christian B. Shelton:</u>

12       LETIZIA, AMBROSE & COHEN, P.C.
         One Church Street
13       New Haven, Connecticut  06510
         By:  ANDREW A. COHEN, Esq.
14

15

16   **A L S O      P R E S E N T:**

17       Christian Shelton
         George Sottile
18

19

20

21

22

23

24

25

24

1          Q.   Your duties never changed during that

2     entire period?

3          A.   Can you be more specific?

4          Q.   Well, actually I should say it in a

5     different way.  Did your day-to-day duties change at

6     any time during the period you were employed there?

7          A.   No.

8          Q.   Now, do you know Laurie Labonia?

9          A.   Yes.

10         Q.   How do you know her?

11         A.   From working at Gardenside Terrace.

12         Q.   What was her position at Gardenside

13    Terrace as you understood it?

14         A.   She was a waitress.

15         Q.   Did she have any position or duties other

16    than waitress to your knowledge?

17         A.   I'm not sure.

18         Q.   Were you her immediate supervisor?

19         A.   No.

20         Q.   Do you know who was her immediate

21    supervisor?

22         A.   No.

23         Q.   What was your, the nature of your business

24    relationship with her, if any?

25         A.   Can you be more specific?

1    offered you this job?

2           A.   Which job?

3           Q.   This temporary position that you held for

4    a year.

5                MR. CASEY:   Objection.   I don't

6    think that's his testimony.   There are two different

7    facilities.   There's the home and then there's the

8    Gardenside Terrace.

9           Q.   Why don't you tell us the difference?

10          A.   As I understand it, Branford Healthcare

11   Center and Gardenside Terrace are both owned by the

12   Sheltons or whatever group they fall under.   If the

13   contract ended at Branford Healthcare Center, there

14   was a need for a manager at Gardenside Terrace.   There

15   wasn't any permanent position available for me and an

16   opportunity existed for me to continue employment with

17   Compass in an interim basis at Gardenside Terrace.   So

18   I was asked to go down to Gardenside Terrace and help

19   out and oversee the operation in the kitchen.

20          Q.   How long did you hold that position?

21          A.   Approximately two months.

22          Q.   All right.   In which position was it that

23   you dealt with Laurie Labonia?

24          A.   The position at Gardenside Terrace.

25          Q.   Now, when you say that you were told that

1    answer.

2            A.   Yes.

3            Q.   But you didn't; is that correct?

4                 MR. CASEY:   Objection.

5            A.   Didn't what?

6            Q.   Report to work at that facility the next

7    morning.

8            A.   No.

9            Q.   And the reason you didn't was because of

10   something Mr. Sottile had told you?

11           A.   Yes.

12           Q.   Over the telephone?

13           A.   Yes.

14           Q.   Describe the incident with Ms. Labonia.

15           A.   Can you be more specific?

16           Q.   Tell us exactly what happened from your

17   perspective.

18           A.   It's been a while so I'm not sure exactly

19   what happened, but the initial outcome was a

20   conversation that she and I had about the temperature

21   in the kitchen and when I went to show her that it

22   wasn't as hot as she thought it to be by pointing to

23   the thermostat, she reacted.

24           Q.   In what way?

25           A.   She had thought that I had touched her and

```
 1              Q.   Except for complaining to those two

 2    gentlemen did you complain to anybody else about

 3    Laurie Labonia?

 4              A.   No.

 5              Q.   Did you ever reprimand Laurie Labonia

 6    other than what you've already told us about?

 7                        MR. CASEY:   Objection.

 8              A.   I wasn't in a position to do that.

 9              Q.   All right.   Was it your understanding that

10    she reported to you?

11              A.   No.

12              Q.   Was it your understanding that she did not

13    report to you?

14              A.   It was unclear.

15              Q.   Did you ever request clarification from

16    anyone on that topic?

17              A.   No.

18              Q.   Were you ever aware of anyone making any

19    complaints about you while you were at Gardenside

20    Terrace?

21              A.   I don't recall.

22              Q.   Were you ever aware of anyone making any

23    complaints about you while you were at the Branford

24    facility?

25              A.   Yes.
```

# CERTIFICATE

I hereby certify that I am a Notary Public, in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to print under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor related to either of the parties to said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this _____9_____ day of ___October___, 2003

_____
NOTARY PUBLIC

My Commission Expires:
5/2005

## BATEMAN AGREEMENT

THIS AGREEMENT, made this *18* day of August, 1999, by and between DORAN ASSOCIATES, LLC, a Connecticut corporation, with principal offices located at 173 Alps Road, Branford Connecticut, 06405 d/b/a/ Gardenside Terrace (hereinafter referred to as "Client"), and COMPASS GROUP USA, INC., by and through its BATEMAN division, a Delaware corporation, with principal offices at 2400 Yorkmont Road, Charlotte, North Carolina 28217 (hereinafter referred to as "Bateman").

### WITNESSETH:

WHEREAS, Client desires to avail itself of Bateman's food services; and

WHEREAS, Bateman desires to perform such services for Client;

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, the parties hereto, intending to be legally bound, hereby agree as follows:

SECTION 1.  CLIENT'S GRANT TO BATEMAN

Client grants to Bateman, as an independent contractor, the exclusive right to operate a contract food service at the following described premises:  173 Alps Road, Branford, Connecticut (hereinafter referred to as "Premises"), and the exclusive right to sell to employees, guests, and other persons at such Premises, food products, non-alcoholic beverages, and other such articles ("Products") as shall be approved by the Client (hereinafter referred to as "Services").

SECTION 2.  BATEMAN'S RESPONSIBILITIES

A.    Pursuant to the provisions of this Agreement, Bateman will operate and manage its Services hereunder at the Premises and keep its Services adequately serviced and supplied with appropriate merchandise.

B.    Bateman agrees to pay all Federal, state and local taxes which may be assessed against Bateman's equipment or merchandise while in or upon the Premises, as well as all Federal, state and local taxes assessed in connection with the operation of its Services upon the Premises.  Bateman also agrees to comply with all Federal, state and local laws and regulations governing the preparation, handling, and serving of foods, and to procure and keep in effect all necessary licenses, permits, and food handler's cards required by law, and to post such permits within the service areas in a prominent place as required by law.  All costs in connection with such taxes (excluding Client's real estate and personal property taxes referred to in Section 3), licenses, permits, and food handler's cards, shall be a Cost of Business and will be charged to the operation of the business. Bateman agrees to comply with applicable Federal, state and local laws and regulations pertaining to wages and hours of employment.

C.     Bateman shall hire all employees necessary for the performance of this Agreement.    Upon being hired, such employees shall be subject to such health examination as proper city, state, or Federal authority may require in connection with their employment. All persons employed by Bateman will be the employees of Bateman, and not of the Client. Bateman agrees that no employees of the Client will be hired by Bateman without written permission of the Client for a period of six (6) months after the termination of their employment with Client. Bateman, in performing work required by this Agreement, shall not discriminate against any employee or applicant for employment because of race, creed, sex, color, national origin, or age, in violation of Federal, state or local law.

D.     Bateman shall perform all necessary mopping/vacuuming of the floors in the dining rooms and kitchen areas.  Client shall be responsible for cleaning walls, windows and electric light fixtures. Bateman agrees to maintain conditions of sanitation and cleanliness. Bateman further agrees that Bateman's facilities and services, as well as the food prepared by Bateman, shall at all times be subject to inspection by an authorized, capable person or persons designated by the Client.

E.     All records shall be kept on file by Bateman for a period of three (3) years from the date the record is made, and Bateman shall, upon reasonable notice, give the Client or his authorized representative the privilege at a reasonable time of inspecting, examining and auditing, during normal business hours, such of Bateman's business records which are directly relevant to the financial arrangements set forth in Exhibit A. The cost of such inspection, examination, and audit will be at the sole expense of the Client and such inspection, examination and audit shall be conducted at the Bateman locations where said records are normally maintained.

F.     Bateman agrees that Bateman's employees and agents shall comply with and observe all applicable rules and regulations concerning conduct on the Premises which Client imposes upon Client's employees and agents.

SECTION 3.   CLIENT'S RESPONSIBILITIES

A.     Client shall, without cost to Bateman, provide Bateman with the necessary space for the operation of said Services, and shall furnish, without cost to Bateman, all utilities and facilities reasonable and necessary for the efficient performance of this Agreement by Bateman, including but not limited to the following:  heat, hot and cold water, steam, gas, lights and electric current, garbage removal services, exterminator services, sewage disposal services, office space and equipment, telephone service and modem line.

B.     Client shall, at its own cost and expense, provide all food equipment, facilities and floor space, as mutually agreed between Client and Bateman, necessary to the efficient operation, transporting, and control of Bateman's Services. The Client will maintain, repair, and replace said equipment and facilities at its own expense, and the

Client shall keep such equipment and facilities maintained in a safe operating condition such that no Bateman employee is exposed to or subjected to any unsafe situation which would violate the Occupational Safety and Health Act, including but not limited to, the general duty and the specific duty clauses thereof, or any other similar Federal, state or local law or regulation; provided, however, if equipment provided by Client becomes inoperative, hazardous or inefficient to operate, Bateman shall have the right to effect repairs or replacements at the expense of the Client, if the Client fails to do so after a reasonable amount of time after notice of said equipment deficiency. Client shall permit Bateman to have the use of all such equipment and facilities in the performance of its obligations hereunder, subject to the duty to exercise reasonable care in the use thereof. Bateman agrees that all equipment and items of equipment now or hereafter furnished by the Client to Bateman are the sole property of the Client, and Bateman agrees not to change, deface, or remove any symbol or mark of identity upon said equipment or items of equipment furnished by the Client.

C.    Client shall either provide Bateman at no expense to Bateman with a starting inventory of food and supplies necessary to provide the Services hereunder or shall provide payment to Bateman for the purpose of purchasing the same.

D.    The Client will be responsible for all necessary cleaning of walls, windows, and electric light fixtures at no cost to Bateman.

E.    The parties agree that they will not hire or permit the employment of any employees of the other party providing services under this Agreement, in position in any of a party's parents, subsidiaries' or affiliates' locations, without prior written permission of the other party, any professional or management employees of a party within the earlier of one (1) year after such employee terminates employment with a party or within one (1) year after the termination of this Agreement.  The parties agree that the employees have acquired special knowledge, skills and contacts as a result of being trained by their respective employers. If a party violates this provision, it is agreed that the breaching party shall pay to the non-breaching party as liquidated damages an amount equal to three (3) times the annual salary of any such employee hired by the other party for each occasion or occurrence on which this provision is breached, plus attorney's fees and any and all costs associated with the enforcement of this provision. Client shall not impose any regulation on Bateman's employees not imposed on Client's employees.

F.    Client shall pay all real estate taxes with respect to the Premises, and Client shall pay all personal property taxes and similar taxes with respect to Client's equipment located on the Premises.

SECTION 4.  FINANCIAL ARRANGEMENTS
The financial arrangements of this Agreement are set forth in Exhibit A which is attached hereto, incorporated herein and made a part hereof as if fully set forth in this Agreement.

SECTION 5.  INDEMNIFICATION; INSURANCE

A.    Bateman shall indemnify Client against any physical damage to tangible property, bodily injury, sickness or death caused by Bateman's negligent acts or omissions or the negligent acts or omissions of Bateman's agents or employees arising out of the consumption or use of the Products sold; provided, however, that nothing contained herein shall require Bateman to indemnify Client for acts or omissions arising out of the negligence of Client, its agents or employees.

B.    Bateman's obligation to hold the Client harmless pursuant to this Agreement shall be dependent upon Client promptly notifying Bateman in writing of any such claims or lawsuits against either Bateman or Client, but in no event later than ten (10) days after the date the Client first received notice of such claim or lawsuit, and, forwarding to Bateman the summons, complaint and all other documents which relate to said claim or lawsuit no later than ten (10) days after the date the Client was served with such documents. Failure of Client to notify Bateman of any such claim or lawsuit within said ten (10) day period shall relieve Bateman of any and all responsibility and liability under this Agreement to indemnify and hold Client harmless. Client will cooperate with Bateman and do nothing to prejudice Bateman's rights without Bateman's written permission.

C.    In order to secure Bateman's obligation to indemnify the Client, Bateman shall procure and maintain the following insurance:

(1)    Should a vehicle be required for the provision of Services under this Agreement, then Bateman shall procure Comprehensive Automobile Bodily Injury Liability and Property Damage Liability Insurance, with combined single limits of Two Million ($2,000,000) Dollars;

(2)    Comprehensive General Liability and Property Damage Liability Insurance, with combined single limits of One Million Dollars ($1,000,000).

Bateman shall, if requested, furnish Client a Certificate of Insurance evidencing such coverage as respects Bateman's operation on the Premises. The cost of the above insurance will be a Cost of Business and shall be charged to the operation of the business.

D.    Bateman will procure Worker's Compensation and employee liability insurance to cover its employees at the Premises.

E.    Bateman and Client mutually agree that they will keep their respective property insured and will waive rights of subrogation of their respective insurance companies to recover losses from the other party. Bateman and Client further agree to waive their rights of recovery from each other for deducted or self-insured property losses.

## SECTION 6.   COMMENCEMENT AND TERMINATION

This Agreement shall become effective as of the 1st day of September, 1999, and shall remain in force for five (5) year(s) unless sooner terminated as herein provided.  It shall thereafter renew itself automatically for similar periods until notice of termination in writing is given by either party as provided herein.

Either party may terminate this Agreement with or without cause by providing notice of said termination in writing sixty (60) days prior to the proposed termination date.  Examples of "for cause" termination include, but are not limited to, failure to pay any amounts when due or a material breach of any of the provisions of this Agreement.  However, in the event the Client terminates this Agreement without cause before the one year anniversary date of this Agreement, the Client shall reimburse Bateman the amount of its projected profits before operating expenses ("PBO") as outlined in Exhibit B.

If either party shall refuse, fail or be unable to perform or observe any of the terms or conditions of this Agreement for any reason other than Excused Performance reasons stated in Section 9 hereof, the party claiming such failure shall give the other party a written notice of such breach.  If, within thirty (30) days from such notice the failure has not been corrected, the injured party may cancel the Agreement effective sixty (60) days after the end of said thirty (30) day period.

The parties further agrees that if, upon written notification by either party, that Bateman's Services are not returning a fair and equitable profit, or Client's costs exceed expectations, and the parties fail to agree upon new financial arrangements satisfactory to both parties within thirty (30) days of said notification, this Agreement may thereupon be terminated by a party effective ten (10) days after the end of said thirty (30) day period.

Bateman may terminate this Agreement at any time or if Client fails to pay when due the full amount of any amounts owed under this Agreement.

Upon the termination or expiration of this Agreement, Bateman shall, as soon thereafter as is feasible, vacate all parts of the Premises occupied by Bateman, where applicable, remove its vending machines and equipment, and return the Premises to Client, together with all the equipment furnished by the Client pursuant to this Agreement, in the same condition as when originally made available to Bateman, excepting reasonable wear and tear and fire and other casualty loss.

The termination of this Agreement shall not affect the rights, privileges, liabilities and/or responsibilities of the parties as they exist as of the effective date of termination and the parties shall cooperate fully with each other during the term of the contract and subsequent to the termination in order to ascertain and satisfy the liabilities of either party to the other.

## SECTION 7.   INDEPENDENT CONTRACTOR RELATIONSHIP

It is mutually agreed and understood that an independent contractor relationship be and is hereby established under the terms and conditions of this Agreement, that employees of Bateman are not nor shall they be deemed to be employees of Client and that employees of Client are not nor shall they be deemed to be employees of Bateman.

## SECTION 8.   BATEMAN'S TITLE TO EQUIPMENT

Where applicable, all equipment owned, purchased or leased and installed by Bateman pursuant to the provisions of this Agreement is and shall at all times remain the property of Bateman, with title vested in Bateman, and Client shall have no property interest in said equipment.

## SECTION 9.   EXCUSED PERFORMANCE

In case performance of any terms or provisions hereof (other than the payment of monies) shall be delayed or prevented because of compliance with any law, decree, or order of any governmental agency or authority, either local, state, or federal, or because of riots, war, public disturbances, strikes, lockouts, differences with workmen, fires, floods, Acts of God, or any other reason whatsoever which is not within the control of the party whose performance is interfered with and which, by the exercise of reasonable diligence said party is unable to prevent, the party so suffering may at its option suspend, without liability, the performance of its obligations hereunder (other than the payment of monies) during the period such cause continues, and extend the term of this Agreement for the period of such suspension of the performance of duties hereunder.

## SECTION 10.        PROPRIETARY AND CONFIDENTIAL INFORMATION

During the term of this Agreement, the parties may have access to or acquire proprietary and confidential information relating to the other party's business, including, but not limited to, information on finances, pricing, potential and present customers, policy manuals, proprietary trade secrets, menus, recipes, guidelines and procedures, surveys, other data, compilations, techniques, financial data, trade secrets that are not generally known to the public, as well as computer software and programs relating to the provision of the Services and finances of the parties (collectively, the "Proprietary and Confidential Information").    The parties acknowledges that the Proprietary and Confidential Information of a party is solely the property of that party and constitutes trade secrets and confidential information of that party, and the other parties' knowledge of the Proprietary and Confidential Information enables the other party to cause irreparable harm upon the disclosure of such Proprietary and Confidential Information. The parties shall not use or appropriate for its own behalf or disclose or communicate, directly or indirectly, any Proprietary and Confidential Information of the other party to any individual, firm, company, or other entity or person in any manner whatsoever.  The parties and their employees shall not copy or reproduce in any media or remove from the Premises any Proprietary and Confidential Information, and the parties shall take all steps required by the other party to protect such Proprietary and Confidential Information.  The

terms and provisions of this Section Ten shall survive the termination of the Agreement. Upon the termination of the Agreement, the parties shall immediately terminate the use of any and all Proprietary and Confidential Information, including any computer software programs, and the parties shall return any and all Proprietary and Confidential Information to the other party immediately upon the termination.

SECTION 11.         ASSIGNMENT

        Neither Bateman nor Client may assign or transfer this Agreement, or any part thereof, without the written consent of the other party.

SECTION 12.         ENTIRE AGREEMENT: WAIVER

        This Agreement constitutes the entire Agreement between the parties with respect to the provision of Bateman's Services, and there are no other or further written or oral understandings or agreements with respect thereto. No variation or modification of this Agreement and no waiver of its provisions shall be valid unless in writing and signed by the duly authorized officers of Bateman and Client. This Agreement supersedes all other agreements between the parties for the provision of Bateman's Services on the Premises.

SECTION 13.         NOTICES

        All notices to Client shall be addressed or faxed to it at:

                        Doran Associates, LLC
                        d/b/a Gardenside Terrace
                        173 Alps Road
                        Branford, Connecticut 06405
                        Facsimile No. _____
                        Attention: President

and all notices to Bateman shall be addressed or faxed to it at:

                        Compass Group USA, Inc. d/b/a Bateman
                        2400 Yorkmont Road
                        Charlotte, North Carolina 28217
                        Facsimile No.: (704) 329-4010
                        Attention: General Counsel.

SECTION 14.         GOVERNING LAW

        This Agreement shall be governed by the laws of the State of Connecticut.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals as of the day and year first above written.

DORAN ASSOCIATES d/b/a
GARDENSIDE TERRACE

By: _____

Name: CHARLES F. SHELTON JR

Title: PRESIDENT

Date: 8/18/99

COMPASS GROUP USA, INC.
by and through its BATEMAN division

By: _____

Name: Dennis Pentieri

Title: President

Date: 9/30/99

## EXHIBIT A

## FINANCIAL ARRANGEMENTS - MANAGEMENT FEE

I.    MANUAL FOOD SERVICES

Bateman shall receive from Client, upon the opening of the Gardenside Terrace facility, a sum totaling in the amount of Fifteen Thousand Dollars ($15,000.00). Client will receive from Bateman a credit for said amount upon the termination or cancellation of this Agreement.

Bateman shall operate Client's manual food service on a Management Fee basis whereby Bateman shall receive a Management Fee, as described herein, and shall be reimbursed for its Costs of Business, as defined herein.

Bateman will operate on the basis of twelve (12) accounting periods which comprise its calendar year. For Bateman's Services provided hereunder, Client will pay Bateman an amount equal to the sum of:

A.  Management Fee of $20,600.00 per year, payable in monthly installments; and

B.  An Administrative Fee of $20,000.00 per year, payable in monthly installments;

D.  Payment Schedule of Management Fee and Administrative Fee during the first year: from 9/15/99 to 9/15/00, Client shall pay the Management and Administrative fees according to the amounts listed below:

| Months | Management Fee | Administrative Fee |
|--------|----------------|--------------------|
| 1-3    | $0             | $1,715 per month   |
| 4-6    | $430 per month | $1,715 per month   |
| 7-9    | $858 per month | $1,715 per month   |
| 10-12  | $1,715 per month | $1,715 per month |

This fee schedule shall only apply from ~~September 15,~~ October 4, 1999 to ~~September 15,~~ October 4, 2000. Beginning ~~September 15,~~ October 4, 2000, Client shall pay $1715.00 per month for the Administrative Fee and $1715.00 per month for the Management Fee.

E.  Bateman's Cost of Business. Costs of Business shall be determined on an accrual basis and shall consist of the sum of the following items, namely:

(1) The costs of all Bateman labor performing services with respect to this Agreement, either on a full time or part time basis, including but not limited to wages (including overtime), salaries, vacation pay, holiday pay, Workmen's Compensation Insurance premiums or costs, unemployment insurance, F.I.C.A.,

group insurance premiums, payroll taxes, severance pay, travel expenses concerning this Agreement, regular health examination cost, pension cost, salary personnel Thrift Plan cost, employee meals, approved bonuses, sick pay, benefits and related costs and other similar costs; and

(2)  The costs of all Products, merchandise, materials, and supplies incurred with respect to this Agreement; and

(3) The costs of all other operating expenses, including but not limited to such operating expenses as vehicle expense; expendable equipment; taxes; insurance; licenses; permits; parts and equipment and maintenance and rental thereof; utilities; rent; special security costs; and other similar cash losses or disappearances incurred by Bateman on the Premises not involving Bateman employees or agents.  Bateman shall give notice to Client of any new operating expenses.

## II.  BATEMAN'S ACCOUNTING TO CLIENT FOR MANUAL FOOD SERVICE

Bateman shall submit to Client within a reasonable time after the end of each accounting period an invoice and, if applicable, a profit and loss statement, showing Costs of Business, Administrative Fee and Management Fee as defined above.  Client shall pay said invoice amount to Bateman within twenty (20) days of the date of said invoice.  Interest shall not begin to accrue until thirty-one (31) days after receipt of the invoice.

## III.    CREDIT TERMS

All past-due amounts due to Bateman will be subject to a service charge of up to 1 1/2% per month of the unpaid balance.

In the event that said amounts set forth in said statements are not paid according to the terms hereof, or if Client's credit has become impaired, Bateman shall have the option of either declining to continue its services hereunder except on a cash-in-advance basis until such time as credit has been re-established to Bateman's satisfaction, or terminating this Agreement immediately without any liability whatsoever to Bateman.

All costs of collection of past-due amounts, including but not limited to reasonable attorney's fees, shall be chargeable to and paid by the Client.

## IV.    CATERING

Bateman shall, as requested, provide catering services to Client either on or off the Premises.  Financial arrangements shall be negotiated by the parties on an event by

event basis. Bateman shall invoice Client for the catering services and Client shall pay said invoice within thirty (30) days of the date of said invoice.

V.    BASIS OF FINANCIAL TERMS

The financial terms of this Agreement have been negotiated between the parties upon the condition that Bateman will operate its Services at the same points of service and remain in operation only the hours agreed to when Bateman begins operations hereunder. If Client desires Bateman to operate its Services for additional points of service and/or remain in operation additional hours, Client and Bateman shall mutually agree on the appropriate financial arrangements for the additional points of service and/or additional hours. Where applicable, prices for the Products sold through said services shall be determined by mutual consent between Bateman and Client. All products shall remain the property of Bateman, with title vested in Bateman until sold.

Bateman's Management Fee and Administrative Charge for the first year of operation shall be determined by mutual consent of the parties. Bateman shall have the option each year thereafter to request of the Client an increase in the Management Fee and Administrative Fee. If the parties are unable to agree to an increase in the Management Fee and/or Administrative Charge, Bateman may terminate this Agreement with sixty (60) days prior written notice.

Pursuant to Section 2B of this Agreement, Bateman shall comply with all federal, state and local laws concerning wages and hours of employment. Bateman's Costs of Business shall be automatically adjusted to pass through any increases resulting from changes in the federal or state minimum wage and hour laws, or, where applicable, any increases resulting from changes in union wages or other labor agreement issues. Provided, however, that Bateman will give Client advanced written notice of any such increases.

10/31/03  11:33 FAX 12037877001            Letizia, Ambrose & Falls                    ☑002
    OCT 31 2003 10:03 FR GARDENSIDE TERRACE    203 483 7752 TO 7877001             P.02/03
▸10/31/03  10:49 FAX 12037877001            Letizia, Ambrose & Falls                    ☑003

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LAURIE LABONIA, | : | |
| Plaintiff | : | Civil Action No. |
| | : | 301CV2399(MRK) |
| v. | : | |
| | : | |
| DORAN ASSOCIATES, LLC, et al | : | |
| Defendants | : | October **31** , 2003 |

### DECLARATION OF CHRISTIAN SHELTON

I, Christian Shelton, make the following declaration pursuant to 28 USC § 1746.

1.      I am over the age of eighteen (18) years of age and understand the meaning of declaring, certifying, verifying and stating truthfully and correctly.

2.      I am the Executive Director of Gardenside Terrance, and I held that position throughout Lauri Labonia's employment at Gardenside Terrace.

3.      Natalie Aldridge, who was Gardenside Terrace's Dining Room Manager at the time, made the decision to hire Lauri.

4.      Lauri was a Gardenside Terrace employee. To my knowledge, she was never an employee of Bateman or Compass Group.

5.      While Lauri was employed at Gardenside Terrace, Gardenside Terrace paid her wages as its Dining Room Manager.

CTDOCS:1565654.1

OCT 31 2003 09:54

6.      I was the only person with authority to decide whether or not Lauri could or would be promoted.  Neither Compass nor Bateman had this authority.

7.      Gardenside Terrace kept records of Lauri's work and Lauri's hours while she was at Gardenside Terrace.

8.      Gardenside Terrance provided workers' compensation insurance for Lauri.

9.      I had the final authority to fire Lauri and I made the decision to do so.

10.     There is no unionized workforce at Gardenside Terrace.


_____
Signature

_Christian B. Shelton_
Printed Name