U.S. DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LAURIE LABONIA | : | CASE NO: 3:01 CV 02399 (MRK) |
| Plaintiff | : | |
| | : | |
| V. | : | |
| | : | |
| DORAN ASSOCIATES, LLC, ET AL. | : | |
| Defendant | : | OCTOBER 31, 2003 |

DEFENDANTS DORAN ASSOCIATES & CHRISTIAN SHELTON'S
MEMORANDUM OF LAW & EXHIBITS IN SUPPORT OF
<u>MOTION FOR SUMMARY JUDGMENT</u>

DEFENDANTS
DORAN ASSOCIATES AND
CHRISTIAN SHELTON

_____
Andrew A. Cohen, ct 07124
Letizia, Ambrose & Falls, P.C.
One Church Street
New Haven, CT 06510
(203) 787-7000

## TABLE OF AUTHORITIES

### *CASES*

Alfano v. Costello, 294 F.3d 365 (2d Cir. 2002)…………...………………..22, 23, 26-29

Bickerstaff v. Vassar College, 196 F.3d 425 (2d Cir. 1999)……………………………12

Bowman v. Shawnee State Univ., 220 F.3d 456 (6th Cir. 2000)………………………...24

Bragdon v. Abbott, 524 U.S. 624 (1998)…………….…………………………...…...14

Brown v. Henderson, 257 F.3d 246 (2d Cir. 2001)………..………………...………. 23

Burch v. Coca-Cola Co., 119 F.3d 305 (5th Cir. 1997)………………………….……17

Byrnie v. Board of Educ., 243 F.3d 93 (2d Cir. 2001)………………………….……23

Colwell v. Suffolk County Police Dept., 158 F.3d 635 (2d Cir. 1998)…………………14

Cruz v. Coach Stores, Inc., 202 F.3d 560 (2d Cir, 2000)……………………………27, 29

Dunegan v. City of Council Grove, 77 F.Supp.2d 1192 (D. Kan. 1999)………………..17

Faragher v. City of Boca Raton, 524 U.S. 775 (1998)…………………………..27, 28, 31

Felix v. New York City Trans. Auth., 324 F.3d 102 (2d Cir. 2003)……………………15

Galdieri-Ambrosini v. National Realty & Dev. Corp., 136 F.3d 276 (2d Cir. 1998)…....38

Hall v. Connecticut Regional Water Auth., 28 F.Supp.2d 76 (D. Conn. 1998)……..28, 29

Harris v. Fork Lift Sys., Inc., 510 U.S. 17 (1993)………………………………….. 27, 28

Howley v. Town of Stratford, 217 F.3d 141 (2d Cir. 2000)…………………………29, 30

LaJeunesse v. Great Atlantic & Pacific Tea Co.,
160 F. Supp.2d 324 (D. Conn. 2001)………………………………………………...11, 16

Leibovitz v. New York City Transit Auth., 252 F.3d 179 (2d Cir. 2001)…………..…24, 27

Lopez v. S.B. Thomas, Inc., 831 F.2d 1184 (2d Cir. 1987)……………………………..27

<u>Luciano v. Olsten Corp.</u>, 110 F.3d 210 (2d Cir. 1997)…………………………………..22

<u>MacGovern v. Hamilton Sunstrand Corp.</u>, 170 F.Supp.2d 301 (D. Conn. 2001), <u>aff'd</u>, 50 Fed. Appx. 59 (2d Cir. 2002)…………………………………………………21

<u>Matsushita Elec.Indus. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986)……………………11

<u>Nucifora v. Bridgeport Bd. of Educ.</u>, 188 F. Supp.2d 197 (D. Conn. 2001), <u>aff'd</u> 736 Fed. Appx. 472 (2d Cir. 2002)..…………………………………………..…...16

<u>Paleogos v. Rehab. Consultants, Inc.</u>, 990 F. Supp. 1460 (N.D. Ga. 1998)…..…………17

<u>Quinn v. Greentree Credit Corp.</u>, 159 F.3d 759 (2d Cir. 1998)…………………………28

<u>Reeves v. Johnson Controls World Servs.</u>, 140 F.3d 144 (2d Cir. 1998)………..12, 15, 21

<u>Reeves v. Sanderson Plumbing Prods.</u>, 530 U.S. 133 (2000)………………………..12, 34

<u>Regional Economic Comm. v. City of Middletown</u>, 294 F.3d 35 (2d Cir. 2002)……….34

<u>Richardson v. New York State Dept. of Corr. Servs.</u>, 180 F.3d 426 (2d Cir. 1989)…….29

<u>Rojas v. Florida</u>, 285 F.3d 1339 (11th Cir. 2002)…………………………………………...23

<u>Ryan v. Grae & Ryblick, P.C.</u>, 135 F.3d 867 (2d Cir. 1998)………………………...12, 17

<u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502 (1993)…………………………….13, 34

<u>Stronkowski v. St. Vincent's Med. Ctr.</u>, 1996 WL 684407 (D. Conn. 1996)……13, 16, 40

<u>Sumner v. United States Postal Service</u>, 899 F.2d 203 (2d Cir. 1990)…………………..35

<u>Toyota Motor Mfg. v. Williams</u>, 534 U.S. 184 (2002)………………………………16, 20

<u>Walker v. Pepsi-Cola Bottling Co. and Teamsters Local 830</u>, 2000 WL 1251906 (D. Del. 2000)……………………………………………………………………………15

### *STATUTES*

28 U.S.C. § 1367(a)……………………………………………………….…………..39

Americans with Disabilities Act, 42 U.S.C. § 12111………………………………passim

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e………………………passim

Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60(a)………………..…..11, 40

### *OTHER CITATIONS*

29 C.F.R. § 1630.2…………………………………………………………………...14, 20

Fed. R. Civ. P. 56(c)………………………………………………………………..11

U.S. DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

LAURIE LABONIA                    :        CASE NO: 3:01 CV 02399 (MRK)
    Plaintiff                 :
                              :
V.                                :
                              :
DORAN ASSOCIATES, LLC, ET AL.     :
    Defendant                 :        OCTOBER 31, 2003

### DEFENDANTS DORAN ASSOCIATES & CHRISTIAN SHELTON'S
### MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

FACTUAL BACKGROUND

    The following facts are undisputed.

1.    *Plaintiff's Employment History at Gardenside Terrace*

    Plaintiff Laurie Labonia was hired by defendant Doran Associates, LLC on January 2, 2000 as a waitress in Gardenside Terrace, an assisted living facility in Branford. Exhibit 1. Defendant Christian Shelton has been the Executive Director of Gardenside Terrace since it opened in November 1999. Exhibit 2 ¶ 2. On April 16, 2000, Mr. Shelton promoted plaintiff to Dining Room Manager and gave her a raise in pay. Exhibit 1; Exhibit 3, Deposition of Plaintiff ("Labonia Depo.") at 78-79. As Dining Room Manager, plaintiff supervised a waitstaff of approximately six individuals, who were all female with the exception of a waiter named Robert Lord. Id. at 74-75, 96, 101. Plaintiff does not believe that her gender played any role in her promotion. Id. at 79.

    During plaintiff's employment, Gardenside Terrace contracted with Bateman Food Service for the overall supervision of its dining services. Exhibit 2 ¶ 4. (Bateman is a division of Compass Group USA, Inc., a co-defendant in this case.) The Director of Dining Services was a Bateman employee, while the other dining staff members were employees of Gardenside

Terrace.  Id. ¶ 4.  At the time of plaintiff's promotion to Dining Room Manager, the Director of

Dining Services was Robert Plaumann.  Exhibit 2 ¶ 5.  Over time, Mr. Plaumann's performance

slipped, and he became less strict about rules and policies established by Gardenside Terrace.

Labonia Depo. at 55-61.  According to plaintiff, Mr. Plaumann had his own private plan to bring

in male staff at higher pay rates than the female staff, but both plaintiff and Mr. Shelton opposed

this and it never was instituted.  Id. at 76.

2.    _The Hiring of Dan Pellechia as Director of Dining Services_

Mr. Plaumann resigned in October 2000, and Bateman replaced him with defendant Dan

Pellechia.  Exhibit 2 ¶ 7.  Plaintiff did not consider Mr. Pellechia to be her supervisor; she

controlled the waitstaff and he controlled the kitchen staff.  Labonia Depo. at 93-96.  According

to plaintiff, when Mr. Pellechia started working at Gardenside Terrace, Mr. Shelton advised

plaintiff that he was a tough person, and that she should "bite [her] tongue" and "bear with him."

Id. at 84-85.  In fact, plaintiff contends that only a few days after Mr. Pellechia started, he "went

off on one of the dishwashers."  Id. at 85.  All of the dishwashers were male.  Id. at 78.

According to plaintiff, Mr. Pellechia was generally rude and "just didn't know how to talk to

people."  He was "just rude to everybody.  He was just rude."  Id. at 88.  Mr. Pellechia made fun

of a male dishwasher named Dave Goodman and called him a loser, about which plaintiff

complained to Mr. Shelton.  Id. at 87.  Mr. Goodman was very upset about Mr. Pellechia's

behavior.  Id. at 88.  Everybody complained about Mr. Pellechia's behavior, including the chefs.

Id. at 88-89.  The chefs, like the dishwashers, were all male.  Id. at 78.  Many of the dishwashers

referred to Mr. Pellechia as "Hitler."  Id. at 98-99.  A dishwasher named Fred Moore told

plaintiff he did not know whether he could stand Mr. Pellechia anymore, because Mr. Pellechia

was "riding" him so much. Id. at 100. Robert Lord, the only male on the waitstaff, also said that Mr. Pellechia was rude and nasty. Id. at 101.

In fact, plaintiff solicited statements from a number of her co-workers later during her employment, after this dispute arose. Labonia Depo. at 161-63. In one statement, dishwasher Fred Moore identifies Mr. Pellechia as "Hitler" and complains about things changed during his tenure, because Mr. Pellechia "wanted to know every move we made even going to the bathroom." Exhibit 4. In another statement, a waitress named Veronica Gagne complained that Mr. Pellechia "came in with an angry bad attitude one morning[. H]e yelled at the chef Joe, another he yelled at the dishwasher Dave[.] Another 2 days he yelled at Laurie and one day he spoke to no one." Exhibit 5. Ms. Gagne was referring to the week that culminated in November 3, 2000, the day on which Mr. Pellechia ultimately acted inexcusably toward plaintiff. See id. In another statement, Robert Lord, the male waitstaff member, wrote that Mr. Pellechia "belittled the waitstaff, spoke to us rudely and even lost his temper." Exhibit 6. According to Mr. Lord, Mr. Pellechia was a "control freak." Id. In a fourth statement procured by plaintiff, dishwasher David Goodman wrote that Mr. Pellechia was rude to plaintiff and grabbed hold of her on November 3, and that he "was also belittling to others, in this food service operations including myself." Exhibit 7.

In Mr. Shelton's view, Mr. Pellechia's supervisory style was strict. Exhibit 2 ¶ 12. Mr. Shelton was aware of conflicts between plaintiff and Mr. Pellechia because she had complained a number of times about his behavior, and in particular about his enforcement of the rules, which were often directed at her. Id. ¶¶ 12-13. Plaintiff complained about Mr. Pellechia's "rude and nasty" behavior toward the entire dining hall staff, both male and female, and both males and females complained about him to management as well. Labonia Depo. at 87-89, 100-05. As to

Mr. Pellechia, the <u>only</u> thing that plaintiff can recall complaining about to Mr. Shelton was this general rudeness and nastiness (both to her and others of both genders). <u>Id</u>. at 104-05, 255-59. Plaintiff "never mentioned, implied or inferred that Mr. Pellechia's comments, behavior or actions had anything to do with her gender or anyone else's gender." Exhibit 2 ¶ 12. Plaintiff also complained repeatedly about Mr. Pellechia to Kim Maturo, Gardenside Terrace's Office Manager. Exhibit 8 ¶ 3. She complained to Ms. Maturo that Mr. Pellechia was too strict, that he wanted plaintiff to perform her job duties, and that he always followed and enforced policies. She would tell Ms. Maturo that "This guy's got to go." <u>Id</u>. ¶ 3. But plaintiff "never once complained that [Mr. Pellechia] was treating her differently from the other staff, or that Dan was treating women (or her) worse than men." <u>Id</u>. ¶ 4. Nor did plaintiff complain to Ms. Maturo about sexual harassment. <u>Id</u>.; Exhibit 2 ¶ 12.[1] Plaintiff never submitted any written complaint about Mr. Pellechia. <u>Id</u>. at 106.

> 3.    *The Incident of November 3, 2000*

On November 3, 2000, an incident occurred between plaintiff and Mr. Pellechia. As plaintiff described this incident in a written statement, she was on the phone with her mother in the Gardenside Terrace Kitchen. Exhibit 9. A waiter complained about the heat in the area, and Mr. Pellechia approached plaintiff and the waiter and suggested that the door be opened for ventilation. According to plaintiff, Mr. Pellechia:

> immediately began yelling and threw off his chef hat grabbing me
> by both my arms and began shaking me violently. At this point I
> told him to take his hands off me at which time he reach[ed] over
> and hung up the phone. He had me against the wall preventing me
> from exiting the kitchen. Office personnel entered the kitchen and
> he was ordered to get away from me and go into another office,
> which he did.

---

[1] During plaintiff's employment, Gardenside Terrace had a clear sexual harassment policy, prohibiting conduct and suggesting that complaints be brought to the attention of one of two managers (one male and one female). Exhibit 14. The policy was posted for all employees to see. Exhibit 11 ¶ 10.

Id. The written statement again says that plaintiff had complained about Mr. Pellechia's "temper and behavior (abusive) with me and other waitstaff," id., a staff that included Robert Lord. At her deposition, plaintiff said that Mr. Pellechia was yelling at the entire waitstaff on the day of the incident, which included Mr. Lord. Labonia Depo. at 113. She also testified that Mr. Pellechia poked her in the shoulder and collarbone, spun her around and pushed her arm down, calling her a goddamn stupid idiot. Id. at 115-23. According to plaintiff, nothing about Mr. Pellechia's conduct during this incident, or at any other time, was sexual. Id. at 123-24. In fact, plaintiff said that no one at Gardenside Terrace ever did anything inappropriately sexual to her. Id. at 124. Other than the incident of November 3, 2000, plaintiff's only complaint about Mr. Pellechia's behavior toward her was that he persistently found fault with the way she did her job and communicated that fact in an unprofessional way. Labonia Depo. at 368.

Plaintiff testified that Office Manager Kim Maturo "came flying into the kitchen, thank god," immediately after the November 3 incident. Labonia Depo. at 126. Ms. Maturo took Mr. Pellechia into a separate office, and plaintiff was taken to the front office so that she could calm down. Plaintiff had no further contact with Mr. Pellechia. Id. at 126-27. Plaintiff did not suffer any physical injury or seek medical attention as a result of this incident. Id. at 136. She said that she had marks on her arms, but Ms. Maturo saw no marks when plaintiff lifted her shirtsleeves. Exhibit 8 ¶ 7.

Mr. Shelton arrived at Gardenside Terrace about 15 or 20 minutes after the incident. Id. at 127. He immediately began an investigation. Exhibit 2 ¶ 19. He spoke first to Mr. Pellechia, who reported his interpretation of the incident. Mr. Shelton sent Mr. Pellechia home immediately. Id. Plaintiff was outside having a cigarette, and Mr. Shelton came out to talk to her. He apologized for the incident and said that Mr. Pellechia should never have touched

plaintiff.  He said that such behavior would not be tolerated and that he would get to the bottom

of it.  Labonia Depo. at 129-31.  Mr. Shelton told plaintiff to go home, with pay.  Id. at 131.  He

also said, "Believe me, Dan Pellechia will be disciplined for this," and he said that Mr. Pellechia

"would never be back."  Id. at 133.  Plaintiff had no problem with anything that Mr. Shelton said,

id. at 132, and in fact she recognized that he "felt bad and he was sincere about it, too."  Id. at

133.  Mr. Shelton did not blame plaintiff at all, and he was very upset about Mr. Pellechia's

actions.  Id.  He was not even interested in examining plaintiff's own behavior, but cared only

about the fact that Mr. Pellechia had acted wrongfully by putting his hands on her.  Id. at 129-31.

Mr. Shelton did not say anything negative about plaintiff as a woman.  Id. at 134.  Plaintiff

believed that Mr. Shelton was doing his best to get to the bottom of the situation.  Id. at 135.

Plaintiff asked Mr. Shelton if she should call the police.  Exhibit 2 ¶ 22.  According to plaintiff,

Mr. Shelton "discouraged" her from doing so, but only by saying he would get to the bottom of

it, and she believes he did not want to upset the residents of the assisted living facility.  Labonia

Depo. at 154-55.

     Mr. Shelton gave plaintiff three days off, with pay.  Labonia Depo. at 134.  Plaintiff is

unaware of anyone else at Gardenside Terrace who ever received three days off with pay.  Id. at

135.  Plaintiff was not disciplined in any way as a result of this incident.  Exhibit 2 ¶ 23.

Plaintiff returned to work after her three days off.  Exhibit 2 ¶ 24.  Mr. Pellechia was replaced

shortly afterwards by Jean Rivas, a female.  Id. ¶ 25.

     4.    *The Termination of Plaintiff's Employment in December 2000*

     Plaintiff did not report to work on Monday, December 11, because she said she was ill.

Labonia Depo. at 207, 228.  On Tuesday, December 12, a co-worker named Megan Moran called

Gardenside Terrace and left a message that she would like to meet with Chris Shelton and Kim

Maturo about a disturbing phone call from plaintiff.  Exhibit 8 ¶ 11.  Mr. Shelton, Ms. Maturo and Ms. Rivas met with Ms. Moran on Wednesday, December 13.  Plaintiff was not present at the meeting and does not know about what Ms. Moran said or did not say there.  Labonia Depo. at 187; see also Exhibit 2 ¶ 28; Exhibit 8 ¶ 12; Exhibit 10.  Plaintiff considers Ms. Moran to be a truthful person, Labonia Depo. at 192, and she has no reason to doubt that Ms. Moran met with the three managers as indicated in the memo about the meeting.  Id. at 181-82.  Plaintiff also admits talking to Ms. Moran on the phone for about ½ hour on or about December 12, 2000.  Id. at 177-80.

Ms. Moran reported at this meeting that plaintiff had called her on her cell phone on the previous day, that she had proceeded to verbally attack Gardenside Terrace and some of its employees, and that she had revealed private information about co-workers.  Among other things, Ms. Moran reported that plaintiff said:  that Ms. Moran should not help Gardenside Terrace in any way; that one of its directors was a cocaine user; and that another co-worker was a drug dealer.  According to Ms. Moran, plaintiff then proceeded to reveal the rate of pay for every member of the dining staff.  Exhibit 8 ¶ 12.  Ms. Moran signed a written memo outlining plaintiff's statements from the phone call.  Exhibit 10.  The memo was also signed by Mr. Shelton, Ms. Rivas and Ms. Maturo.  Id.[2]

As a result of the December 13 meeting, Mr. Shelton decided to terminate plaintiff's employment the next day.  Exhibit 2 ¶ 29.  At the close of the meeting, he talked to Ms. Maturo and Ms. Rivas about this decision, but he felt that he should "sleep on it" and make the decision official on December 14.  Exhibit 11 ¶ 4; Exhibit 12 ¶ 4.  On the morning of December 14, Mr.

---

[2] Plaintiff admitted at deposition that an accusation of forgery "was mentioned" during her phone call to Ms. Maturo, although she later denied this and said she does not recall.  Labonia Depo. at 184-86.  Plaintiff also said that the discussion of drug use did not occur simply in one conversation with Ms. Moran, but that it was "old news."  Id. at 184.

Shelton informed Ms. Maturo and Ms. Rivas of his final decision to terminate Ms. Labonia's employment. Exhibit 11 ¶ 5; Exhibit 12 ¶ 5. He asked Ms. Rivas to telephone plaintiff to inform her that her employment was terminated. Exhibit 11 ¶ 5. Ms. Rivas did in fact call plaintiff from her office on the morning of December 14, 2000, with Mr. Shelton present in the room. Id. ¶ 6. Ms. Rivas told plaintiff that she was terminated and that she would be receiving a letter explaining the reasons. Id. The telephone call was very short, probably less than a minute. Id. Mr. Shelton drafted and signed a letter to plaintiff on the morning of December 14, outlining the reasons for her termination, and placed it in Gardenside Terrace's outgoing mail, which is ordinarily picked up at the end of the day. Id. ¶ 7.

As that letter indicates, the reasons for plaintiff's termination were the passing of confidential information about employee wages, instructing a staff member to act in a disloyal and uncooperative manner, and making false or malicious statements concerning the Clinical Director and a co-worker, all in violation of the personnel policy of Gardenside Terrace. Exhibit 13; Exhibit 2 ¶ 29. That personnel policy includes a number of reasons for termination, including insubordination, passing information of confidential nature to unauthorized persons, and the making of false or malicious statements concerning staff members. Exhibit 14.

Plaintiff believes that the sole reason for the termination of her employment was that she went to the police to complain about Mr. Pellechia. Labonia Depo. at 144-47, 260-62, 389. She knows of no other possible reason for her termination, except for what is written in the memo and termination letter. Id. at 144-45. However, official documents in this case indicate that plaintiff did not go to the Branford Police Department to file a complaint about Mr. Pellechia's November behavior until after Gardenside Terrace had decided to fire her (and had informed her of that fact). Specifically, the police report documenting her visit is unambiguously dated

December 14, 2000 at 15:30 (3:30 p.m.) as the "Date and Time of Report."  Exhibit 15.  Plaintiff

has no evidence to support any belief that this information is incorrect.  Id. at 150-51.  Chris

Shelton and Kim Maturo, the two Gardenside managers who were involved in these events, have

stated under oath that they knew nothing about any police complaint by plaintiff when they met

with Ms. Moran on December 13, 2000 or when the decision was made to terminate plaintiff the

following day.  Exhibit 11 ¶ 9; Exhibit 12 ¶ 6.  As they have pointed out, it was only after

plaintiff's termination that the Branford Police responded to Gardenside Terrace, based on

plaintiff's complaint.  Exhibit 2 ¶ 30; Exhibit 11 ¶ 8.  In fact, late in the afternoon of December

14, 2000, Officer Bonfiglio of the Branford Police came to Gardenside Terrace.  He said that Ms.

Labonia had just made a complaint, and he wondered why she had waited so long to report this

incident.  Chris Shelton told Officer Bonfiglio that Ms. Labonia had been fired that morning.  Id.

Plaintiff has no evidence to contradict this sworn testimony about the knowledge of Ms.

Maturo and Mr. Shelton.  Plaintiff admits that she has no factual support for her claim that she

was discharged in retaliation for this police complaint, except for what she mistakenly or falsely

alleges to have been the time relationship between her police complaint and her discharge.

Labonia Depo. at 146.  Plaintiff admits that "There's no fact that supports it.  It's just what I think

happened."  Id. at 147.

Plaintiff applied for another job with an assisted living center after leaving Gardenside

Terrace.  She does not apply for such jobs generally because she is reluctant to write down that

she was terminated, and to explain what happened.  Labonia Depo. at 387-88.  Instead, plaintiff

has worked in restaurants.  Id. at 49-51, 387; Exhibit 18 at 2.

5.     _History of the Case, Including Disability Claim_

Plaintiff filed a complaint with the Connecticut Commission on Human Rights and Opportunities on February 15, 2001, alleging discrimination on the basis of gender and on the basis of having previously asserted statutory rights, and alleging that she was "not reinstated due to a disability." Exhibit 16. Her affidavit alleged that she "was temporarily disabled because of a physical assault by Respondent Dan Pellechia, just prior to my termination." Id. ¶ 4. Plaintiff's CHRO complaint made no mention of any other "disability." Id. In her deposition in this case, plaintiff said that the only time she was disabled was when Dan Pellechia "had me up against the wall." Labonia Depo. at 42-43. (In responses to her request to admit, plaintiff evaded this issue by saying she was "uncertain" whether she had any disability other than the "temporary disability" related to Mr. Pellechia's actions of November 3. Exhibit 17 ¶ 4.)

Plaintiff later testified that her "disability" during her tenure at Gardenside Terrace was "anxiety attacks," but that she had only "a few" or "a couple of" anxiety attacks during her employment at Gardenside. Labonia Depo. at 340-47. She also said that she takes Xanax or Valium "once an awhile" for such attacks. Id. at 276-77. Plaintiff also testified that she had no problems with anxiety during her first period of work at Gardenside, and that it was only after the incident with Mr. Pellechia that she had such attacks on any regular basis. Id. at 349. Prior to her last month of work at Gardenside, however, she only left work early once for an anxiety attack. Id. at 352. Her alleged anxiety attacks during her last month of work would last only from 15 minutes to an hour; she was able to take care of herself during these times, and plaintiff admits that these so-called anxiety attacks did not prevent her from performing any major life activities. Id. at 358. According to plaintiff, her job performance was good, except when she had her few anxiety problems. Id. at 340-41.

Plaintiff withdrew her complaint from the jurisdiction of the CHRO before there was any determination as to "reasonable cause."  Plaintiff then filed her complaint with this court on December 21, 2001.  (Her motion to file an amended complaint was denied, and the original complaint remains in effect.)  On May 30, 2002, the Court dismissed plaintiff's claims of intentional and negligent infliction of emotional distress, as well as claims of discrimination against Mr. Shelton individually.  In counts one and two of her complaint, plaintiff alleges (under federal and state law, respectively) that Doran Associates illegally fired her because of her gender, and that she was subject to unequal terms and conditions of employment and harassment because of her gender.[3]  She also appears to be making the same claims on the basis of her "temporary disability."  Complaint ¶ 21.  Counts one and two also allege that Doran illegally retaliated against her for protected activity; her claim of retaliatory discharge against Mr. Shelton individually survives under Connecticut law only, as a result of the Court's ruling on his motion to dismiss.

ARGUMENT

The standard for summary judgment under Rule 56 is familiar.  Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Rule 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  LaJeunesse v. Great Atlantic & Pacific Tea Co., 160 F. Supp.2d 324, 329 (D. Conn. 2001).  To defeat a properly supported summary judgment

---

[3] Plaintiff brings her claims under the Americans with Disabilities Act, 42 U.S.C. §§ 12111 et seq., Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., and the Fair Employment Practices Act, Conn. Gen. Stat. §§ 46a-60(a) et seq.

motion, a plaintiff must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In cases of discrimination, the appropriateness of summary judgment depends on a number of factors. These include the strength of plaintiff's prima facie case, the probative value of proof that the employer's explanation is false, as well any other evidence that supports the employer's case. See Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 148-49 (2000). In this case, the evidence presented establishes that defendants Doran and Shelton are entitled to summary judgment on all of plaintiff's claims.

I.    PLAINTIFF'S CLAIMS OF DISABILITY DISCRIMINATION MUST FAIL AS A MATTER OF LAW

Plaintiff claims in count one of her complaint that "in the manner described above" -- which recounts events leading to her termination -- she was "discriminated against in the terms and conditions of her employment because of her temporary disability," allegedly in violation of the Americans with Disabilities Act and Connecticut state law.[4] A plaintiff who raises a claim of disability discrimination bears the initial burden of establishing a prima facie case. Ryan v. Grae & Ryblick, P.C., 135 F.3d 867, 869 (2d Cir. 1998). In order to make out a prima facie case of discriminatory discharge under the ADA, a plaintiff must show that: (1) she suffers from a disability within the meaning of the law; (2) she could perform the essential functions of her job with or without reasonable accommodation; and (3) she was discharged because of her disability. Reeves v. Johnson Controls World Servs., 140 F.3d 144, 149-50 (2d Cir. 1998). If plaintiff satisfies this standard, the employer may articulate a legitimate nondiscriminatory reason for its

---

[4] Plaintiff states broadly that Gardenside Terrace discriminated against her because of her disability, in the terms and conditions of her employment, but there is neither a specific allegation nor evidence that she was treated badly while an employee because of her purported disability. In fact, she testified that she was always allowed to go home and relax when she had so-called anxiety attacks, and that no one at Gardenside Terrace ever gave her any difficulty over this issue. Labonia Depo. at 394.

actions, in which instance any presumption of discrimination drops out, and the plaintiff bears the burden of proving that the employer's reason are a pretext for discrimination.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).

Plaintiff's claim that she was illegally discharged because of a disability is frivolous for two overall reasons.  First, plaintiff concedes that she is not disabled, describes her own condition as only temporary and related to one specific incident, and recognizes that she has not been substantially impaired in any major life activity.  Second, even if she were disabled, plaintiff's complaint and evidence do not link such a "disability" to any tangible detriment in the terms and conditions of her employment, including the termination of her job; plaintiff has repeatedly testified that even in her mind, the termination of her job was based solely on supposed retaliation for reporting the November 3 incident to the police.

A.    *Plaintiff Has Not Established A Prima Facie Case of Disability Discrimination*

1.    *Plaintiff Is Not Disabled*

It is self-evident that a person who is not disabled (or perceived to be so, or having a record of disability) cannot succeed in a claim of disability discrimination under the ADA.  The purpose of the statute was to:

> assure that truly disabled, but genuinely capable, individuals will not face discrimination in employment because of stereotypes about the insurmountability of their handicaps.  It would debase this high purpose if the statutory protections available to those truly handicapped could be claimed by anyone whose disability was minor and whose relative severity of impairment was widely shared.  Indeed, the very concept of an impairment implies a characteristic that is not commonplace and that poses for the particular individual a more general disadvantage in his or her search for satisfactory employment.

Stronkowski v. St. Vincent's Med. Ctr., 1996 WL 684407 (D. Conn. 1996).

Under the ADA, a disability is "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual." 42 U.S.C. § 12111(8). Regulations promulgated by the Equal Employment Opportunity Commission further define disability to include "any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h). "Major life activities" are defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." Id. § 1630.2(i). "Substantially limits" is defined to mean unable to perform a major life activity that the average person in the general population can perform, or "significantly restricted as to the condition, manner or duration under which an individual can perform a major life activity as compared to the condition, manner or duration under which the average person in the general population can perform the same major life activity." Id. § 1630.2(j)(1). Relevant factors in determining whether an individual is substantially limited in a major life activity include the nature and severity of the impairment, the duration or expected duration of the impairment, and the permanent or long term impact of or resulting from the impairment. Id. § 1630.2(j)(2).

In evaluating whether an individual has such an ADA qualifying disability, the Second Circuit has used an approach taken by the Supreme Court in Bragdon v. Abbott, 524 U.S. 624 (1998). See Colwell v. Suffolk County Police Dept., 158 F.3d 635, 641 (2d Cir. 1998) . Plaintiff must show that she suffers from a physical or mental impairment, must identify the activity claimed to be impaired and establish that it constitutes a "major life activity," and then must show that her impairment "substantially limits" that major life activity. If a plaintiff fails to satisfy any of these three requirements, her discrimination claim must fail as a matter of law. Under this general analysis, a plaintiff suing under the Americans with Disabilities Act who

suffers from anxiety or stress but is not otherwise impaired in a major life activity should not be able to bring her claim before a jury simply by alleging that her job causes insomnia or other "disabling" symptoms.  Felix v. New York City Trans. Auth., 324 F.3d 102, 107 (2d Cir. 2003). And even if an individual suffers from a recognized emotional or mental syndrome such as "panic disorder," that individual cannot succeed on an ADA claim, as a matter of law, without showing that the disorder <u>substantially</u> impairs her in a <u>major</u> life activity, evaluated according to the particular facts of the case.  Reeves v. Johnson Controls World Servs., 140 F.3d 144 (2d Cir. 1998); accord, Walker v. Pepsi-Cola Bottling Co. and Teamsters Local 830, 2000 WL 1251906 (D. Del. 2000) (employee's variety of illnesses, including depression and anxiety, do not make him disabled under ADA in absence of evidence demonstrating substantial impairment in major life activity, such as inability to work in broad class of jobs).

Plaintiff's own pleadings and testimony in this case make it clear that she is not disabled and therefore cannot make out a prima facie case of discrimination.

(i)    <u>*Plaintiff Alleges only a "Temporary Disability"*</u>

Plaintiff's own complaints with the CHRO and this Court allege only that she suffered from a "temporary disability" while employed by Gardenside Terrace.  Complaint ¶ 21; Exhibit 16.[5]  According to plaintiff's CHRO complaint, this "temporary disability" was the emotional upset she allegedly experienced <u>after</u> the November 3, 2000 incident with Dan Pellechia.  Id. ¶ 4. This view of her own condition is affirmed by her deposition testimony, in which she said that the <u>only</u> time she was disabled was when Dan Pellechia "had me up against the wall."  Labonia Depo. at 42-43.  (In later responses to her request to admit, plaintiff evaded this issue by saying

---

[5] The original complaint filed with this Court is the governing complaint; plaintiff's motion to file an amended complaint was denied, and she made no further attempts to file amendments.

she was "uncertain" whether she had any disability other than the "temporary disability" related to Mr. Pellechia's actions of November 3.  Exhibit 17 ¶ 4.)

Courts within the Second Circuit, and the vast majority of courts that have considered the question, have held that temporary disabilities do not trigger the protections of the Americans with Disabilities Act because individuals with temporary injuries are not disabled.  "Temporary injuries . . . without substantial limitations and permanent effects, do not warrant the protections of the ADA."  LaJeunesse v. Great Atlantic & Pacific Tea Co., 160 F. Supp.2d 324, 332 (D. Conn. 2001); see also Toyota Motor Mfg. v. Williams, 534 U.S. 184, 197 (2002) (to qualify as disability under ADA, impact of health condition must be permanent or long term).  Even if a health condition is periodic or sporadic, rather than "temporary" in the sense of a one-time occurrence, it will not ordinarily qualify as a disability under the ADA.  A case in point is Nucifora v. Bridgeport Bd. of Educ., 188 F. Supp.2d 197, 205 (D. Conn. 2001), aff'd, 36 Fed. Appx. 472 (2d Cir. 2002).  In Nucifora, plaintiff testified that she was impaired in eating, sleeping, seeing, driving and focusing, but she admitted that these problems occurred only while she was intoxicated and that some of the problems occurred only infrequently.  She also admitted that she had since been hired for other jobs and needed no accommodation.  Explaining that such temporary problems do not constitute disabilities under the ADA, and that plaintiff had failed to establish a prima facie case, the court granted summary judgment for her employer.  And in Stronkowski v. St. Vincent's Med. Ctr., 1996 WL 684407 (D. Conn. 1996), a discharged employee argued that her back condition rendered her disabled under federal and Connecticut law.  But plaintiff in that case had told the Connecticut Labor Department that she had returned to work without restrictions, and that her part-time hours were merely designed to accommodate her physical therapy -- not to accommodate any inability to work for long hours.  The court noted

that even though plaintiff had some difficulty lifting, climbing stairs and driving, and that her pain medication sometimes made her sleepy, these conditions simply did not render her disabled. "Stronkowski's back condition was not of a particularly long duration and does not appear to have had a permanent or long-term impact. . . .  [A]lthough her condition was difficult, it continued to improve with time." Id.; accord, see also Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 870-71 (2d Cir. 1988) (affirming summary judgment for employer because plaintiff's periodic colitis not a disability under ADA, even though she occasionally soiled herself when symptomatic; plaintiff could take care of herself even when symptoms appeared); Burch v. Coca-Cola Co., 119 F.3d 305, 316 (5th Cir. 1997) (periodic inability to walk, talk, think, etc. resulting from alcoholism does not constitute disability under ADA).

        In this case, plaintiff in this case has unambiguously pleaded that her alleged disability is temporary, and then described it in testimony as temporary or at best occasional one.  Plaintiff testified that she was only disabled once, and that was when Mr. Pellechia supposedly had his hands on her.  Plaintiff testified that her anxiety was at its worst only for about one month, after the incident with Mr. Pellechia.  Such a temporary condition simply does not qualify as a disability under the ADA, and plaintiff therefore cannot establish a prima facie case of discrimination.  See Dunegan v. City of Council Grove, 77 F.Supp.2d 1192, 1203 (D. Kan. 1999) (granting summary judgment for employer because plaintiff's inability to work under particular supervisor is not substantial impairment in major life activity); Paleogos v. Rehab. Consultants, Inc., 990 F. Supp. 1460, 1464-66 (N.D. Ga. 1998) (granting summary judgment for employer because plaintiff who requested leave of absence for "stress related mental condition which [she] attributed to work related stress" is not disabled under ADA, even if stress interfered with relations with management).

(ii)     *Plaintiff Denies She Is Disabled, and Her Testimony Clarifies that* <u>*She is Not Substantially Impaired in a Major Life Activity*</u>

Plaintiff also cannot establish a prima facie case of disability discrimination because she has denied that she is disabled, and her testimony makes it clear that she is not substantially impaired in any major life activity.   Plaintiff freely admitted at her deposition that she does not consider herself disabled:

> Q   <u>Mrs. LaBonia, is it your contention that you are disabled?</u>
>
> A   <u>No.</u>
>
> Q   Is it your contention that while you worked at Gardenside Terrace you were disabled?
>
> A   As I worked?  Repeat the question, please.
>
> Q   Sure.  Is it your contention that during the period of time that you worked at Gardenside Terrace that you were a disabled person during that time?
>
> A   While I worked there?
>
> Q   Yes.
>
> A   A particular time was I disabled while working there?
>
> Q   At any time during your period of employment by Gardenside Terrace, were you a disabled person, in your own view?
>
> A   Yeah.  When he had me up against the wall, I was pretty disabled.
>
> Q   Was there any other time when you worked at Gardenside Terrace that you considered yourself to be disabled?
>
> A   No.

Labonia Depo. at 42-44.

Even if these isolated statements were not binding as an admission, plaintiff's testimony as a whole makes it clear that she is not disabled within the meaning of the ADA and its

regulations. Beyond the fact that plaintiff has identified herself as "temporarily" disabled, her description of her supposed health problems make it clear that whatever condition she has is neither significant nor prolonged enough to render her disabled in comparison to the general population.

In her third deposition session, after she had testified that she is not disabled at all, plaintiff did attempt to newly describe herself as disabled. First she said that her disability was "I got fired for someone putting their hands on me." Labonia Depo. at 346. She then said that her "disability" during her tenure at Gardenside Terrace was "anxiety attacks." Id. at 347. Plaintiff said, however, that she had no problems with anxiety during her first period of work at Gardenside, and that it was only about a month or so at the end of her employment -- after the incident with Mr. Pellechia -- that she had anxiety attacks on any regular basis. Id. at 349. She initially said that she had only "a few" or "a couple of" anxiety attacks during her employment at Gardenside overall, id. at 340-41, but then said that she had three or four attacks per week during her last month, but that she only left work four or five times during that period. Id. at 349-52. Plaintiff said she had only left work once for an anxiety attack in the entire time before the Pellechia incident. Id. at 352. During these "attacks," plaintiff was not substantially impaired in sleeping, eating, or other major life activities. Id. at 357-58. Plaintiff only takes Xanax or Valium "once an awhile" for such attacks. Id. at 276-77. According to her testimony, the anxiety attacks during her last month of work would last only from 15 minutes to an hour, and she was able to take care of herself during these times. Plaintiff explicitly admitted that her so-called anxiety attacks did not prevent her from performing any major life activities even during her last month of employment -- the time when she described those "anxiety attacks" to be at their most severe. Id. at 358. Plaintiff also testified that her job performance at Gardenside

Terrace was good, except when she had her few anxiety problems. Id. at 340-41. (In fact, she was promoted during her year of employment. See Exhibit 1.)

Once again, the guiding principle of the ADA is that an individual is not entitled to protection without demonstrating, through specific and individual evidence, that she is substantially impaired in a major life activity. In general, "major life activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2 (i). To prove that an impairment substantially limits the major life activity of working, a plaintiff must show that she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2 (j)(3)(i) . "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." Id. As the U.S. Supreme Court has noted, an individual must have an impairment that prevents her from doing activities that are of "central importance to most people's daily lives" in order to be disabled under the ADA. Toyota Motor Mfg. at 197.

Plaintiff has not brought forward evidence sufficient to meet this standard. First, she has not even identified any major life activity in which she is substantially impaired. There is no evidence that she cannot walk, talk, care for herself, etc. as well as the population as a whole. Even assuming that the pertinent life activity is "working," plaintiff has no evidence that she is substantially impaired from performing a class or broad range of jobs; since leaving Gardenside Terrace, she has gone on to a number of jobs in the restaurant industry, see Exhibit 18, and she would have applied for jobs in assisted living centers if she would not have felt awkward about explaining her termination. Labonia Depo. at 387-88.

The mere fact that plaintiff suffered occasional anxiety attacks while at Gardenside Terrace, especially because of problems with Mr. Pellechia, clearly is not sufficient to qualify her as disabled.  See Reeves v. Johnson Controls World Servs., Inc., 140 F.3d 144, 150-53 (2d Cir. 1998) (affirming summary judgment for employer because panic disorder with agoraphobia not disability under ADA, in absence of showing of substantial impairment in major life activity); MacGovern v. Hamilton Sunstrand Corp., 170 F.Supp.2d 301, 310 (D. Conn. 2001), aff'd, 50 Fed. Appx. 59 (2d Cir. 2002) (granting summary judgment for employer where no evidence that employee's depression and seasonal adjustment disorder caused substantial impairment in major life activity).  Instead, the pleadings and undisputed evidence in this case demonstrate only that plaintiff suffered from occasional anxiety attacks, for which she occasionally took medication.  The attacks caused her to miss work occasionally.  The attacks were exacerbated by plaintiff's problems with Mr. Pellechia, so that she experienced more such attacks during the last month or so of her work at Gardenside Terrace.  She was always able to take care of herself.  Even if plaintiff has experienced such periodic anxiety attacks in other contexts, at other times, she cannot show that this kind of condition substantially impairs her in a major life activity -- and indeed, she admits that it does not.  Her claim of discrimination must therefore fail as a matter of law.

B.    *Plaintiff Has Not Pled and Cannot Prove any Connection between a "Disability" and a Tangible Detriment in the Terms and Conditions of her Employment*

Plaintiff's complaint seems to suggest that her employment was terminated because of her alleged disability, but it fails to set forth any factual underpinning for such a claim, and there is no evidence to support such a claim.  Moreover, plaintiff has repeatedly testified that, in her view, she was discharged in retaliation for her complaints about Mr. Pellechia's actions, and

solely for that reason.  See infra at 35-36.  Therefore, there is no basis for a claim that plaintiff's

employment was terminated because of any disability.[6]

II.    PLAINTIFF'S CLAIMS OF GENDER DISCRIMINATION & SEXUAL
       HARASSMENT MUST FAIL AS A MATTER OF LAW

Plaintiff's claims that defendant Doran Associates treated her differently because of her

gender, and that she was sexually harassed by way of a hostile work environment, are equally

baseless.

A.    *Plaintiff has Failed to Establish a Prima Facie Case of Gender Discrimination or
      Hostile Work Environment*

A claim of gender-based disparate treatment requires a showing of an adverse

employment action because of gender.  E.g., Alfano v. Costello, 294 F.3d 365, 373 (2d Cir.

2002).  In order to meet her burden of setting forth a prima facie case of gender discrimination in

the terms and conditions of her employment, plaintiff must bring forward admissible facts

showing that "she was treated less favorably than comparable male employees in circumstances

from which a gender-based motive could be inferred."  Luciano v. Olsten Corp., 110 F.3d 210,

215 (2d Cir. 1997).  The plaintiff also must show a link between the discrimination and "tangible

job benefits" such as compensation, terms, conditions or privileges of employment.  Alfano at

373.

Apart from the termination of her employment (which will be discussed below),

plaintiff alleges broadly that "in the manner described above" in her complaint, she was

discriminated against in the terms and conditions of her employment because of her gender.  The

only fair reading of the section comprising "the manner described above" is that plaintiff is

alleging a hostile work environment, based on "abusive and harassing conduct" by Dan

---

[6] In any event, Gardenside Terrace has articulated a legitimate nondiscriminatory reason for its decision, and
plaintiff has failed to demonstrate that such a reason is pretextual.  See infra at 38-39.

Pellechia.  A gender-based claim based on this conduct must fail, however, because:  (1)

plaintiff's own submissions and evidence demonstrate that Mr. Pellechia's conduct was gender-

neutral; (2) the conduct did not nearly rise to the level of a hostile work environment; and (3)

there is no evidentiary basis for imputing any allegedly objectionable conduct to Gardenside

Terrace.

> 1.    *Plaintiff has no Evidence that She was Treated Differently, in any*
> *Material Way, Because of Her Gender*

It goes without saying that mean or harsh conduct in itself will not support a claim of sex

discrimination claim unless that conduct is directed toward a particular gender.  See, e.g., Brown

v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) (plaintiff must demonstrate that conduct

occurred because of her sex).  Wide varieties of conduct by employers and co-workers can be

offensive or objectionable, but such behavior does not fall within the purview of Title VII unless

it is intended to harm someone because of gender.  As the Second Circuit has recently

emphasized:

> Everyone can be characterized by sex, race, ethnicity, or (real or
> perceived) disability; and many bosses are harsh, unjust, and rude.
> It is therefore important in hostile work environment cases to
> exclude from consideration personnel decisions that lack a linkage
> or correlation to the claimed ground of discrimination.  Otherwise,
> the federal courts will become a court of personnel appeals.

Alfano v. Costello, 294 F.3d 365, 377 (2d Cir. 2002).  The role of the court is to prevent

employment practices that are genuinely unlawful, and "not to act as a superpersonnel

department that second guesses employers' business judgments."  Byrnie v. Board of Educ., 243

F.3d 93, 103 (2d Cir. 2001).  Federal courts are not in the business of judging whether or not

employment decisions are prudent or fair.  E.g., Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir.

2002).  Evidence of objectionable behavior, if facially neutral as to sex, is irrelevant to a claim of

sexual harassment without evidence that it was directed at harming a person on the basis of gender.  See Bowman v. Shawnee State Univ., 220 F.3d 456, 464 (6th Cir. 2000).   "The discrimination must be because of sex."  Leibovitz v. New York City Transit Auth., 252 F.3d 179, 189 (2d Cir. 2001) (emphasis in original).

Not only has plaintiff repeatedly pointed out that Mr. Pellechia was mean to everybody on the staff, however, both male and female, but she herself went out of her way to obtain written statements to this effect.  Those statements, which plaintiff procured, Labonia Depo. at 161-63, and then submitted to the CHRO, are attached as Exhibits 4-7.  One male co-worker refers to Mr. Pellechia as "Hitler."  A female employee complains about Mr. Pellechia's meanness to a chef named Joe (who is male, Labonia Depo. at 171) and a dishwasher named Dave.  Another employee named Robert Lord complains that Mr. Pellechia (labeled a "control freak") "spoke to us rudely and even lost his temper."  A fourth statement by a male employee says that Mr. Pellechia was belittling to him and others.  Such statements (which will be corroborated by other employees of both genders) contradict any claim of sex discrimination.  Mr. Pellechia was disliked by males and females alike, because they felt he treated them all disrespectfully.

Plaintiff's own testimony repeatedly confirms that Mr. Pellechia treated both men and women badly.  Plaintiff testified that Mr. Pellechia was rude and "just didn't know how to talk to people."  Questioned about the difference between Mr. Pellechia and his predecessor, plaintiff testified as follows:

> Q     Did his style differ from Mr. Plaumann's?  At some point did
>        you become aware of that?
>
> A     He was rude.
>
> Q     How so?

A    I don't know.  He just didn't know how to talk to people.  He was just was loud, rude.  I can't explain it.  He was just like -- he just didn't know how to talk to people.

Q    Was he loud and rude to everybody?

A    Yeah, like -- yeah, he was pretty loud and rude to -- the poor dishwasher had a problem with him, made fun of him because he was a dishwasher, called him a loser, and I went to Mr. Shelton about that and Dave Goodman did.  He just didn't have a way with words.

Q    Do you remember the name of that dishwasher?

A    Dave Goodman.

Labonia Tr. at 87.  According to plaintiff, everybody in the dining staff complained about Mr. Pellechia's behavior, including chefs, id. at 88-89; the chefs were all male.  Id. at 78.  "The guys in the kitchen" said that Mr. Pellechia was rude and nasty.  Id. at 94.  In fact, a lot of the dishwashers, who were all male (id. at 78), referred to Mr. Pellechia as "Hitler."  Id. at 98-99. According to plaintiff's testimony, a dishwasher named Fred Moore told plaintiff that he did not know if he could stand Mr. Pellechia any more, because of the way that Mr. Pellechia was "riding" him.  Id. at 100.  Robert Lord, who was the only male on plaintiff's waitstaff, also complained that Mr. Pellechia was rude and nasty.  Id. at 101.  Just a few days after Mr. Pellechia started, according to plaintiff, he "went off on one of the dishwashers."  She testified that he was loud and rude to everybody, id. at 87-90.  Even at her third deposition session (when her original attorney had been replaced), plaintiff summarized by saying that Mr. Pellechia was very critical of "me and everybody."  Id. at 366-69.  Plaintiff's own statements even show that Mr. Pellechia was in a foul mood toward the entire staff on the day of the incident with her, id. at

113, and there is no fact demonstrating that he was motivated by plaintiff's gender in his actions that day.

While it is true that plaintiff complained to Gardenside Terrace management about Mr. Pellechia's behavior, she never once indicated that this behavior was directed at females or based on gender, and she admits that male cooks and dishwashers were making the same complaints as female waitresses. Labonia Depo. at 89-90; Exhibit 2 ¶ 31; Exhibit 7 ¶ 4. Indeed, plaintiff admits that defendant Christian Shelton decided to promote her to dining room manager shortly after she was hired as a waitress, and that gender was irrelevant to his decision. Labonia Depo. at 78-79. Even more tellingly, plaintiff testified that Mr. Shelton supported her in her opposition to a blatant attempt by Robert Plaumann, Mr. Pellechia's predecessor, to favor males in hiring and wages. Id. at 76. In short, Plaintiff cannot bring forward any credible evidence that Dan Pellechia or Gardenside Terrace treated female staff worse than male staff, and her claim of gender discrimination must fail as a matter of law.[7]

2.    *Plaintiff Has No Evidence of a Hostile Work Environment*

As described below, plaintiff may have experienced an objectionable and intrusive incident on November 3, 2000, and she may have worked with an unpleasant co-manager before that time; she was not, however, subjected to sexual harassment by any stretch of the imagination.[8] The core of plaintiff's complaint appears to be the allegation that she was exposed to a "hostile work environment" as an employee of Gardenside Terrace. This claim based on allegations that: (1) Mr. Pellechia was verbally abusive and condescending toward women,

---

[7] There was a passing reference at plaintiff's third deposition session to suggest that Mr. Pellechia was harsher to females than males. But conclusory statements that males are treated better than females are insufficient to meet the evidentiary standard required for sending a sex discrimination claim to the jury. See Alfano v. Costello, 294 F.3d 365, 370-81 (2002).

[8] Plaintiff stated unambiguously that Mr. Pellechia was not her supervisor and that he had no control over her. Labonia Depo. at 93-94.

Complaint ¶ 12; and (2) Mr. Pellechia assaulted plaintiff on November 3, 2000 (mistakenly identified as December 3 in her complaint, Labonia Depo. at 107).  As already explained, there has been no showing that Mr. Pellechia's conducted was directed specifically at women.  But even aside from his motivation, and granting plaintiff the benefit of the doubt, this pattern of events does not establish a hostile work environment as a matter of law.

A claim of hostile work environment requires a showing:  (1) that the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and (2) that a specific basis exists for imputing the objectionable conduct to the employer.  Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998); Alfano v. Costello, 294 F.3d 365 (2d Cir. 2002).  "Not all work place conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII."  Harris v. Fork Lift Sys., Inc., 510 U.S. 17, 67 (1993).  The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule and insult that the terms and conditions of her employment were altered thereby.  Leibovitz v. New York City Transit Auth., 252 F.3d 179, 188 (2d. Cir. 2001).  "A hostile working environment is shown when the incidents of harassment occur either in concert or with a regularity that can reasonably be termed pervasive."  Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1189 (2d Cir. 1987).  "In order to survive summary judgment on a claim of hostile work environment harassment, a plaintiff must produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment."  Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000).  Moreover, "a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in

fact did perceive to be so." <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998) (emphasis

added). If the conduct is not severe or pervasive enough to create an objectively hostile or

abusive work environment that a reasonable person would find hostile or abusive, it is beyond

the scope of Title VII. <u>Harris</u>, 510 U.S. at 21.

In <u>Quinn v. Greentree Credit Corp.</u>, 159 F.3d 759 (2d Cir. 1998), the Second Circuit

affirmed the trial court's granting of summary judgment on the plaintiff's claim that she had

been subjected to sexual harassment under Title VII. In <u>Quinn</u>, the plaintiff alleged that she had

been subjected to offensive comments, including comments referring either to the speaker's own

sexual prowess, to plaintiff's body or to the plaintiff's and her husband's perceived sexual

orientation. <u>Id.</u> at 763-64. The plaintiff also alleged that co-workers displayed pornography,

pantomimed sex acts, and that her supervisor brushed against her breasts with papers he was

carrying. <u>Id.</u> The Court held that the plaintiff had not alleged facts sufficient to show that she

had been sexually harassed:

> Accepting as true all of [plaintiff's] allegations . . . we conclude
> that [plaintiff] has not produced evidence sufficient to support a
> finding that she was subject to abuse of sufficient severity or
> pervasiveness as to 'alter the conditions of [her] employment,'
> <u>Harris</u>, 510 U.S. at 21, 114 S. Ct. 367. Though the two incidents in
> question – [her supervisor's] comment, apparently regarding [her]
> posterior, and his use of papers held in his hand to touch her
> breasts – are obviously offensive and inappropriate, they are
> sufficiently isolated and discrete that a trier of fact could not
> reasonably conclude that they pervaded [her] work environment.
> Nor are these incidents, together or separately, of sufficient
> severity to alter the conditions of [her] employment without regard
> to frequency or regularity.

<u>Id.</u> at 768. Another case in point is <u>Hall v. Connecticut Regional Water Auth.</u>, 28 F.Supp.2d 76

(D. Conn. 1998). In <u>Hall</u>, plaintiff was a female customer service representative whose first

male supervisor allegedly shook his finger in her face and yelled at her repeatedly. On one

occasion, he also grabbed plaintiff's head and made her bow her head in agreement with her. He also annoyed plaintiff on a regular basis, and plaintiff alleged that his behavior was confined to females. According to plaintiff, a subsequent male supervisor asked about her menstrual period and called her a "bimbo" and a "stupid woman." Another supervisor allegedly yelled at plaintiff and explained his behavior by saying it was because of how women treated him. The <u>Hall</u> court granted the employer's motion for summary judgment, concluding that plaintiff had not produced sufficient evidence to support a finding "that she was subjected to abuse of sufficient severity or pervasiveness so as to alter the conditions of her employment." <u>See also</u> <u>Alfano v. Costello</u>, 294 F.3d 365 (2d Cir. 2002) (insufficient evidence to send hostile work environment claim to jury despite 12 alleged incidents of mistreatment, four of them sexual, including the placing of a carrot and two potatoes in plaintiff's mailbox arranged to suggest male genitalia).

Unless they are extremely serious, isolated incidents will not amount to discriminatory changes in the terms and conditions of employment; a single isolated instance of harassment will generally not suffice to establish a hostile work environment unless it was "extraordinarily severe." <u>Cruz</u>, 202 F.3d at 570. The Second Circuit has stated, for example, that one single <u>sexual</u> assault may be sufficient to meet this standard. <u>See</u> <u>Richardson v. New York State Dept. of Corr. Servs.</u>, 180 F.3d 426, 437 (2d Cir. 1989). In other words, even in instances involving one serious incident, the claim must fail without actual evidence linking behavior to the plaintiff's gender. <u>See</u> <u>Alfano</u>, 294 F.3d at 374. An isolated incident of severely improper behavior should not support a Title VII claim unless it includes evidence of "more pronounced discriminatory overtones." <u>See</u> <u>id</u>. at 379.

A recent case in point is <u>Howley v. Town of Stratford</u>, 217 F.3d 141 (2d Cir. 2000), where the Second Circuit reversed the grant of summary judgment for employer on the basis

primarily of one extreme incident that was unavoidably directed at the plaintiff <u>as a woman</u>.  In

<u>Howley</u>, the plaintiff was a female firefighter whose supervisor, in a meeting where plaintiff was

the only female, screamed at plaintiff to "shut the fuck up, you fucking whining cunt," made

inappropriate remarks about plaintiff's menstrual cycle, said "[t]here is no fucking way that I will

fucking apologize to the fucking cunt down there," then launched into an extended barrage of

obscene verbal abuse, including at least one comment to the effect that the reason she did not

make assistant chief was because she did not "suck cock good enough and only made lieutenant."

<u>Id</u>. at 148.  The supervisor then followed this extreme incident with continuing harassment.  The

court explained that the incident could be held by a juror to violate the gender discrimination

rules of Title VII because "<u>the fomenting of gender-based skepticism</u> as to the competence of a

commanding officer may easily have the effect, among others, of diminishing the respect

accorded the officer by subordinates and thereby impairing her ability to lead in the life-

threatening circumstances often faced by firefighters."  <u>Id</u>. at 154 (emphasis added).  It is clear

that the <u>Howley</u> court would not have reached the same result without the evidence that this

single incident of beratement and insult at the meeting was based on the plaintiff's gender, and

not simply an example of a supervisor's extreme meanness.

Plaintiff's evidence in this case does not satisfy the standard of "pervasiveness or

severity" that is required to send a hostile work environment claim to the jury.  In the first place,

plaintiff freely admits that Mr. Pellechia's behavior was not sexual in any way (on either

November 3, 2000 or on any other occasion).  Labonia Depo. at 123-24.  In fact, plaintiff freely

admitted that no one at Gardenside Terrace had ever done anything inappropriately sexual to her.

<u>Id</u>. at 124.  Second, plaintiff has repeatedly insisted that Mr. Pellechia was not her supervisor and

that he had no control over her work.  <u>Id</u>. at 93-94.  Third, there is simply no evidence that Mr.

Pellechia's behavior on November 3, 2000 was gender-based; unlike the supervisor in <u>Howley</u>, Mr. Pellechia said and did nothing to relate his actions to the fact that plaintiff is a woman.

Fourth, even if there were somehow any evidence that Mr. Pellechia was directing his behavior at plaintiff as a woman, his behavior that day was not sufficiently extreme. According to plaintiff's own handwritten account about the incident (which again mis-identifies it as occurring on December 3), she was in the Gardenside Terrace kitchen, on the telephone with her mother. Exhibit 9. When a waiter complained about the heat, Mr. Pellechia "approached us and I suggested he open the rear door for some ventilation." At this point, Mr. Pellechia yelled and "threw off his chef hat grabbing me by both my arms and began shaking me violently." <u>Id</u>. She told Mr. Pellechia to take his hands off, and he reached over and hung up the phone. He then "had me against the wall," which prevented plaintiff from leaving. At this point, office personnel entered and ordered Mr. Pellechia to get away from plaintiff, which he did. <u>Id</u>. Plaintiff's report to the police was very much to the same effect. <u>See</u> Exhibit 15. At her deposition, plaintiff added that Mr. Pellechia was poking her in the shoulder and collarbone, and spun her around. Labonia Depo. at 115-23. According to plaintiff, Mr. Pellechia also called her a "goddamn stupid idiot." <u>Id</u>. at 121. Plaintiff also said that Kim Maturo, the Office Manager for Gardenside Terrace, "came flying into the kitchen, thank god" right after the incident, and Ms. Maturo took Mr. Pellechia into the office, away from plaintiff. <u>Id</u>. at 126. Granted that a single <u>sexual</u> assault could be severe enough to constitute a hostile work environment, this incident -- even as described by plaintiff herself -- was neither sexual nor gender-based, nor was it severe enough to qualify as sexual harassment.

3.      *There is No Basis for Imputing any Allegedly "Hostile" Behavior to Gardenside Terrace, Which Immediately Resolved the Problem*

Beyond the question of the conduct involved is the question of employer liability for alleged sexual harassment.  According to the recent pronouncements of the U.S. Supreme Court, an employer will not be liable for a co-employee's harassing activity unless the employer either provided no reasonable avenue of complaint or knew of the harassment but did nothing about it.  Faragher v. City of Boca Raton, 524 U.S. 775 (1998).  In this case, plaintiff herself has insisted that Mr. Pellechia was not her supervisor and that he did not direct her work in any way; according to plaintiff; she controlled the waitstaff and he controlled the kitchen staff.  Labonia Depo. at 93-96.  It is undisputed that Gardenside Terrace had a reasonable avenue of complaint, since it had a written sexual harassment policy, Exhibit 13, and since plaintiff herself testified that she repeatedly complained about Mr. Pellechia's behavior to Gardenside management.  But the problem with plaintiff's claim here is that she never once complained to management about sexual harassment; she complained that Mr. Pellechia was rude and nasty, but never that he was directing this behavior to women in particular.  Labonia Depo. at 104-05, 256-58, 397-98; Exhibit 2 ¶ 12; Exhibit 8 ¶¶ 3-4.  In fact, plaintiff complained about Mr. Pellechia not only on her own behalf, but also on behalf of male co-workers and the total group of dining employees. Labonia Depo. at 87-88, 103-05, 259.  Since male employees were complaining as well, id. at 88-89, Gardenside may reasonably have concluded that there was a "rude and nasty" supervisor on the premises, but there was no possible basis for Gardenside management to infer that Mr. Pellechia was violating its sexual harassment policy.  Moreover, Gardenside Terrace took action immediately after the November 3 incident, by sending Mr. Pellechia off the premises and

making sure he never returned.[9]  According to plaintiff, Christian Shelton came outside to talk to

her right after the incident, apologized for what had occurred, and promised that it would not be

tolerated.  He reassured plaintiff that it would never happen again, and he did not even attempt to

make an issue of plaintiff's own behavior in the incident.  Labonia Depo. at 129-31.  He also told

plaintiff to go home with pay, and she ultimately received three paid days off because, according

to her, Mr. Shelton felt bad for what had happened.  Id. at 129-34.  Plaintiff testified that she felt

Mr. Shelton was doing the best he could to get to the bottom of the situation.  Id. at 135.

Gardenside Terrace took immediate corrective action for Mr. Pellechia's behavior on November

3, and there is no evidentiary basis for a finding that it is liable for any supposed sexual

harassment of plaintiff.

> B.  *Plaintiff Has Not Pled and Cannot Prove any Connection between her*
> *Gender and a Tangible Detriment in the Terms and Conditions of her*
> *Employment*

Plaintiff's complaint suggests that her employment was terminated because of her gender,

but it fails to set forth any factual underpinning, and there is no evidence to support such a claim.

Moreover, plaintiff has repeatedly testified that, in her view, she was discharged in retaliation for

her complaints about Mr. Pellechia's actions, and not for any other reason (except possibly, as

she admitted, the legitimate ones stated by Gardenside Terrace).  See infra at 34.  Therefore,

there is no basis for the claim that plaintiff's employment was terminated because of her

gender.[10]

---

[9] Plaintiff's most strenuous complaint about Gardenside Terrace is that it got rid of Mr. Pellechia without telling her immediately.  See, e.g., Labonia Depo. at 215-17.  She may be angry or upset about this fact, but it does not support any claim.

[10] In any event, Gardenside Terrace has articulated a legitimate nondiscriminatory reason for its decision, and plaintiff has failed to demonstrate that such a reason is pretextual.  See infra.

III.    PLAINTIFF'S CLAIM OF RETALIATORY DISCHARGE MUST FAIL AS A
        <u>MATTER OF LAW</u>

Plaintiff complains that defendants Doran Associates and Christian Shelton, the

Executive Director of Gardenside Terrace, illegally discharged her in retaliation for filing a

complaint or asserting her rights under Title VII and/or the ADA.  (This claim, under

Connecticut law, is the only remaining claim against Mr. Shelton individually.)  The claim is

baseless and should be dismissed.

In analyzing claims of retaliation, courts generally use the standard three-part burden

shifting approach already described above.  <u>Regional Economic Comm. v. City of Middletown</u>,

294 F.3d 35, 48 (2d Cir. 2002).  Under this familiar framework, plaintiff must establish a prima

facie case of illegal retaliation.  <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 506 (1993).  If

plaintiff can establish a prima facie case, the burden shifts to the employer merely to produce a

legitimate, nondiscriminatory reason for the discharge.  <u>Id</u>. at 509.  If the employer succeeds in

producing such a reason, any presumption of discrimination drops out of the picture.  Plaintiff

then bears the burden of proving that the legitimate reasons offered by the employer were not its

true reasons, but instead were a pretext for discrimination.  <u>Id</u>. at 507-08.  The combination of a

prima facie case and sufficient evidence to find that the employer's justification is false may, in

an appropriate case, be sufficient for a trier of fact to conclude that the employer unlawfully

discriminated, but the plaintiff at all times retains the ultimate burden of proof that his discharge

was illegal.  <u>Reeves v. Sanderson Plumbing Prods.</u>, 530 U.S. 133, 143 (2000).

A.    *Plaintiff has Failed to Establish a Prima Facie case of Retaliatory*
      *<u>Discharge</u>*

In order to set forth a prima facie case of retaliation, the plaintiff must show that she

"engaged in protected participation or opposition under Title VII, that the employer was aware of

this activity, that the employer took adverse action against the plaintiff, and that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action." E.g., Sumner v. United States Postal Service, 899 F.2d 203, 208-09 (2d Cir. 1990). Plaintiff's sole factual theory is that she was fired in retaliation for reporting the Dan Pellechia incident to the police; in fact, her deposition testimony repeatedly made it clear that this is plaintiff's single belief as to why she is no longer employed by Gardenside Terrace. As plaintiff testified, "I think they fired me because I went to the police." Labonia Depo. at 145. Plaintiff said she knows no other possible reasons for her firing (except for the reasons set forth in Gardenside Terrace's memo about her termination). Id. at 144-45. In fact, plaintiff claimed to have no other beliefs or even ideas as to why she would have been fired. Id. at 146-47. "I believe it was because I called the cops; I knew too much, seen too much." Id. at 260-62; accord, id. at 378-79, 389.

There are three interrelated reasons why plaintiff has not even met the requirements of a prima facie case in support of such a claim. First, there is no evidentiary support for an allegation that plaintiff contacted the police before she was fired by Gardenside Terrace. Second, the undisputed evidence reveals that Gardenside Terrace management was unaware of such a police report when it decided to terminate plaintiff's employment. Third, even if there were any genuine factual dispute as to those points, plaintiff as a matter of law was not asserting any rights under Title VII by going to the police about the November 3 incident.

       1.     *There is No Evidence that Plaintiff Reported the November 3 Incident to the Police Before She was Fired*

Plaintiff has no evidence to support her claim that she reported the incident of November 3, 2000 to the police before she was fired, and in fact the evidence unambiguously shows that

plaintiff did not report the Pellechia incident to the police until <u>after</u> Gardenside Terrace decided to terminate her.  This in itself must destroy any "retaliation" claim.

 The incident with Dan Pellechia occurred on Friday, November 3, 2000.  Labonia Depo. at 107.  There is no written documentation of any police complaint or investigation until six weeks later, at 3:30 p.m. on December 14, when plaintiff finally went to the Branford Police.  Exhibit 15.  The police report itself makes it clear that the complaint was inexplicably delayed.  <u>Id</u>.  At her deposition, plaintiff testified vaguely about going to the police earlier.  She also said that she actually had "called" the police on the day of the incident, but that she has no documents to demonstrate this.  Labonia Depo. at 137.  She said that there should be a tape recording of such a phone call but that she has never attempted to obtain it.  <u>Id</u>.  Plaintiff testified at deposition that she first visited the police station either December 11, 12 or 13, 2000, and that all she knows is that she was fired the day after she went.  <u>Id</u>. at 139, 142.  Plaintiff also promised to obtain documentation of the exact date she believes she went to the police, <u>id</u>. at 228, but she has not produced any document other than the police report.  Plaintiff's testimony was contradictory as to when she was fired -- first saying it was December 14 at 1:40 p.m., then that it was December 13 at 1:40 p.m., then that she does not know.  <u>Id</u>. at 143-44.  "To be exact," however, plaintiff said she thinks she was fired on December 13, 2000.  <u>Id</u>. at 144.  Plaintiff then testified that she could not recall what time she went to the police, or the days of the week when these events occurred.  <u>Id</u>. at 152-53.

 The specific and uncontroverted evidence, however, reveals the following.  The police report itself is unambiguously dated December 14, 2000 at 15:30 (3:30 p.m.) as the "Date and Time of Report."  Plaintiff admitted she has no evidence to support any belief that this information is incorrect.  <u>Id</u>. at 150-51.  On December 12, 2000, two days earlier, a Gardenside

Terrace employee named Megan Moran called and left a message that she would like to meet with Chris Shelton about a phone call from plaintiff. Exhibit 8 ¶ 11. The next day, December 13, 2000, Mr. Shelton met with Ms. Moran, Office Manager Kim Maturo, and Jean Rivas, the new Director of Dining Services. Id. ¶ 12; Exhibit 2 ¶ 28. At the meeting, Ms. Moran told the other three individuals that plaintiff had made highly inflammatory and objectionable statements on the phone to her. Exhibit 8 ¶ 12. Ms. Moran's report about the phone call was memorialized in a detailed memo of December 13, 2000. Exhibit 10. Among other things, Ms. Moran reported that plaintiff said: that Ms. Moran should not help Gardenside Terrace in any way; that one of its directors was a cocaine user; and that another co-worker was a drug dealer. According to Ms. Moran, plaintiff then proceeded to reveal the rate of pay for every member of the dining staff. Exhibit 8 ¶ 12. As a result of the December 13 meeting, Mr. Shelton decided to terminate plaintiff's employment the next day. Exhibit 2 ¶ 29. He talked to Ms. Maturo and Ms. Rivas about this decision but decided to "sleep on it" and make the decision official on December 14. Exhibit 11 ¶ 4; Exhibit 12 ¶ 4.

The next morning, December 14, 2000, as a result of that meeting, Mr. Shelton made the final decision to terminate plaintiff's employment. Exhibit 2 ¶ 29, Exhibit 11 ¶¶ 4-7; Exhibit 12 ¶¶ 4-5. Jean Rivas called plaintiff on the morning of December 14, with Mr. Shelton present, to inform her that she was discharged. Exhibit 11 ¶ 6. Mr. Shelton wrote and sent a letter to this effect before 3:30 p.m., the time that plaintiff went to the police. Id. ¶ 7. The undisputed evidence reveals that plaintiff did not report the Pellechia incident to the police until after the decision to terminate her employment.

2.     *The Undisputed Evidence Shows that Gardenside Management was Unaware of any Report to the Police when it Decided to Terminate Plaintiff's Employment*

Even if the Court were to find some factual dispute as to the timing of plaintiff's police complaint and the decision to fire her, there is no genuine evidentiary dispute as to whether Gardenside management knew about such a complaint when the decision was made. Chris Shelton and Kim Maturo, the two Gardenside managers who were involved in these events, have stated under oath that they know nothing about a police complaint when they met on December 13, 2000 or when the decision was made to terminate plaintiff the following day. Exhibit 11 ¶ 9; Exhibit 12 ¶ 6. It was only after plaintiff's termination that the Branford Police responded to Gardenside Terrace, based on plaintiff's complaint. Exhibit 2 ¶ 30; Exhibit 11 ¶¶ 8-9.

Plaintiff has no evidence to contradict this sworn testimony about the knowledge of Ms. Maturo and Mr. Shelton. Indeed, she admits that she has no factual support for her claim of retaliation, except for what she mistakenly or falsely alleges to have been the time relationship between her police complaint and her discharge. Labonia Depo. at 146. As plaintiff admitted, "There's no fact that supports it. It's just what I think happened." Id. at 147.

3.     *Plaintiff's Complaint to the Police does not Constitute Protected Activity Under Title VII*

In order to establish the second prong of her prima facie case of retaliation, "implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at activity prohibited by Title VII. Galdieri-Ambrosini v. National Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998). In Galdieri-Ambrosini, the court held as a matter of law that there was no indication in the plaintiff's complaints that she believed her co-worker's conduct to be based on gender, so that the employer could not have been held to retaliate against her for

opposing activity prohibited by Title VII.  An employer cannot fire someone for complaining about sexual harassment or discrimination, but plaintiff is not asserting that this is what happened here -- her theory is that she was fired for reporting Dan Pellechia's "assault" to the police.  As the police report of plaintiff's complaint makes clear, however, plaintiff made no official complaint about discrimination or harassment.  The police report makes no mention of gender of harassment.  Exhibit 15.  It is simply a complaint that someone "assaulted [plaintiff] at her place of employment."  Id.  Without a genuine assertion of protected rights under Title VII of the Civil Rights Act of 1964, of which her employer was aware, plaintiff's retaliation claim fails.

B. *Doran Associates has Articulated a Legitimate Nondiscriminatory Reason for Terminating Plaintiff's Employment, and She Has No Evidence that <u>Reason is Pretextual</u>*

1. *Plaintiff was Fired for Willful and Outrageous Violations <u>of Gardenside Terrace's Workplace Rules</u>*

Plaintiff's employment was terminated for one reason:  on December 12, 2000, she acted in an extremely disloyal and hostile manner to her employer, violating its clear workplace rules in the process.  Her statements are described in detail in the signed statement of Megan Moran, the co-worker whom plaintiff called on December 12.  <u>See</u> Exhibit 1.  Ms. Moran came forward to Mr. Shelton with this information voluntarily, without being asked.  Exhibit 8 ¶ 11.  Ms. Moran met with three Gardenside Terrace representatives (two female) to discuss her phone call with plaintiff.  The decision was then made to terminate plaintiff's employment for violating Gardenside Terrace's policies.  <u>See</u> Exhibits 10 & 13.  The reasons outlined in the memo about the meeting with Ms. Moran, and in the termination letter to plaintiff, clearly articulate a legitimate nondiscriminatory reason for her discharge.

2.    *There is No Evidence that Gardenside Terrace's Reasons for its Decision are a Pretext for Discrimination*

Plaintiff has produced no evidence that these reasons for the discharge are pretextual. Plaintiff recalls talking to Megan Moran for about ½ hour on or about December 12, 2000. Labonia Depo. at 177-80.  She admits that she and Ms. Moran discussed the subject of alleged forgery by Chris Shelton.  Id. at 184.  (Her testimony as to whether the other subjects of the memo were even discussed was evasive at best.  For example, she said that the discussion of drug use by management was not simply one conversation, but was "old news."  See generally id. at 184-202.)  She has no reason to doubt that Ms. Moran met with the three managers as indicated in the memo describing that conversation.  Id. at 181-82.  She has no information to indicate that Ms. Moran did not report the things described in that memo to management.  Id. at 187.  She considers Ms. Moran to be a truthful person.  Id. at 192.  She has no factual basis for a belief that Chris Shelton was upset about her supposed complaint to the police, or that this "upset" led to a decision to terminate her employment.  Id. at 262-63.  There is no genuine evidence to take issue with the credibility of Mr. Shelton or Ms. Maturo.  Without any such evidence of pretext, plaintiff's claim of retaliatory discharge is insufficient as a matter of law.

IV.    PLAINTIFF'S STATE LAW CLAIMS SHOULD BE DISMISSED FOR LACK OF SUPPLEMENTARY JURISDICTION

If the Court grants summary judgment on plaintiff's claims under the ADA and Title VII does not reach the merits as to her claims under state law, including the statutory claims under the Fair Employment Practices Act, then it should decline to exercise its supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367(a).  See Stronkowski v. St. Vincent's Med. Ctr., 1996 WL 684407 (D. Conn. 1996)

.

DEFENDANTS
DORAN ASSOCIATES AND
CHRISTIAN SHELTON


_____
Andrew A. Cohen, ct 07124
Letizia, Ambrose & Falls, P.C.
One Church Street
New Haven, CT 06510
(203) 787-7000

<u>CERTIFICATION</u>

I hereby certify that a copy of the foregoing was mailed postage prepaid via first class

mail on this 31st day of October 2003 to all counsel and pro se parties of record as follows:

John R. Williams, Esq.
Willams and Pattis, LLC
51 Elm Street, Suite 409
New Haven, CT 06510
Phone: 562-9931
Fax: 776-9494

Nicole J. Anker, Esq.
Bingham Dana
One State Street
Hartford, CT 06103-3178
Phone: 860-240-2700
Fax: 860-240-2818

David Casey, Esq.
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110-1726
Phone: 617-951-8000
Fax: 617-951-8736

_____
Andrew A. Cohen