U.S. DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LAURIE LABONIA | : | CASE NO: 3:01 CV 02399 (MRK) |
|     Plaintiff | : | |
| | : | |
| V. | : | |
| | : | |
| DORAN ASSOCIATES, LLC, ET AL. | : | |
|     Defendant | : | OCTOBER 31, 2003 |

DEFENDANTS DORAN ASSOCIATES & CHRISTIAN SHELTON'S
LOCAL RULE 9(C)(1) STATEMENT

1. Plaintiff Laurie Labonia was hired by defendant Doran Associates on January 2, 2000 to work as a waitress in its Gardenside Terrace assisted living facility in Branford. Exhibit 1.

2. Defendant Christian Shelton has been the Executive Director of Gardenside Terrace since it opened in November 1999. Exhibit 2 ¶ 2.

3. On April 16, 2000, Mr. Shelton promoted plaintiff to dining room manager and gave her a raise in pay. Exhibit 1; Exhibit 3, Deposition of Plaintiff ("Labonia Depo.") at 78-79.

4. As dining room manager, plaintiff supervised a waitstaff of about six individuals, which was all-female except for a male waiter named Robert Lord. Id. at 74-75, 96, 101.

5. Plaintiff does not believe that her gender played any role in her promotion. Id. at 79.

6. During plaintiff's employment, Gardenside Terrace contracted with an outside service called Bateman Food Service for supervision of its dining services. Exhibit 2 ¶ 4. Bateman is a division of Compass Group USA, Inc., a co-defendant in this case.)

7. The Director of Dining Services has always been a Bateman employee, while the other dining staff members are employees of Gardenside Terrace. Id. ¶ 4.

8. At the time of plaintiff's promotion to dining room manager, the Director of Food Services was Robert Plaumann. Exhibit 2 ¶ 5.

9. Over time, Mr. Plaumann's performance slipped, and in particular he became less strict about rules; he was liberal about breaks, for example, and he allowed the staff to eat a lot of the food and drink a lot of soda. Labonia Depo. at 55-61.

10. According to plaintiff, at one point after her promotion, Mr. Plaumann had his own private plan to bring in male staff at higher pay rates than the female staff, but both plaintiff and Mr. Shelton opposed this and it never was instituted. Id. at 76.

11. Mr. Plaumann resigned in October 2000, and Bateman replaced him with defendant Dan Pellechia. Exhibit 2 ¶ 2.

12. Plaintiff did not consider Mr. Pellechia to be her supervisor; she controlled the waitstaff and he controlled the kitchen staff. Labonia Depo. at 93-96.

13. When Mr. Pellechia started working at Gardenside, Mr. Shelton advised plaintiff, in effect, that he was a tough person, and that she should "bite [her] tongue" and "bear with him." Id. at 84-85.

14. In fact, only a few days after Mr. Pellechia started, he "went off on one of the dishwashers." Id. at 85.

15. All of the dishwashers were male. Id. at 78.

16. According to plaintiff, Mr. Pellechia was generally rude and "just didn't know how to talk to people." He was "just rude to everybody. He was just rude." Id. at 88.

17.     Mr. Pellechia made fun of a male dishwasher named Dave Goodman and called him a loser, and plaintiff herself complained to Chris Shelton about this.  Id. at 87.

18.     Mr. Goodman was very upset about Mr. Pellechia's behavior.  Id. at 88.

19.     Everybody complained about Mr. Pellechia's behavior, including the chefs.  Id. at 88-89.

20.     The chefs, like the dishwashers, were all male.  Id. at 78.

21.     Many of the dishwashers referred to Mr. Pellechia as "Hitler."  Id. at 98-99.

22.     A dishwasher named Fred Moore told plaintiff he did not know whether he could stand Mr. Pellechia anymore, because Mr. Pellechia was "riding" him so much.  Id. at 100.

23.     Robert Lord, the only male on plaintiff's waitstaff, also said that Mr. Pellechia was rude and nasty.  Id. at 101.

24.     In fact, plaintiff herself solicited statements from a number of her co-workers much later during her employment, after this dispute arose.  Labonia Depo. at 161-63.

25.     In one statement, dishwasher Fred Moore identifies Mr. Pellechia as "Hitler" and complains about things changed during his tenure, because Mr. Pellechia "wanted to know every move we made even going to the bathroom."  Exhibit 4.

26.     In another statement, a waitress named Veronica Gagne complained that Mr. Pellechia "came in with an angry bad attitude on e morning[.  H]e yelled at the chef Joe, another he yelled at the dishwasher Dave[.] Another 2 days he yelled at Laurie and one day he spoke to no one."  Exhibit 5.

27.     Ms. Gagne was referring to the week that culminated in November 3, 2000, the day on which Mr. Pellechia ultimately acted inexcusably toward plaintiff.  See id.

3

28.     In another statement, male waiter Robert Lord wrote that Mr. Pellechia "belittled the waitstaff, spoke to us rudely and even lost his temper."  Exhibit 6.

29.     According to Mr. Lord, Mr. Pellechia was a "control freak."  Id.

30.     In a fourth statement procured by plaintiff herself, dishwasher David Goodman writes that Mr. Pellechia was rude to plaintiff and grabbed hold of her on November 3, and that he "was also belittling to others, in this food service operations including myself."  Exhibit 7.

31.     In Mr. Shelton's own view, Mr. Pellechia's supervisory style was strict.  Exhibit 2 ¶ 12.

32.     Mr. Shelton was aware of conflicts between plaintiff and Mr. Pellechia because she had complained a number of times about his behavior, and in particular about his enforcement of the rules, which were often directed at her.  Id. ¶¶ 12-13.

33.     Plaintiff complained about Mr. Pellechia's "rude and nasty" behavior toward the entire dining hall staff, both male and female, and both males and females complained about him to management as well.  Labonia Depo. at 87-89, 100-05.

34.     As to Mr. Pellechia, the only thing that plaintiff can recall complaining about to Mr. Shelton was this general rudeness and nastiness (both to her and others of both genders).  Id. at 104-05, 255-59.

35.     Plaintiff "never mentioned, implied or inferred that Mr. Pellechia's comments, behavior or actions had anything to do with her gender or anyone else's gender."  Exhibit 2 ¶ 12.

36.     Plaintiff also complained repeatedly about Mr. Pellechia to Kim Maturo, Gardenside Terrace's office manager.  Exhibit 8, Maturo Affidavit ¶ 3.

4

37. She complained to Ms. Maturo that Mr. Pellechia was too strict, that he wanted plaintiff to perform her job duties, and that he always followed and enforced policies. She would tell Ms. Maturo that "This guy's got to go." Id. ¶ 3.

38. But plaintiff "never once complained that [Mr. Pellechia] was treating her differently from the other staff, or that Dan was treating women (or her) worse than men." Id. ¶ 4.

39. Nor did plaintiff complain to Ms. Maturo about sexual harassment. Id.; Exhibit 2 ¶ 12.

40. Plaintiff never submitted any written complaint about Mr. Pellechia. Labonia Depo. at 106.

41. On November 3, 2000, an incident occurred between plaintiff and Mr. Pellechia.

42. As plaintiff described this incident in a written statement, she was on the phone with her mother in the Gardenside Terrace Kitchen. Exhibit 9.

43. According to plaintiff's written statement, a waiter complained about the heat in the area, and Mr. Pellechia approached plaintiff and the waiter and suggested that the door be opened for ventilation. Exhibit 9.

44. According to plaintiff's written statement, Mr. Pellechia:

> immediately began yelling and threw off his chef hat grabbing me by both my arms and began shaking me violently. At this point I told him to take his hands off me at which time he reach[ed] over and hung up the phone. He had me against the wall preventing me from exiting the kitchen. Office personnel entered the kitchen and he was ordered to get away from me and go into another office, which he did.

Exhibit 8.

45. The written statement again says that plaintiff had complained about Mr. Pellechia's "temper and behavior (abusive) with me and other waitstaff," id., a staff that included the male Robert Lord.

46. Mr. Pellechia was yelling at the entire waitstaff on the day of the incident, which included Mr. Lord. Labonia Depo. at 113.

47. According to plaintiff's testimony, Mr. Pellechia poked her in the shoulder and collarbone, spun her around and pushed her arm down, calling her a goddamn stupid idiot. Id. at 115-23.

48. Nothing about Mr. Pellechia's conduct during this incident, or at any other time, was sexual. Id. at 123-24.

49. No one at Gardenside Terrace has ever done anything inappropriately sexual to plaintiff. Id. at 124.

50. According to plaintiff, office manager Kim Maturo "came flying into the kitchen, thank god," after the November 3 incident. Labonia Depo. at 126.

51. Ms. Maturo took Mr. Pellechia into a separate office, and plaintiff was taken to the front office so that she could calm down. Id. at 126-27.

52. Plaintiff had no further contact with Mr. Pellechia at Gardenside Terrace. Id. at 126-27.

53. Plaintiff did not suffer any physical injury or seek medical attention as a result of this incident. Id. at 136.

54. Plaintiff said that she had marks on her arms. Exhibit 8 ¶ 7.

55. Ms. Maturo saw no marks when plaintiff lifted her shirtsleeves. Exhibit 8 ¶ 7.

56. Chris Shelton arrived within 15 or 20 minutes. Labonia Depo. at 127.

57. Mr. Shelton immediately began an investigation. Exhibit 2 ¶ 19.

58. Mr. Shelton spoke first to Mr. Pellechia, who reported his interpretation of the incident. Id.

59. Mr. Shelton sent Mr. Pellechia home immediately. Id.

60. Plaintiff was outside having a cigarette, and Mr. Shelton came out to talk to her. Labonia Depo. at 129-31.

61. Mr. Shelton apologized for the incident and said that Mr. Pellechia should never have touched plaintiff. Id.

62. Mr. Shelton also said that such behavior would not be tolerated and that he would get to the bottom of it. Id. at 129-31.

63. Mr. Shelton told plaintiff to go home, with pay. Id. at 131.

64. Mr. Shelton also said, "Believe me, Dan Pellechia will be disciplined for this," and that Mr. Pellechia "would never be back." Id. at 133.

65. Plaintiff had no problem with anything that Mr. Shelton said, id. at 132, and in fact she recognized that he "felt bad and he was sincere about it, too." Id. at 133.

66. Mr. Shelton did not blame plaintiff at all, and he was very upset about Mr. Pellechia's actions. Id.

67. Mr. Shelton was not even interested in examining plaintiff's own behavior, but cared only about the fact that Mr. Pellechia had acted wrongfully by putting his hands on her. Id. at 129-31.

68. Nor did Mr. Shelton say anything negative about plaintiff as a woman. Id. at 134.

69. Plaintiff believed that Mr. Shelton was doing his best to get to the bottom of the situation. Id. at 135. Plaintiff asked Mr. Shelton if she should call the police. Exhibit 2 ¶ 22.

70. According to plaintiff, Mr. Shelton "discouraged" her from calling the police, but only by saying he would get to the bottom of it. Labonia Depo. at 154-55.

71. Plaintiff believes that Mr. Shelton did not want to upset the residents of the assisted living facility. Labonia Depo. at 154-55.

72. Mr. Shelton and Ms. Maturo gave plaintiff three days off, with pay. Labonia Depo. at 134.

73. Plaintiff is unaware of anyone else at Gardenside Terrace who ever received three days off with pay. Id. at 135.

74. Plaintiff was not disciplined in any way as a result of this incident. Exhibit 2 ¶ 23.

75. Plaintiff returned to work after her three days off. Exhibit 2 ¶ 24.

76. Other than the incident of November 3, 2000, plaintiff's only complaint about Mr. Pellechia was that he persistently found fault with the way she did her job and communicated that fact in an unprofessional way. Labonia Depo. at 368.

77. Mr. Pellechia was replaced shortly afterwards by Jean Rivas, a female. Id. ¶ 25.

78. Plaintiff did not report to work after Monday, December 11, because she said she was ill. Labonia Depo. at 207, 228.

79. On Tuesday, December 12, a co-worker named Megan Moran called Gardenside Terrace and left a message that she would like to meet with Chris Shelton and Kim Maturo about a phone call from plaintiff. Exhibit 7 ¶ 11.

80. Mr. Shelton, Ms. Maturo and Ms. Rivas met with Ms. Moran on Wednesday, December 13. Id.

8

81. Plaintiff was not present at the meeting and does not know about what Ms. Moran said or did not say there. Labonia Depo. at 187; see also Exhibit 2 ¶ 28; Exhibit 8 ¶ 12; Exhibit 10.

82. Plaintiff considers Ms. Moran to be a truthful person. Labonia Depo. at 192.

83. Plaintiff has no reason to doubt that Ms. Moran met with the three managers as indicated in the memo about the meeting. Id. at 181-82.

84. Plaintiff has no information to indicate that Ms. Moran did not report the things described in that memo to management. Id. at 187.

85. Plaintiff admits talking to Ms. Moran on the phone for about ½ hour on or about December 12, 2000. Id. at 177-80.

86. Ms. Moran reported at this meeting that plaintiff had called her on her cell phone on the previous day, and proceeded to verbally attack Gardenside Terrace and some of its employees, and to reveal private information about co-workers. Exhibit 7 ¶ 12; Exhibit 10.

87. Among other things, Ms. Moran reported that plaintiff said: that Ms. Moran should not help Gardenside Terrace in any way; that one of its directors was a cocaine user; and that another co-worker was a drug dealer. Exhibit 7 ¶ 12; Exhibit 10.

88. According to Ms. Moran, plaintiff then proceeded to reveal the rate of pay for every member of the dining staff. Exhibit 7 ¶ 12; Exhibit 10.

89. Ms. Moran signed a written memo outlining plaintiff's statements from the phone call. Exhibit 10.

90. The memo was also signed by Mr. Shelton, Ms. Rivas and Ms. Maturo. Id.

91. An accusation of forgery "was mentioned" during plaintiff's phone call to Ms. Maturo. Labonia Depo. at 184-86.

92. Discussion about drug use at did not occur simply in one conversation with Ms. Moran, but it was "old news." Id. at 184.

93. As a result of the December 13 meeting, Mr. Shelton decided to terminate plaintiff's employment the next day. Exhibit 2 ¶ 29.

94. At the close of the meeting, Mr. Shelton talked to Ms. Maturo and Ms. Rivas about this decision, but he felt that he should "sleep on it" and make the decision official on December 14. Exhibit 11 ¶ 4; Exhibit 12 ¶ 4.

95. On the morning of December 14, Mr. Shelton informed Ms. Maturo and Ms. Rivas of his final decision. Exhibit 11 ¶ 5; Exhibit 12 ¶ 5.

96. Mr. Shelton asked Ms. Rivas to telephone plaintiff to inform her that her employment was terminated. Exhibit 11 ¶ 5.

97. Ms. Rivas did in fact call plaintiff from her office on the morning of December 14, 2000, with Mr. Shelton present in the room. Id. ¶ 6.

98. Ms. Rivas told plaintiff that she was fired, and that she would be receiving a letter explaining the reasons. Id.

99. The call from Ms. Rivas was very short, probably less than a minute. Id.

100. Mr. Shelton drafted and signed a letter to plaintiff on the morning of December 14, outlining the reasons for her termination, and placed it in Gardenside Terrace's outgoing mail, which is ordinarily picked up at the end of the day. Id. ¶ 7.

101. The letter from Mr. Shelton stated that the reasons for plaintiff's termination were the passing of confidential information about employee wages, instructing a staff member to act in a disloyal and uncooperative manner, and making false or malicious statements concerning the

Clinical Director and a co-worker, all in violation of the personnel policy of Gardenside Terrace. Exhibit 13; Exhibit 2 ¶ 29.

102. The Gardenside Terrace personnel policy includes a number of reasons for termination, including insubordination, passing information of confidential nature to unauthorized persons, and the making of false or malicious statements concerning staff members. Exhibit 14.

103. Gardenside Terrace also had in force a clear sexual harassment policy, which was posted for all employees to see. The policy prohibited conduct and suggesting that complaints be made to one of two managers, one of whom was male and one of whom was female. Exhibit 14; Exhibit 11 ¶ 10.

104. Plaintiff believes that the <u>sole</u> reason for the termination of her employment was that she went to the police to complain about Mr. Pellechia. Labonia Depo. at 144-47, 260-62, 389.

105. Plaintiff knows of no other possible reason for her termination, except for what is written in the memo and termination letter. Id. at 144-45.

106. Official documents indicate that plaintiff did not go to the Branford Police Department to file a complaint about Mr. Pellechia's November behavior until December 14, 2000 at 15:30 (3:30 p.m.). Exhibit 15.

107. Plaintiff has no documentary evidence to support any belief that the date and time listed in that police report are incorrect. Labonia Depo. at 150-51.

108. Chris Shelton and Kim Maturo, the two Gardenside managers who were involved in these events, knew nothing about any police complaint by plaintiff when they met on December 13, 2000. Exhibit 11 ¶ 9; Exhibit 12 ¶ 6.

11

109.    Mr. Shelton and Ms. Maturo knew nothing about any police complaint by plaintiff when the decision was made to terminate plaintiff the following day.  Exhibit 11 ¶ 9; Exhibit 12 ¶ 6.

110.    It was only <u>after</u> plaintiff's termination that the Branford Police responded to Gardenside Terrace, based on plaintiff's complaint.  Exhibit 2 ¶ 30; Exhibit 11 ¶ 8.

111.    Late in the afternoon of December 14, 2000, Officer Bonfiglio of the Branford Police came to Gardenside Terrace.  Exhibit 11 ¶ 8.

112.    Officer Bonfiglio said that Ms. Labonia had just made a complaint, and he wondered why she had waited so long to report this incident.  Id.

113.    Chris Shelton told Officer Bonfiglio during that meeting that Ms. Labonia had been fired that morning.  Exhibit 11 ¶ 8.

114.    Plaintiff has no factual support for her claim that she was discharged in retaliation for this police complaint, except for what she mistakenly or falsely alleges to have been the time relationship between her police complaint and her discharge.  Labonia Depo. at 146.

115.    As to the allegation that she was discharged in retaliation for her police complaint, Plaintiff admits that "There's no fact that supports it.  It's just what I think happened." Id. at 147.

116.    Plaintiff has no factual basis for a belief that Chris Shelton was upset about her supposed complaint to the police, or that this "upset" led to a decision to terminate her employment.  See id. at 262-63.

117.    Plaintiff filed a complaint with the Connecticut Commission on Human Rights and Opportunities on February 15, 2001, alleging discrimination on the basis of gender and on the basis of having previously asserted statutory rights, and alleging that she was "not reinstated due to a disability." Exhibit 16.

118. Plaintiff's CHRO affidavit alleged that she "was temporarily disabled because of a physical assault by Respondent Dan Pellechia, just prior to my termination." Id. ¶ 4.

119. Plaintiff's CHRO complaint made no mention of any other "disability." Id.

120. In responses to her request to admit, plaintiff evaded this issue by saying she was "uncertain" whether she had any disability other than the "temporary disability" related to Mr. Pellechia's actions of November 3. Exhibit 17 ¶ 4.

121. In her deposition in this case, plaintiff said that the only time she was disabled was when Dan Pellechia "had me up against the wall." Labonia Depo. at 42-43.

122. Plaintiff admitted that she had only "a few" or "a couple of" anxiety attacks during her employment at Gardenside. Id. at 340-47.

123. Plaintiff takes Xanax or Valium "once an awhile" for such attacks. Id. at 276-77.

124. Plaintiff had no problems with anxiety during her first period of work at Gardenside, and that it was only after the incident with Mr. Pellechia that she had such attacks on any regular basis. Id. at 349.

125. Prior to her last month of work at Gardenside, however, she only left work early once for an anxiety attack. Id. at 352.

126. Plaintiff's alleged anxiety attacks during her last month of work would last only from 15 minutes to an hour; she was able to take care of herself during these times, and plaintiff admits that these so-called anxiety attacks did not prevent her from performing any major life activities. Id. at 358.

127. When she did need to go home for anxiety attacks, she was allowed to, and told to go home and relax. No one ever gave her any difficulty for this. Id. at 394.

128. According to plaintiff, her job performance was good, except when she had her few anxiety problems. Id. at 340-41.

129. Plaintiff withdrew her complaint from the jurisdiction of the CHRO before there was any determination as to "reasonable cause."

130. Plaintiff applied for another job with an assisted living center after leaving Gardenside Terrace. She does not apply for such jobs generally because she is reluctant to write down that she was terminated, and to explain what happened. Labonia Depo. at 387-88.

131. Instead, plaintiff has worked in restaurants. Id. at 49-51, 387; Exhibit 18 at 2.

>                     DEFENDANTS
>                     DORAN ASSOCIATES AND
>                     CHRISTIAN SHELTON
>
>
>                     _____
>                     Andrew A. Cohen, ct 07124
>                     Letizia, Ambrose & Falls, P.C.
>                     One Church Street
>                     New Haven, CT 06510
>                     (203) 787-7000

<u>CERTIFICATION</u>

I hereby certify that a copy of the foregoing was mailed postage prepaid via first class mail on this 31st day of October 2003 to all counsel and pro se parties of record as follows:

John R. Williams, Esq.
Willams and Pattis, LLC
51 Elm Street, Suite 409
New Haven, CT 06510
Phone: 562-9931
Fax: 776-9494

Nicole J. Anker, Esq.
Bingham Dana
One State Street
Hartford, CT 06103-3178
Phone: 860-240-2700
Fax: 860-240-2818

David Casey, Esq.
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110-1726
Phone: 617-951-8000
Fax: 617-951-8736

_____
Andrew A. Cohen