UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LAURIE LABONIA,
        Plaintiff       :

v.                  :

DORAN ASSOCIATES, LLC, et al  :
        Defendants    :

Civil Action No.
301CV2399(MRK)

October 31, 2003

MEMORANDUM OF LAW IN SUPPORT OF
COMPASS GROUP'S AND DANIEL PELLECHIA'S
MOTION FOR SUMMARY JUDGMENT

## I.   Introduction

Plaintiff Lauri Labonia ("Labonia") has prosecuted this case under two distinct legal theories. The tort aspect of her case is based on theories which cannot be asserted against employers because they are preempted by the workers' compensation statute; the discrimination aspect can only be asserted against employers because only they are liable under employment discrimination statutes. Labonia's straddling of these issues must end because she has admitted that she was employed by Gardenside Terrace ("Gardenside") only.[1] Thus, the claims she has

---

[1]    Defendant Doran Associates LLC does business as Gardenside. Stmt., ¶ 1.

CTDOCS:1550871.2

asserted against Compass Group USA, Inc. ("Compass")[2] as her employer cannot stand. For their part, the state tort law claims must either be dismissed as having no legal merit or be remanded to state court because, without viable discrimination claims, there is no federal jurisdiction.

## II.    Facts

Labonia claims that Daniel Pellechia ("Pellechia"), the sole Compass employee assigned to Gardenside to oversee the production and service of food to its residents, was rude to her and others. She also claims that, on one occasion, he accosted her physically. From this, Labonia charges Compass with discrimination and sexual harassment on principles of vicarious liability, and Compass as well as Pellechia with assault and other tort claims.

Gardenside is an assisted living facility located in Branford, Connecticut. Statement of Undisputed Facts ("Stmt."), ¶ 2. It had contracted with Compass to provide some oversight over its food services operations. Stmt., ¶ 3

In early 2000, Labonia responded to an advertisement in the newspaper for a position as a waitress at Gardenside. Stmt., ¶¶ 1, 4. Natalie Aldridge, Gardenside 's Dining Room Manager, made the decision to hire her. Stmt., ¶ 5.

When Labonia was hired, and for the duration of the time she spent at Gardenside, Labonia was an employee of Gardenside, and never an employee of Compass. Stmt., ¶ 6. She

---

[2]    Defendant Compass does business as Bateman Food Service. Stmt., ¶ 3.

was paid by Gardenside, not Compass. Stmt., ¶ 8. Decisions about her promotion were made by Gardenside's Executive Director, Christian Shelton ("Shelton"), not Compass. Stmt., ¶ 9. Gardenside maintained records of Labonia's hours and provided Workers' Compensation insurance for her. Stmt., ¶ 10, 30. Indeed, according to Labonia, she was supervised, evaluated, and promoted by Gardenside. Stmt., ¶ 11.

Robert Plaumann, Compass' sole employee at the Gardenside site, was replaced in the Fall of 2000 by another Compass employee, Pellechia. Stmt., ¶ 13. Pellechia was not Labonia's supervisor. Stmt., ¶ 14. Pellechia and Labonia worked separately. Stmt., ¶ 15. He interacted with the kitchen staff and Labonia supervised the wait staff. Stmt., ¶ 15.

According to Labonia, Pellechia was loud and rude to everybody - men and women alike. Stmt., ¶ 16. When Labonia complained about Pellechia's behavior, she complained only that he was rude, and made no other complaints. Stmt., ¶ 17.

On November 3, 2000, Labonia and Pellechia got into an argument over the heat in the kitchen (the "November 3 Incident"). Stmt., ¶ 19. Pellechia's behavior towards Labonia on November 3, 2000 (or at any time) was not sexual in nature. Stmt., ¶ 21. Indeed, during the time Labonia was at Gardenside, nobody there did anything inappropriately sexual to her. Stmt., ¶ 22.

After the argument between Pellechia and Labonia on November 3, 2000, both of them were kept apart. Stmt., ¶ 23. Labonia was permitted by Shelton to go home for the rest of that day, with pay, and given three days off with pay. Stmt., ¶ 24.

3

After November 3, 2000, Pellechia was no longer assigned to the Gardenside facility and Labonia and Pellechia never interacted again outside the context of this lawsuit. Stmt., ¶ 25. Labonia suffered no physical injuries whatsoever from her confrontation with Pellechia. Stmt., ¶ 26. Nor did she ever seek medical treatment as a result of the November 3 Incident. Stmt., ¶ 27. Labonia has not seen a psychiatrist, psychologist or other mental health professional since her termination from Gardenside. Stmt., ¶ 28. She has only seen a general practitioner who prescribed anxiety medication for a condition which preceded the November 3 incident by decades. Stmt., ¶ 28.

Labonia was fired by Gardenside on December 14, 2000. Stmt., ¶ 29. Only Shelton had the authority to fire her and he alone made the decision to do so. Stmt., ¶ 29. Labonia now sues on the theories of employment discrimination and tort for the incidents stemming from her employment relationship with Gardenside and the November 3 altercation with Pellechia.

## III.    Legal Argument

### A.    Standard for Summary Judgment

Summary judgment should be granted if the pleadings and other evidence show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2458, 91 L.Ed. 265 (1986); *AXA Marine and Aviation Ins. (UK), Ltd. v. Seajet Indus., Inc.*, 84 F.3d 622, 624 (2d Cir. 1996). "After discovery, if the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, then

4

summary judgment is appropriate." *Halpern v. Bristol Bd. of Ed.*, 52 F.Supp.2d 324, 329 (D.Conn. 1999) (internal quotation marks, brackets and citations omitted).

Here, summary judgment must be granted on all of Labonia's federal claims and on most if not all of her state claims. Any remaining state claims must be dismissed for lack of subject matter jurisdiction.

**B.    Compass was Not Labonia's Employer and, Therefore, Has No Liability Under the Anti-Discrimination Statutes**

Labonia fails to demonstrate that Compass was her employer and therefore liable under federal or state anti-discrimination statutes. Title VII prohibits an "employer" from discriminating with respect to an individual's "compensation, terms, conditions, or privileges of employment due to an individual's race, color, religion, sex or national origin." 42 U.S.C. §2000e-2(a)(1). To prevail on a hostile work environment claim under Title VII, the theory advanced by Labonia, a plaintiff must prove (among other things) that "a specific basis exists for imputing the conduct that created the hostile work environment to the employer." *See, e.g., Armstrong v. Chrysler Fin. Corp.*, 1998 WL 342045, *2 (D.Conn. 1998)[3] (citing cases) (emphasis added). Similarly, the CFEPA makes it a discriminatory practice for any "employer" to discharge any individual from employment or to discriminate against that individual in employment because of the individual's sex. Conn. Gen. Stat. § 46a-60(a)(1) (emphasis added).

---

[3]    Copies of all unreported decisions attached hereto as Exhibit A.

5

Federal courts, including the courts of our District, have consistently held that federal anti-discrimination statues apply only to the claims of an <u>employee</u> (or prospective <u>employee</u>) seeking redress for the unlawful employment practices of an <u>employer</u>. *Tadros v. Coleman*, 717 F.Supp. 996, 1002 (S.D.N.Y. 1989), aff'd, 898 F.2d 10 (2d Cir. 1990), cert. denied, 498 U.S. 869 (1990); *Eisenberg v. Advance Relocation and Storage, Inc.*, 82 F.Supp.2d 241, 245 (S.D.N.Y. 2000); *Krijn v. Pogue Simone Real Estate Co.*, 752 F.Supp. 102, 104 (S.D.N.Y. 1990), aff'd mem., 930 F.2d 910 (2d Cir. 1991). Thus, an individual may not maintain a federal discrimination claim against an entity which is not her employer.

According to the Second Circuit, when Congress drafted Title VII, it "had in mind 'the conventional master-servant relationship as understood by common-law agency doctrine.'" *Pietras v. Bd. of Fire Comm'rs of Farmingville*, 180 F.3d 468, 473 (2d Cir. 1999). Whether an individual is an employee for purposes of Title VII and the CFEPA, therefore, turns in the first instance on whether she has received direct or indirect remuneration from the alleged employer. *O'Connor v. Davis*, 126 F.3d 112, 116 (2d Cir. 1997). Direct remuneration means base pay and other compensation. "Indirect remuneration" means "significant benefits" such as "disability pension, survivors' benefits, group life insurance, and scholarships for dependents upon death." *Pietras*, 180 F.3d at 473.

Here, Labonia was paid by Gardenside and not Compass. Stmt., ¶ 8. She received no direct remuneration from Compass, such as wages, and no indirect remuneration such as benefits, pension, 401k, life insurance, scholarships, health insurance or any other benefit.

6

Furthermore, Labonia was not hired by Compass, and was not considered an employee of Compass by either Gardenside or Labonia. Stmt., ¶¶ 5, 7. Gardenside decided whether or not to promote her or fire her. Stmt., ¶¶9, 29. Gardenside maintained records of her hours, her employment, permitted her to take vacation, and overtime, and provided Workers' Compensation insurance for her. Stmt., ¶¶ 10, 30. Indeed, Labonia expressly stated that she was not a Compass employee. Stmt. ¶ 7.

The fact that Compass did not pay Labonia, while a critical factor in determining whether she was its employee, does not necessarily end the analysis. The term employer also "has been construed in a functional sense to encompass persons who are not employers in conventional terms, but who nevertheless control some aspect of an individual's compensation, terms, conditions, or privileges of employment." *EEOC v. Sage Realty Corp.*, 87 F.R.D. 365, 370 (S.D.N.Y. 1980). The Second Circuit has identified five factors relevant to determining joint employer status: "whether the alleged joint employer (1) did the hiring and firing; (2) directly administered any disciplinary procedures; (3) maintained records of hours, handled the payroll, or provided insurance; (4) directly supervised the employees; or (5) participated in the collective bargaining process." *AT&T v. NLRB*, 67 F.3d 446, 451 (2d Cir. 1995).

From the record in this case, its plain that Compass meets none of these requirements. Compass did not have the power to hire, promote or fire Labonia. Stmt., ¶¶ 5, 9, 29. Moreover, Labonia asserts that Pellechia, the sole Compass employee physically present at Gardenside, did not supervise Labonia. Stmt., ¶¶ 14, 15. Gardenside, not Compass, maintained records of

7

Labonia's hours, handled the payroll and provided workers' compensation insurance for her. Stmt., ¶¶ 8, 10, 30. Because there was no union at Gardenside, the final factor is inapplicable. Stmt., ¶ 31. Thus, Compass meets none of the criteria for being considered Labonia's "joint employer." Title VII and CFEPA therefore do not reach the alleged conduct in this case and summary judgment must be granted on Counts One and Two.

### C. Even if Compass was Labonia's Employer, She Fails to Demonstrate that the Work Environment was Sufficiently Hostile to Invoke Title VII's and the CFEPA's Prohibitions on Sexual Harassment.

"Generally, a claim of sexual harassment under federal law has proceeded 'on one of two theories: (1) quid pro quo - - e.g., favorable treatment in return for sought sexual favors - - or; (2) hostile work environment." *Garris v. Dept. of Correction*, 170 F.Supp.2d 182, 187-88 (D.Conn. 2001). The same principle holds true for allegations under the CFEPA. *Id.* at 187. As Labonia has no facts concerning quid-pro-quo sexual harassment, analysis of her case must focus on hostile work environment. The incidents she alleges, however, are simply not sufficiently severe or pervasive to constitute sexual harassment; nor, indeed were they sexual.

In order to establish a hostile work environment, "the workplace [must be] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create a hostile working environment." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 78 (1998). "In order to be actionable . . . a sexually objectionable environment must be both objectively and subjectively offensive, one that

8

a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. Boca Raton*, 524 U.S. 775, 787 (1998).

"[T]he mere utterance of an epithet which engenders offensive feelings in an employee does not implicate Title VII.  Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment - - and environment that a reasonable person would find hostile or abusive - - is beyond Title VII's purview." *Harris*, 510 U.S. at 21 (internal quotation marks and alterations omitted).  Thus, many courts have found that conduct similar to the conduct alleged here does not create a hostile work environment.  *Oliveira v. State of Connecticut Dept. of Children and Families*, No. 3:97CV412(CFD), 2000 WL 565489 (D.Conn. Mar. 29, 2000) (supervisor repeatedly yelling at and denigrating employee in front of other employees, and ordering her to perform menial tasks not pervasive or sufficiently severe to produce a hostile working environment); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 763-64 (2d Cir. 1998) (finding insufficient evidence of hostile work environment where a co-employee brushed against plaintiff's breasts with appears he was carrying and a comment about plaintiff's posterior).

An individual who is equally rude to both men and women does not create a sexually hostile environment.  *Sheehan v. Purolator*, 839 F.2d 99, 105 (2d Cir.) (affirming judgment against hostile work environment claim where supervisor's "temper was manifested indiscriminately toward men and women. . ."), cert. denied, 488 U.S. 891 (1988); *Johnson v.*

9

*Tower Air*, 149 F.R.D. 461, 469 (E.D.N.Y. 1992) (dismissing claim by female flight attendant based on insulting remarks and obscene gestures of supervisor; complainant not singled out on basis of gender because supervisor was irrational and vulgar with everyone; "[b]ehavior that is immature, nasty, or annoying, without more, is not actionable as sexual harassment."); *Fair v. Guiding Eyes for the Blind*, 742 F.Supp. 151, 156 (S.D.N.Y. 1990) (rejecting hostile work environment claim based on homosexual discussion by male supervisor equally offensive to both sexes); *Laird v. Gragin Fed. Bank*, 41 F.3d 1510 (7th Cir. 1994) (affirming summary judgment; "Title VII simply does not protect employees from generally abusive or hostile employers or supervisors."), cert. denied, 115 S.Ct. 2562 (1995); *cf Vaughn v. Pool Offshore Co.*, 683 F.2d 922, 925-26 (5th Cir. 1982) (African-American employee subjected to rude pranks not singled out because of his race because obnoxious treatment shared with other employees); *Bradford v. Sloan Paper Co.*, 383 F.Supp. 1157, 1161 (N.D.Ala. 1974) (both white and African-American employees felt overworked and harassed).

Nothing that Labonia has put forward demonstrates that Pellechia's behavior towards her was based on her sex. In fact, she expressly stated that his behavior towards her was <u>not</u> sexual in nature. Stmt., ¶¶ 21, 22. In addition, the undisputed facts demonstrate that Pellechia's alleged condescending statements -- and that is all he allegedly did under this claim -- were made to males and females alike. Stmt., ¶ 16. Thus, Labonia has failed to put forward evidence of a sufficiently severe or hostile work environment to support an allegation of sexual harassment.

10

**D.    Labonia's Claims of Disability Discrimination Fail Because She Had No Legally Protected Disability.**

Labonia alleges that she was discriminated against in violation of both the CFEPA (Count Two) and the ADA (Count One) on the grounds of her "temporary disability." Neither the ADA nor the CFEPA, however, encompass discrimination for temporary disabilities.

In order to create a *prima facie* case of discrimination under the ADA, a plaintiff must show that: (1) her employer is subject to the ADA; (2) she suffers from a disability within the meaning of the ADA; (3) she could perform the essential functions of her job with or without accommodations; and (4) she was fired because of her disability. *Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d 144, 149-50 (2d Cir. 1998). A disability within the meaning of the ADA is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual." 42 U.S.C. § 12102(2)(A). To ascertain if a plaintiff is disabled for the purposes of the ADA, courts have developed a three-prong test: (1) the plaintiff must be afflicted with a physical or mental impairment; (2) the impairment must have impact on a major life activity; and (3) the impairment must substantially limit that major life activity. *Bragdon v. Abbott*, 524 U.S. 624, 632-39, 118 S.Ct. 2196, 2002-05, 141 L.Ed.2d 450 (1998).

It is well-established that "[a] disability under the ADA 'does not include temporary medical conditions, even if those conditions require extended leaves of absence from work' because such conditions are not substantially limiting." *Huskins v. Pepsi Cola of Odgensburg*

11

*Bottlers*, 180 F.Supp.2d 347 (N.D.N.Y. Nov. 8, 2001) (*quoting Halpern v. Abacus Tech. Corp.*, 128 F.3d 191, 199 (4th Cir. 1997)). "Courts within this circuit and the vast majority of courts elsewhere which have considered the question, have held that temporary disabilities do not trigger the protections of the ADA because individuals with temporary disabilities are not disabled persons within the meaning of the act." *Graaf v. North Shore Univ. Hosp.*, 1 F.Supp.2d 318, 312 (S.D.N.Y. 1998). *See, also, Huskins*, 180 F.Supp.2d at 352 (collecting cases); *Lajeunesse v. Grate Atlantic & Pacific Tea Co., Inc.*, 160 F.Supp.2d 324 (D.Conn. 2001) (rotator cuff injury does not substantially limit major life activity as plaintiff's condition improved after surgery and much of the discomfort was temporary); *Stronkowski v. St. Vincent's Medical Center*, Civ. No. 3:94CV2175(AHN), 1996 WL 684407 (D.Conn. Aug. 1, 1996) (employee with temporary back injury not disabled under ADA).

The rationale behind excluding ADA protection for temporary disabilities is clear. As Judge Nevas noted,

> the ADA assure[s] that truly disabled, but genuinely capable, individuals will not face discrimination in employment because of stereotypes about the insurmountability of their handicaps. It would debase this high purpose if the statutory protections available to those truly handicapped could be claimed by anyone whose disability was minor and whose relative severity of impairment was widely shared. Indeed, the very concept of impairment implies a characteristic that is not commonplace and that poses for the particular individual a more general disadvantage in his or her search for satisfactory employment.

*Stronkowski*, 1996 WL at * 7 (citing *Venclauskas v. Conn. Dept. of Pub. Safety Div. of State Police*, 921 F.Supp. 78, 81 (D.Conn. 1995)).

Here, Labonia has specifically alleged that she was temporarily disabled, thus excluding her from coverage under the ADA. See Complaint, Count One. Furthermore, she has failed to identify any major life activity which was substantially effected by her alleged temporary disability, thus failing the pleading requirements of the ADA.

In addition, her testimony reveals a lack of actionable disability. She has expressly stated that, except for a few seconds while Pellechia had her pinned against the wall, she was not disabled while at Gardenside. Stmt., ¶ 32. A few seconds of disability quite simply does not create a disability cognizable under the ADA. Finally, as argued above, Labonia cannot successfully press an ADA claim against Compass because it did not employ her.[4]

Labonia's claims under the CFEPA for discrimination based on disability are similarly flawed. Section 46a-60(a)(1) provides that it is discriminatory for "an employer . . . to discharge from his employment any individual . . . because of the individual's . . . physical disability, including, but not limited to, blindness." "Physically disabled" is, in turn, defined under Conn. Gen. Stat. § 46a-51(15) as "any individual who has any chronic physical handicap, infirmity or

---

[4]   The ADA and Title VII have precisely the same definition of "employer." Thus, if Compass is not Labonia's employer under Title VII, it was not her employer under the ADA.

impairment, whether congenital or resulting from bodily injury, organic processes or changes or from illness, including, but not limited to, epilepsy, deafness or hearing impairment or reliance on a wheelchair or other remedial appliance or device." Thus, CFEPA claims based on disability are properly rejected where the plaintiff's injuries were merely temporary. *See Lajeunesse*, 160 F.Supp.2d at 333 (dismissing a CFEPA claim of an employee with a rotator cuff injury who was able to return to work almost immediately with restrictions on lifting weights and who, after surgery, experienced reduction of much of the discomfort he had temporarily experienced.)

The Court should, therefore, grant summary judgment on Labonia's disability-based claims contained in Counts One and Two.

E. **Labonia May Not Assert Retaliatory Discharge Claims Against Pellechia Individually or Compass.**

Although Labonia has attempted to assert claims for discriminatory discharge against Pellechia in his individual capacity, the CFEPA does not provide for individual liability. *Perodeau v. City of Hartford*, 259 Conn. 729, 744 (2002). To that end, this Court has already dismissed the CFEPA claim brought against Shelton in his individual capacity, ruling that "[t]he discriminatory discharge claim against defendant Shelton in count two is dismissed because Conn. Gen. Stat. §46a-60(a)(1) does not impose liability on individual employees." Decision, attached hereto as Exhibit B. Thus, under settled Connecticut law, and under the law of the case,

14

the Court must render summary judgment on Count Two to the extent that it seeks to impose individual liability against Pellechia.

Moreover, to the extent that Labonia asserts discriminatory discharge claims against Compass, she is precluded from doing so by the fact that Compass had no power to discharge her and, indeed, did not fire her. The witnesses (including Labonia) agree that Compass had no authority to fire her. Stmt., ¶ 29. Labonia herself suspects that Mr. Shelton made the decision to fire her and Mr. Shelton confirms that fact. Stmt., ¶ 29. As Compass did not discharge Labonia, it follows that Compass could not have discharged Labonia for discriminatory reasons. Labonia's claim against Compass for discriminatory discharge, therefore, fails.

**F.**    **Labonia has Failed to Assert Sufficiently Outrageous Conduct to Support an Intentional Infliction of Emotional Distress Claim.**

In her Fourth Count, Labonia makes a claim for intentional infliction of emotional distress. She has not advanced evidence to create a triable issue on this theory, however, because even if her allegations are true, Compass' and Pellechia's conduct falls far short of that which is sufficiently outrageous to support such a claim. The Court already recognized this when it granted Gardenside's Motion to Dismiss, ruling that "[t]he intentional infliction of emotional distress claim against defendants Shelton and Doran in count four is dismissed because the alleged conduct was not 'extreme and outrageous' within the meaning of this tort."[5]

---

[5]    Compass and Pellechia did not advance a motion to dismiss and, therefore, there is currently no ruling concerning Labonia's claims against Compass and Pellechia.

In order to prevail on a claim for intentional infliction of emotional distress, a plaintiff must prove that (1) a defendant intended or knew that emotional distress would likely result from its conduct; (2) a defendant's conduct was extreme and outrageous; (3) a defendant's conduct caused the plaintiff distress; and (4) the plaintiff's distress was severe. *Peytan v. Ellis*, 200 Conn. 243, 253 (1986). The disputed conduct must exceed all bounds tolerated by a decent society, and cannot be merely rude, tactless or insulting. *Id.* at 254.[6]

Labonia fails to demonstrate that Compass' and Pellechia's conduct or her emotional distress was sufficiently severe to support her claim. Liability requires conduct "of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." *Forsythe v. Ambrogio*, No. CV970404059S, 2001 WL 837717, **3 (Conn.Super.Ct. June 29, 2001). Here, Labonia's emotional distress was not sufficiently severe. She failed to consult any mental health professionals as a result of her altercation with Pellechia on November 3rd, or seek medical treatment of any kind, which indicates that her emotional distress was insignificant at best. Stmt., ¶¶ 26, 27, 28.

Labonia has also failed to show sufficiently outrageous behavior to support this claim. "Whether conduct alleged by a plaintiff rises to the level of 'extreme and outrageous' is, in the

---

[6]    "Liability has been found only where conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. . ." 1 Restatement (Second), Torts § 46, comment (d), p. 73 (1965).

first instance, a question for the court.  This is so at least in part to protect courts from being flooded by 'suits claiming distress for every kind of threat, indignity or abuse no matter how trivial.'"  *Roberts v. Kelley*, No. CV 980418904, 1999 WL 240731, **2 (Conn.Super.Ct. Apr. 9, 1999) (internal citations omitted).

Courts have refused to find liability for intentional infliction of emotional distress on facts similar to those alleged here.  *See, e.g.*, *Valencia v. St. Francis Hosp. & Med. Ctr.*, No. CV 940538867S, 1996 WL 218760, **8 (Conn.Super.Ct. Apr. 2, 1996) (allegations of defendant grabbing plaintiff's arm, pulling her into back room and yelling at her insufficient as a matter of law to support intentional infliction of emotional distress); *Rosenberg v. Meriden Housing Auth.*, No. CV950377376, 1999 WL 1034611, *6-7 (refusal to allow plaintiff to speak or respond to allegations about his conduct, interrupting him, and refusing to permit him to address his accusers during a meeting concerning the termination of his employment did not constitute extreme and outrageous conduct); *Henderson v. Hoban*, No. 391352, 1998 WL 405268, *5-6 (Conn.Super.Ct. July 10, 1998) (defendant shouting at plaintiff, threatening to strike her, verbally attacking her, threatening and abusing her, and inviting a physical altercation not sufficiently extreme and outrageous); *Richter v. Danbury Hosp.*, No. 307869, 1998 WL 321853, *6 (Conn.Super.Ct. June 9, 1998) rev'd on other grounds, 160 Conn.App. 280 (Conn.App. 2000) (defendant's showing his dislike and antipathy towards plaintiff, recommending reduction of his privileges, and influencing others to terminate his employment not sufficiently extreme and

17

outrageous); *DeLeon v. Little*, 981 F.Supp. 728, 738 (D.Conn. 1997) (supervisor's conduct in ordering employee to purchase illegal drugs, stand guard while supervisor ingested drugs, ordering employee to perform personal errands and tasks, making repeated calls to employee at her home, threatening to terminate employee and replace her with an individual of another race, implementing discriminatory sick time policies, monitoring work attendance, and criticizing employee in front of other employees not sufficiently extreme and outrageous); *Hill v. Pinkerton Sec. & Investigation Services, Inc.*, 977 F.Supp. 148, 160 (D.Conn. 1997) (conduct not extreme and outrageous where plaintiff complained about race discrimination and, as a result, was subjected to adverse employment conditions, transferred to two other locations, disciplined and reprimanded).

While the November 3rd Incident between Pellechia and Labonia was inappropriate and unfortunate, confrontations often occur in the work place. Even crediting Labonia's contentions that the argument was heated and that Pellechia poked her collar bone while yelling at her, this behavior is not sufficiently severe or outrageous to support a claim of intentional infliction of emotional distress.

Nor are Labonia's allegations that Pellechia spoke to her in a condescending fashion enough to support an intentional infliction of emotional distress claim because insults are insufficient to create such a cause of action. *See, e.g., Garris v. Dept. of Correction*, 170 F.Supp.2d 182, 190 (D.Conn. 2001) (allegations of supervisors entering plaintiff's office,

18

locking the door and threatening her with poor reviews insufficient to create cause of action for intentional infliction of emotional distress); *Armstrong v. Chrysler Fin. Corp.*, 1998 WL 342045 (D.Conn. May 14, 1998) (referring to an employee as "you-who" criticizing, insulting and demeaning her on daily basis, taking away her authority, declaring her incompetent, and demeaning her professional ability in front of supervisors does not meet the required threshold of outrageousness.); *Roberts v. Kelley*, No. CV 980418904, 1999 WL 240731, **2 (Conn.Super.Ct. Apr. 9, 1999) (being called a "liar" in a department store insufficient to support a claim for intentional infliction of emotional distress.) "Conduct that is merely insulting or displays bad manners or results in hurt feelings is not sufficient to form the basis for an action based upon intentional infliction of emotional distress." *Esposito v. Connecticut College*, No. X04CV970117504S, 2000 WL 1337665, **5 (Conn.Super.Ct. Sept. 1, 2000). "The liability clearly does not extend to mere insults, indignities, threats, petty oppressions or other trivialities." *Roberts*, 1999 WL at **2.

Labonia has failed to generate a triable issue on her claim for intentional infliction of emotional distress and summary judgment must be granted on Count Four.

**G.    The Conduct Alleged by Labonia Does Not Satisfy the Standard for Negligent Infliction of Emotional Distress.**

The conduct alleged by Labonia does not rise to the level necessary to support a claim for negligent infliction of emotional distress. The Connecticut Supreme Court recently decided that an employee may not bring a negligent infliction of emotional distress claim which arises during

19

an on-going employment relationship. *Perodeau v. City of Hartford*, 259 Conn. 729 (2002).

While Compass was not Labonia's employer, the policy considerations underlying the *Perodeau*

case are no less relevant here. The Court recognized that individuals who are employees "should

expect to be subject to. . . vicissitudes of employment, such as workplace gossip, rivalry,

personality conflicts and the like." *Id*. at 757. "Thus, it is clear that individuals in the workplace

should expect to experience some level of emotional distress, as a result of conduct in the

workplace. . . That is simply an unavoidable part of being employed." *Id*.

Even assuming that Labonia's testimony concerning the November 3 Incident is accurate,

it is clear that Pellechia's actions that day were simply the result of a personality conflict and the

conduct alleged was no more than a heated dispute over working conditions. It, therefore, falls

within the scope of *Perodeau* as conduct arising during an employee's working day and cannot

form the basis of a negligent infliction of emotional distress claim.

Labonia also asserts that the telephone call informing her of her termination of

employment amounted to negligent infliction of emotional distress. While it is understandable

that one might experience some emotional distress upon being informed of the termination of her

employment, this is merely part of the experience of being a member of the workplace. *See id*.

Neither the November 3 Incident nor the telephone call regarding the termination of Labonia's

employment is enough to rise to the level of negligent infliction of emotional distress and the

Court should grant summary judgment in favor of Compass and Pellechia on Labonia's Fifth

Count.

**H.    If Summary Judgment is Granted on all of Plaintiff's Federal Claims, the Court Must Dismiss her State Law Claims.**

Where there is no diversity of citizenship between the parties, a district court has only supplementary jurisdiction over a state law claim. *Collette v. St. Luke's Roosevelt Hosp.*, No. 99 CIV. 4864 GEL, 2002 WL 31159103, *11 (S.D.N.Y. Sept. 26, 2002). A district court may decline to exercise such jurisdiction where it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The Second Circuit has made it clear that a district court make the choice to decline jurisdiction over state law claims, stating that "if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well." *Castellano v. Bd. of Trustees*, 937 F.2d 752, 758 (2d Cir. 1991).

Here, there is no diversity of citizenship. Labonia is a Connecticut citizen as are defendants Shelton, Gardenside, and Pellechia. While Compass is a citizen of a foreign state, this fact alone does not change the analysis. There are Connecticut citizens on both plaintiff's side and defendants' side, thus destroying diversity. *Owen Equip. & Erection Co. v Kroger*, 437 U.S. 365, 373-74 (1978). Therefore, if the Court grants summary judgment on plaintiff Labonia's federal claims, it should decline jurisdiction over and dismiss any remaining state law claims.

CTDOCS:1550871.2

THE DEFENDANTS
COMPASS GROUP USA, INC. and DANIEL
PELLECHIA

By _____
     David Casey
     Nicole J. Anker [CT 20110]
     **Bingham McCutchen LLP**
     One State Street
     Hartford, CT 06103
     (860) 240-2700
     (860) 240-2818 (fax)
     Their Attorneys

CTDOCS:1550871.2

## CERTIFICATION

I hereby certify that a copy of the foregoing has been sent this 31st day of October,

2003 via first class mail, postage prepaid, to the following counsel of record:

John Williams, Esq.
Dawne Westbrook, Esq.
Williams and Pattis, LLC
51 Elm Street - Suite 409
New Haven, CT 06510

Andrew Cohen, Esq.
Letizia, Ambrose & Cohen, P.C.
One Church Street
New Haven, CT 06510

Nicole J. Anker

23

CTDOCS:1550871.2