1998 WL 342045
(Cite as: 1998 WL 342045 (D.Conn.))

Page 1

▷
Only the Westlaw citation is currently available.

United States District Court, D. Connecticut.

Cynthia ARMSTRONG
v.
CHRYSLER FINANCIAL CORP and Roger Pinneault

No. Civ. 397CV1557(AHN).

May 14, 1998.

RULING ON MOTIONS TO DISMISS

NEVAS, J.

*1 This employment discrimination case involves a claim of hostile work environment. The plaintiff, Cynthia Armstrong ("Armstrong"), alleges claims under Title VII, the Connecticut Fair Employment Practices Act ("CFEPA"), Conn.Gen.Stat. § 46a-60, and Connecticut common law. Pending before the court are the motions of the plaintiff's employer, Chrysler Financial Corporation ("Chrysler") and her supervisor, Roger Pinneault ("Pinneault"), to dismiss the complaint in its entirety pursuant to Fed.R.Civ.P. 12(b)(6). For the following reasons, the motions [docs. # 11 and # 13] are GRANTED IN PART and DENIED IN PART.

FACTS

The following facts are alleged in the complaint and are taken as true for purposes of this motion. Armstrong was employed by Chrysler as the customer service manager of its New Haven branch from 1983 until May 31, 1996. She performed her duties at a satisfactory or higher level, and always met or exceeded her job expectations. In January 1996, Pinneault became the branch manager.

Between January 1996 and May 31, 1996, Pinneault subjected Armstrong to verbal harassment. He addressed her and other female employees as "You-Who" and "Eloise," but addressed male employees by their proper names. He criticized, insulted, demeaned, and embarrassed Armstrong on a daily basis. He took away her authority as customer service manager, but he did not interfere with the authority of the office's two male managers. Pinneault frequently declared Armstrong incompetent and demeaned her professional ability in the presence of her superiors and subordinates. Pinneault's behavior was pervasive and created a working environment that was intimidating, insulting, and abusive to Armstrong and other female employees. Moreover, Chrysler failed to supervise Pinneault or to intervene to prevent him from engaging in sexually harassing conduct when it knew or, in the exercise of reasonable care, should have known of his conduct.

In addition to these facts, the defendants maintain that the court should also consider the facts which Armstrong alleged in the charges she filed with the CHRO. [FN1] Among those facts are that Armstrong resigned because the New Haven office was closing and that the reason she did not accept the position she was offered in the Boston zone office was that she would have to work under Pinneault's supervision.

FN1. As a general rule, matters outside the complaint cannot be considered on a motion to dismiss without converting the motion to one for summary judgment. See Fed.R.Civ.P. 12(b). However, where a plaintiff does not attach to the complaint or incorporate by reference a document on which it relies and which is integral to the complaint, a defendant may introduce that document as part of a motion attacking the pleadings. See Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir.1991), cert. denied, 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992). Accordingly, because the plaintiff's administrative charges are integral to the complaint, complaint, the court may properly consider the administrative complaint as part of the pleadings in this case.

DISCUSSION

Chrysler claims that the Title VII claim must be dismissed because the complaint does not allege facts that entitle Armstrong to relief. Pinneault moves to dismiss on the grounds that there is no

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1998 WL 342045
(Cite as: 1998 WL 342045 (D.Conn.))

Page 2

individual supervisory liability under Title VII or CFEPA, and because Armstrong failed to exhaust her administrative remedies against him. Both defendants maintain that the common law claims should also be dismissed.

I. *Sufficiency Of Title VII and CFEPA Claims*

Armstrong's claims under Title VII and CFEPA are characterized as "hostile work environment" claims. The defendants maintain that Armstrong has failed to establish on the face of her pleadings that a hostile work environment was created or that the situation she complains about should be imputed to Chrysler. The defendants also maintain that Armstrong has not properly alleged a constructive discharge. Armstrong contends that the complaint satisfies the minimal pleading requirements of the federal rules.

*2 The federal rules only require the complaint to set forth a "short and plain statement of the claim showing the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). This rule was designed to permit the defendant to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery. *See* 2A Moore's Federal Practice ¶ 8.13, at 8-73 (2d ed.1991). Under Rule 8(a), a plaintiff is not required to prove his case at the pleading stage. *See Ricciuti v. New York City Transit Auth.,* 941 F.2d 119, 124 (2d Cir.1991). Indeed, the pleading of evidence is not only unnecessary, but in contravention of proper pleading procedure. *See Geisler v. Petrocelli,* 616 F.2d 636, 640 (2d Cir.1980). The purpose of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence that might be offered in support of the claim. *See id.* at 639. "[A] complaint should not be dismissed for insufficiency unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim." *Id.*

To prevail on a hostile work environment [FN2] claim a plaintiff must show (1) that the workplace was permeated with discriminatory intimidation, ridicule and insult that was sufficiently severe or pervasive to alter the conditions of the work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer. *See Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 715 (2d Cir.1996); *Briones v. Runyon,* 101 F.3d 287, 291-92 (2d Cir.1996); *Karibian v. Columbia Univ.,* 14 F.3d 773, 777 (2d Cir.), *cert. denied,* 512 U.S. 1213, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994).

> FN2. Connecticut courts have held that federal standards apply to claims under Connecticut's employment discrimination statutes. *See Levy v. Commission on Human Rights & Opportunities,* 35 Conn.App. 474, 646 A.2d 893, *aff'd,* 236 Conn. 96, 671 A.2d 349 (1994).

Judging the complaint with these procedural and substantive principles in mind, it appears that Armstrong may be able to establish facts that entitle her to relief under Title VII and CFEPA.

A. *Sufficiency of Alleged Conduct*

With respect to the first element of the hostile environment claim, Armstrong alleges Pinneault subjected her on a daily basis to verbal harassment, criticism, insults, that he continually demeaned and embarrassed her about her appearance, that he took away her authority, and frequently declared her incompetent and demeaned her professional ability in the presence of others.

These allegations are sufficient to state a prima facie case under Title VII. Armstrong is entitled to develop and present a full evidentiary record to the trier of fact so that it can determine from the totality of the circumstances whether the harassment was so pervasive and severe as to create an abusive environment. *See Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (in determining whether the work environment was hostile the court should consider such factors as the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating or merely offensive, and whether it unreasonably interfered with the employee's work performance). Armstrong is also entitled to have all of her evidence considered in light of the social context in which the behavior occurred and its effect on her. *See Oncale v. Sundowner Offshore Serv., Inc.,* 523U.S. 75, ----, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1988) (noting that the inquiry into whether conduct violated Title VII requires

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1998 WL 342045  
(Cite as: 1998 WL 342045 (D.Conn.))

Page 3

careful consideration of the social context in which particular behavior occurs because "the real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed"). *See also Gallagher v. Delaney,* No. 97-7726, 1998 WL 119614, slip op. at *8 (2d Cir. March 19, 1988) (commenting that "[a]n Article III judge is not a hierophant of social graces [and that] [e]valuation of ambiguous acts present [ ] an issue for the jury.").

B. *Imputing Supervisor's Conduct to Chrysler*

*3 The allegations pertaining to this element of the hostile environment claim are that Pinneault was Chryler's agent, servant and employee and that Chrysler failed to supervise him or to intervene when it knew or should have known of his improper conduct.

In determining whether an employer is liable for an employee's conduct, the Supreme Court has directed lower courts to draw from traditional agency principles. *See Kotcher v. Rosa & Sullivan Appliance Center, Inc.,* 957 F.2d 59, 63 (2d Cir.1992) (citing *Meritor Savings Bank FSB v. Vinson,* 477 U.S. 57, 72, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). The Second Circuit has held that an employer is liable for the discriminatorily abusive work environment created by a supervisor if the supervisor uses his or her actual or apparent authority to further the harassment, or if he was otherwise aided in accomplishing that harassment by the existence of the agency relationship. *See Karibian v. Columbia Univ.,* 14 F.3d at 780; *see also Kotcher,* 957 F.2d at 64 (recognizing that the actions of a supervisor at a sufficiently high level in the hierarchy may be imputed to the employer). [FN3]

> FN3. There is no merit to the defendants' claim that Pinneault's conduct may only be imputed to Chrysler if Chrysler provided no reasonable avenue for complaint or knew of the harassment but did nothing to prevent it. The Second Circuit has stated that this standard only applies where the harassment is attributable to a co-worker, not a supervisor *See Karibian v. Columbia Univ.,* 14 F.3d at 780; *Van Zant,* 80 F.3d at 715.

Whether Pinneault used his authority to further the harassment or whether he was at a sufficiently high level in the hierarchy are issues that are not properly before the court on this motion to dismiss. Accordingly, Armstrong's allegations that Pinneault was her supervisor and Chrysler's agent are sufficient to allow the claim to survive.

Based on the foregoing, it does not appear that Armstrong can prove no set of facts entitling her to relief, and the motion to dismiss the hostile environment claim is denied.

C. *Sufficiency of Constructive Discharge Allegations*

The defendants maintain that Armstrong's claim of constructive discharge must be dismissed because she alleged in the administrative complaint that her employment with Chrysler ended because the New Haven office closed. They assert that this allegation is inconsistent with a claim of constructive discharge. Armstrong maintains that she has consistently asserted that Pinneault's behavior would, at some point, have forced her to resign and that this allegation states a constructive discharge.

To establish a constructive discharge, the plaintiff must show that the employer deliberately made the working conditions so intolerable that the employee was forced to resign. *See Stetson v. Nynex Serv. Co.,* 995 F.2d 355, 359 (2d Cir.1993). Ultimately the plaintiff must convince the trier of fact that "the working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have been compelled to resign." *Pena v. Brattleboro Retreat,* 702 F.2d 322, 325 (2d Cir.1983).

Here, the court agrees that Armstrong's allegation that she would have been forced to resign "at some point" if the New Haven office had not closed is not sufficient to state a claim of constructive discharge. However, she also asserts that she did not accept a position in the Boston zone office because she would have had to work under Pinneault's supervision. This is tantamount to resignation and is sufficient to state a constructive discharge claim.

II. *Individual Liability Under Title VII*

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1998 WL 342045  
(Cite as: 1998 WL 342045 (D.Conn.))

Page 4

*4 Pinneault moves to dismiss the Title VII claim against him in his individual capacity because the Second Circuit has held that individual defendants with supervisory control over a plaintiff may not be held personally liable under Title VII. *See Tomka v. Seiler Corp.,* 66 F.3d 1295, 1313 (2d Cir.1995). Armstrong submits that the Second Circuit incorrectly decided *Tomka* and urges the court to allow her claim against Pinneault to stand so that the Second Circuit will have an opportunity to correct its error.

The court declines Armstrong's invitation to disregard binding authority of the Second Circuit. *Tomka* is controlling this court and the claim against Pinneault in his individual capacity is dismissed.

III. *State Law Claims*

A. *Individual Liability Under CFEPA*

Pinneault moves to dismiss Armstrong's claim against him in his individual capacity under CFEPA. He maintains that this court should reconsider its ruling in *Murphy v. Burgess,* No. 3:96CV1987(AHN), 1997 WL 52960 (D.Conn. July 16, 1997), in light of the circumstances of this case. [FN4]

> FN4. There is no merit to the defendants' claim that the court should decline to exercise supplemental jurisdiction over this claim because it presents a novel issue that has not been decided by Connecticut courts. Pendent or supplemental jurisdiction is "a doctrine of flexibility, designed to allow courts to deal with cases involving pendent claims in the manner that most sensibly accommodates a range of concerns and values." *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988). Thus, the Supreme Court has instructed district courts to "deal with cases involving pendent claims in the manner that best serves the principles of economy, convenience, fairness, and comity which underlie the pendent jurisdiction doctrine." *Id.* at 357. "[W]here state-law claims are joined with a federal claim that has substance sufficient to confer subject matter jurisdiction on the federal court, and the claims derive from a common nucleus of operative fact such that it would ordinarily be expected that they would all be tried in one judicial proceeding, the district court has the power to take jurisdiction of the state-law claims as well." *Robinson v. Via,* 821 F.2d 913, 925 (2d Cir.1987) (citing *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 725-28, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). Moreover, this is not one of the unusual cases where the court would abuse its discretion by not dismissing the unresolved issue of state law. *See Morse v. University of Vt.,* 973 F.2d 122, 128 (2d Cir.1992).

In *Murphy* this court recognized that the express language of CFEPA does not provide for personal liability of supervisory employees, that neither the Connecticut Supreme Court nor the Second Circuit have addressed the issue, and that there is a split of authority among the Connecticut Superior Courts. *See Murphy,* 1997 WL 52960 at * 3-4. Nonetheless, it concluded that, based on the substantial differences between the statutory scheme and remedial provisions of CFEPA and Title VII, the Connecticut Supreme Court would construe CFEPA more broadly than its federal counterpart with respect to individual supervisory liability. *See id.* at 4.

Despite the defendant's invitation, the court is not inclined to reconsider its conclusion that CFEPA imposes liability on supervisory employees who hold positions of power, control and authority, and who use that power, control, and authority to engage in conduct giving rise to a discrimination claim.

There is also no merit to Pinneault's motion to dismiss the CFEPA claim on the grounds that Armstrong failed to name him in the administrative complaint.

In Title VII actions, courts have recognized an exception the general rule that a defendant must be named in the EEOC complaint. This "identity of interest" exception permits a Title VII action to proceed against an unnamed party where there is a clear identity of interest between the unnamed defendant and the party named in the administrative

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1998 WL 342045
(Cite as: 1998 WL 342045 (D.Conn.))

Page 5

charge. *See Johnson v. Palma,* 931 F.2d 203, 209 (2d Cir.1991).

To determine if there is an identity of interest the court should consider: (1) whether the role of the unnamed party could, through reasonable effort by the complainant, be ascertained at the time the EEOC complaint was filed; (2) whether, under the circumstances, the interest of a named party is so similar to those of the unnamed party that, for the purpose of obtaining voluntary conciliation and compliance, it would be unnecessary to include the unnamed party in the EEOC proceedings; (3) whether the unnamed party's absence from the EEOC proceedings resulted in actual prejudice to his interests; and (4) whether the unnamed party in some way represented to the complainant that its relationship with the complainant was to be through the named party. *Id.; Cook v. Arrowsmith Shelburne, Inc.,* 69 F.3d 1235 (2d Cir.1995); *Malasky v. Metal Prod. Corp.,* 44 Conn.App. 446, 689 A.2d 1145, *cert. denied,* 241 Conn. 906, 695 A.2d 539 (1997).

*5 Application of these factors here supports the identity of interest exception. The interests of Chrysler and Pinneault are similar if not identical, and the allegations against Pinneault are not separate and distinct from those against Chrysler. Moreover, Armstrong was not represented by counsel at the administrative level and Pinneault has not shown any prejudice by her failure to name him.

B. *Intentional Infliction of Emotional Distress*

The defendants maintain that this claim should be dismissed because (1) the complaint does not allege the elements of this cause of action and does not sufficiently allege outrageousness; (2) the claim is barred by the exclusivity provisions of Connecticut Worker's Compensation Act; and (3) the claim is barred under the doctrine of respondeat superior. The court agrees that the complaint does not allege sufficiently outrageous and extreme conduct to support a cause of action for intentional infliction of emotional distress.

Liability for intentional infliction of emotional distress has been found only where conduct exceeds all bounds usually tolerated by decent society and is so outrageous in character, so extreme in degree, and is calculated to cause, and does cause, mental distress of a very serious kind. *See Petyan v. Ellis,* 200 Conn. 243, 254, 510 A.2d 1337 (1986); *Reed v. Signode Corp.,* 652 F.Supp. 129, 137 (D.Conn.1986). Mere insults, indignities, annoyances, or conduct that displays bad manners or results in hurt feelings, is insufficient. *See Kintner v. Nidec-Torin Corp.,* 662 F.Supp. 112, 114 (D.Conn.1987); *Reed,* 652 F.Supp. at 137. The issue of whether a defendant's conduct is extreme and outrageous is a question to be determined by the court in the first instance. *Kintner,* 662 F.Supp. at 137; *Collins v. Gulf Oil Corp.,* 605 F.Supp. 1519, 1522 (D.Conn.1985).

Here, Armstrong alleges that Pinneault addressed her as "You-Who" and Eloise, criticized, insulted, demeaned, and embarrassed her on a daily basis, took away her authority, frequently declared her incompetent, and demeaned her professional ability in the presence of her superiors and subordinates. This conduct does not meet the required threshold of outrageousness. *Cf. Valencia v. St. Francis Hosp. & Med. Ctr.,* Civ. No. 94-538867S, 1996 Conn.Super. LEXIS 894 (Superior Court Apr. 2, 1996) (holding that conduct was not extreme and outrageous where defendant "grabbed plaintiff's arm in front of patients and co-workers, pulled her in a back room and yelled at her"); *Johnson v. Chesebrough-Pond's USA Co.,* 918 F.Supp. 543, 552-53 (D.Conn.1996) (concluding that conduct was not extreme and outrageous where employee was suddenly terminated and physically escorted from the building like a criminal) *aff'd,* 104 F.3d 355 (2d Cir.1996); *Barbuto v. William Bachus Hosp.,* No. 105452 (Conn.Supp.Ct. April 13, 1995) (defendant's conduct in removing plaintiff from a work-shift schedule despite reassurances it would not do so and suspending her for two days not extreme and outrageous); *Reed,* 652 F.Supp. at 137 (conduct not extreme and outrageous where policy against leaves of absence was applied to employee undergoing cancer treatment).

*6 Because the allegations are not sufficient to satisfy the threshold requirements of outrageousness, the court need not address the defendants' arguments that the claim is barred by the Connecticut Worker's Compensation Act or the doctrine of respondeat superior.

C. *Breach of Covenant of Good Faith and Fair Dealing*

The defendants maintain that Armstrong's claim for

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1998 WL 342045
(Cite as: 1998 WL 342045 (D.Conn.))

Page 6

breach of the covenant of good faith and fair dealing must be dismissed because this cause of action only exists where an employee is otherwise without redress. The court agrees.

In the employment context, a claim for breach of the covenant of good faith and fair dealing can only be brought where the employee is "otherwise without remedy." See *Atkins v. Bridgeport Hydraulic Co.*, 5 Conn.App. 643, 648, 501 A.2d 1223 (1995). Dismissal of this claim is appropriate here because Armstrong has adequate statutory remedies under Title VII and CFEPA. She is thus not otherwise without remedy and dismissal of this common-law claim will not "leave a valuable social policy ... unvindicated." *Id.*

IV. *Punitive Damages*

The defendants maintain that Armstrong has not asserted any basis for recovery of punitive damages under 42 U.S.C. § 1981a(b)(1). Armstrong does not contest the defendants' allegation, but rather seeks leave to replead the required allegations that the defendants acted with malice or reckless indifference to her federally protected rights.

When a claim is dismissed for insufficiency under Rule 12(b)(6) and the plaintiff requests permission to file an amended complaint, that request should ordinarily be granted. See *Ricciuti*, 941 F.2d at 123. Only in a rare case should leave to replead be denied, especially where there has been no prior amendment. *Id.* Accordingly, Armstrong is granted leave to file an amended complaint containing the allegations that are necessary for punitive damages.

CONCLUSION

For the foregoing reasons, the defendants' motions to dismiss [docs. # 11 and # 13] are DENIED with respect to the Title VII claim against Chrysler and the CFEPA claim against Pinneault. With respect to the Title VII claim against Pinneault and the state law claims of intentional infliction of emotional distress and breach of the covenant of good faith and fair dealing, and the claim for punitive damages, the motions are GRANTED. The plaintiff is granted leave to file an amended complaint which adequately alleges a claim for punitive damages and deletes the claims that have been dismissed, within twenty-one days of this ruling.

SO ORDERED this 13 day of May, 1998 at Bridgeport, Connecticut.

1998 WL 342045, 1998 WL 342045 (D.Conn.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2000 WL 565489
(Cite as: 2000 WL 565489 (D.Conn.))

Page 1

C
Only the Westlaw citation is currently available.

United States District Court, D. Connecticut.

Julia OLIVEIRA,
v.
STATE of Connecticut DEPARTMENT OF CHILDREN AND FAMILIES.

No. 3:97CV412 CFD.

March 29, 2000.

RULING ON MOTION FOR SUMMARY JUDGMENT

DRONEY.

*1 The plaintiff, Julia Oliveira, brought this action against the defendant, the Connecticut Department of Children and Families ("DCF"). She claims that the defendant discriminated against her on the basis of her national origin in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ -2000e et seq., by wrongfully terminating her employment (Count 1) and by creating a hostile work environment (Count 2). She also claims that the defendant discriminated against her on the basis of her age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 et seq., by wrongfully terminating her employment (Count 3). In addition, the plaintiff claims that the defendant retaliated against her in violation of both Title VII (Count 4) and the ADEA (Count 5). She seeks reinstatement of her employment or front pay, as well as compensatory damages, statutory liquidated damages under the ADEA, and costs and attorneys fees.

The defendant filed a motion for summary judgment [Document # 32] as to all of the plaintiff's claims. For the reasons set forth below, the defendant's motion is GRANTED IN PART and DENIED IN PART.

I. Background

The following facts are not disputed. In September 1994, the plaintiff, a native of India, applied and was accepted for a social worker trainee position with DCF. As a condition of her employment, she was required to complete a six- month probationary period known in DCF as a "working test period." The plaintiff's employment was terminated by DCF on March 5, 1995. Following her termination, the plaintiff filed a grievance with her union, which was denied, and a complaint with the Equal Employment Opportunities Commission, which declined to pursue the matter but issued her a "right to sue" letter. The plaintiff then filed this action.

II. Summary Judgment Standard

In the context of a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986). A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." *Miner v. City of Glens Falls,* 999 F.2d 655, 661 (2d Cir .1993) (internal quotation marks and citation omitted). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir .1992) (internal quotation marks omitted) (quoting *Anderson,* 477 U.S. at 248), cert. denied, 506 U.S. 965 (1992). After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

*2 "The nonmovant must do more than present evidence that is merely colorable, conclusory, or speculative and must present 'concrete evidence from which a reasonable juror could return a verdict in his favor.' " *Alteri v. General Motors Corp.,* 919 F.Sup. 92, 94-95 (N.D.N.Y.1996) (quoting *Anderson,* 477 U.S. at 256). A party may not create its own "genuine" issue of fact simply by presenting contradictory or unsupported statements. See *Securities & Exchange Comm'n v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978). When a motion for summary judgment is supported by documentary evidence and sworn affidavits, the nonmoving party must present "significant

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2000 WL 565489
(Cite as: 2000 WL 565489 (D.Conn.))

Page 2

probative evidence to create a genuine issue of material fact." *Soto v. Meachum,* Civ. No. B-90-270 (WWE), 1991 WL 218481, at *6 (D.Conn. Aug. 28, 1991). In ruling on a motion for summary judgment, the Court resolves "all ambiguities and draw [s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich,* 963 F.2d at 523.

III. Age Discrimination Claims

The defendant argues that, in light of the Supreme Court's recent decision *Kimel v. Florida Bd. of Regents,* 120 S.Ct. 631 (2000), the plaintiff's ADEA claims are barred by the Eleventh Amendment to the United States Constitution. This Court previously rejected this argument, on the basis of *Cooper v. New York State Office of Mental Health,* 163 F.3d 770 (2d Cir.1998), in ruling on the defendant's motion to dismiss. However, because the *Kimel* decision has since effectively overruled the *Cooper* decision, this Court considers anew the defendant's Eleventh Amendment argument.

The Supreme Court held in *Kimel* that, in enacting the ADEA, Congress did not validly abrogate the states' sovereign immunity to suits by private individuals that is provided by the Eleventh Amendment. See 120 S.Ct. at 650. States therefore retain their sovereign immunity from suits under the ADEA. *See generally, id.* Consequently, because the parties in this case do not dispute that the defendant is a state entity, [FN1] the plaintiff's ADEA claims are barred by the Eleventh Amendment. On this basis, the motion for summary judgment is GRANTED as to Counts 3 and 5.

FN1. Although Alexandra Molina, a DCF supervisor who is alleged to have been involved in the incidents in the complaint, was originally named as a Defendant in this case, she was not named as a Defendant in the plaintiff's amended complaint filed on April 23, 1999. Nor did she join the instant summary judgment motion. On these bases, the Court concludes that Ms. Molina is no longer a defendant in this action.

IV. Hostile Work Environment Claim

The Second Circuit's *Quinn v. Green Tree Credit Corp.* decision sets forth a good summary of the law for hostile work environment claims based on the U.S. Supreme Court's decision in *Harris v. Forklift Systems, Inc.,* 510 U.S. 17 (1993):

Title VII provides, in relevant part, that "[i]t shall be unlawful for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has interpreted Title VII to reach, among other conduct, "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) ("hostile work environment" as sex discrimination). This form of harassment is actionable "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (citations and internal quotation marks omitted).

*3 159 F.3d 759, 765 (2d Cir.1998). "As a general matter, isolated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or with regularity that can reasonably be termed pervasive." *Id.* at 768 (internal citations and quotation marks omitted). "However, where the conduct is sufficiently severe, it may alter the plaintiff's conditions of employment without repetition." *Id.* Nevertheless, the
  mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive--is beyond Title VII's purview.

*Harris,* 510 U.S. at 21 (internal quotation marks and alterations omitted). A hostile work environment rather "can be determined only by looking at all of the relevant circumstances." *Id.* at 23. In considering all of the relevant circumstances, the Court may consider several factors, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; whether it is unreasonably interferes with an employee's work performance; and psychological harm to the employee. *See id.* "[W]henever the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse, it is actionable under Title VII, so long as the employee subjectively experienced a hostile work environment." *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 439 (2d Cir.1999) (internal quotation marks omitted).

In this case, the plaintiff claims that the defendant subjected her to a hostile work environment, through the actions of its employee, the plaintiff's supervisor, [FN2] because of the plaintiff's national origin. In support of her hostile work environment claim, the plaintiff has presented evidence that her supervisor (1) repeatedly yelled at her in front of her co-workers, calling her "incompetent" and the "worst worker [her supervisor] had ever come across in her life," and telling her "there are no jobs out there" for people "like her"; [FN3] (2) commented that she did not know how to "deal with the class of clients served by DCF"; (3) ordered her to perform menial tasks that interfered with her duties as a social worker; (4) lied to other DCF officials about having conducted supervisory conferences with her; (5) ordered her to visit a child at school without the child's parent's permission, which her supervisor knew would not be permitted by the school and would humiliate her; (6) directed her to redo various work assignments; and (7) retained her deficient work in her employment file in order to create a "paper trail" that would serve as a basis for terminating her employment.

> FN2. It is assumed, for the purposes of this opinion, that the actions of the supervisor are imputed to the Defendant. *See, e.g., Richardson,* 180 F.3d at 436.

> FN3. As set forth in the plaintiff's opposition brief, this statement was understood by the plaintiff to relate to her age and not her national origin.

*4 It is undisputed that none of these incidents made any direct reference to the plaintiff's national origin. The Court also concludes that they are not even "oblique" references to the plaintiff's Indian origin. *See Shabat v. Blue Cross Blue Shield of Rochester,* 925 F.Sup. 977, 983 (W.D.N.Y.1996) (involving criticisms of the plaintiff's work performance and suggestions that the plaintiff did not know how to interact with others, and distinguishing comments made without reference to the plaintiff's national origin from other anti-Semitic comments), *aff'd sub nom., Shabat v. Billotti,* 108 F.3d 1370 (2d Cir.1997). They may very well have been uncomfortable or insulting to the plaintiff, but they do not convey the tinge of discrimination. This evidence therefore lacks the requisite nexus with the plaintiff's national origin to support a hostile work environment claim on that basis. *See Shabat,* 925 F.Sup. at 982-83; *Filipovic v. K & R Express Sys., Inc.,* No. 95C6741, 1997 WL 790593, at *14-15 & n. 10 (N.D.Ill.1997) (involving the plaintiff's reassignment to undesirable tasks and comparing generic vulgarity with slurs directed at the plaintiff's national origin). This is so even when considered together with the speech and conduct that explicitly referred to her Indian origin, as described below; there is no apparent connection between the two.

The only evidence of a hostile work environment that the plaintiff has offered that more explicitly concerns her Indian origin is her deposition testimony that her supervisor (1) stated that people from foreign countries should return to their own countries after gaining experience in the United States; (2) failed to respond when the plaintiff asked her whether she was being treated poorly because she was from India; and (3) treated other non-Indian employees better than she treated the plaintiff, for example, by giving them more resources to perform their work and by not requiring them to perform various menial tasks. Even assuming that these comments and actions by the plaintiff's supervisor occurred as the plaintiff has described them, and that they were offensive to her, they are not actionable under Title VII on the basis of a hostile work environment; the comments and actions must have adversely affected the work performance and the well-being of a reasonable person. They do not meet this objective test. See *Richardson,* 180 F.3d at 436; *see also Shabat,* 925 F.Sup. at 984.

Even if the plaintiff's supervisor's statement that people from other countries should return to their own countries was construed by the plaintiff as hostile, the statement was not objectively hostile to

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2000 WL 565489
(Cite as: 2000 WL 565489 (D.Conn.))

Page 4

her national origin. *See Shabat,* 108 F.3d at 1370; *Prado v. Luria & Sons, Inc.,* 975 F.Sup. 1349, 1355 (S.D.Fla.1997) (involving comments about the number of Hispanics in South Florida). The plaintiff's supervisor never told the plaintiff that she should return to India. The plaintiff's supervisor also indicated that she herself planned to return to Puerto Rico, which undercuts the claim that the challenged statement was intended to mean that immigrants were not welcome here. *Cf. Flom v. Waste Management, Inc.,* No. 95C1924, 1997 WL 137174, at * 8 (N.D.Ill.1997) (involving statements directed at the plaintiff's continued employment, as well as significant ethnic slurs).

*5 The plaintiff's supervisor's failure to respond to the plaintiff's question concerning poor treatment because of her Indian origin was not, without more, objectively hostile to the plaintiff on the basis of her national origin, either. *See Prado,* 975 F.Sup. at 1355 (involving a supervisor who, among other allegedly discriminatory actions, would not explain an allegedly discriminatory comment directed at a Hispanic employee). The plaintiff also offers no evidence to support her claim that other non-Indian employees were treated better than she; the plaintiff admits in her deposition that she has no idea how other employees were treated. Even if the plaintiff had presented such evidence, she would be required to establish a connection between her poor treatment and her national origin, which she has not done. *See Filipovic,* 1997 WL 790593, at *15 & n. 10.

In addition, even if these comments and actions of the plaintiff's supervisor occurred as the plaintiff claims and met the objective test described above, the Court concludes that they were not pervasive or sufficiently severe to produce a hostile working environment. The plaintiff offers evidence of only three discriminatory statements or instances of conduct by her supervisor over a period of approximately six months. *Compare Shabat,* 108 F.3d at 1370 (involving approximately nine offensive comments in a three and a half year period); *Filipovic,* 1997 WL 790593, at *15 (involving four offensive comments in a year), *Prado,* 975 F.Sup. at 1355 (involving about six offensive comments in a three-month period); *with Flom,* 1997 WL 137174, at * 1 (involving offensive comments that increased in frequency on a daily basis). *See also generally Richardson,* 180 F.3d at 439-40 (comparing, for purposes of summary judgment analysis, the frequency and severity of discriminatory conduct in different cases). The record in this case does not reveal the "kind of abusive work environment, permeated with discrimination, that is necessary to support liability for creating or tolerating a hostile work environment." *Shabat,* 925 F.Sup. at 982. The Court therefore concludes, as a matter of law, that the plaintiff's supervisor's comments and actions did not create a hostile work environment.

Accordingly, the motion for summary judgment is GRANTED as to Count 2, the plaintiff's claim of a hostile work environment based on national origin discrimination.

V. Remaining Claims

The Defendant's motion for summary judgment as to the plaintiffs remaining claims is DENIED. The Court finds that genuine issues of material fact exist as to Count 1, including the following: (1) whether the plaintiff was performing her duties satisfactorily; (2) whether the Defendant's proffered reason for terminating the plaintiff's employment was false; (3) whether the plaintiff's national origin was at least a motivating factor for the Defendant's termination of her employment; and (4) whether the plaintiff has established a causal connection between her complaints of national origin discrimination and the termination of her employment. The Court also finds that genuine issues of material fact exist as to Count 4, including whether the plaintiff's national origin was at least a motivating factor for the Defendant's alleged retaliation against her.

*6 For the reasons set forth above, the Defendant's motion for summary judgment [Document # 32] is GRANTED IN PART and DENIED IN PART. Only Counts 1 and 4 of the plaintiffs amended complaint remain in this case.

SO ORDERED this 29th day of March 2000 at Hartford, Connecticut.

2000 WL 565489, 2000 WL 565489 (D.Conn.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
23 A.D.D. 1225
**(Cite as: 1996 WL 684407 (D.Conn.))**

Page 1

C

United States District Court, D. Connecticut.

Rosalie STRONKOWSKI
v.
ST. VINCENT'S MEDICAL CENTER.

Civ. No. 3:94CV2175 AHN.

Aug. 1, 1996.

Former employee brought Americans with Disabilities Act (ADA) action against former employer. Employer moved for summary judgment. The District Court, Alan H. Nevas, J., held that: (1) employee with temporary back injury was not disabled and employer did not view her as disabled within meaning of ADA, and (2) employer proffered legitimate, nondiscriminatory reason for employee's termination, by stating that she made repeated errors in preparation and administration of potentially dangerous radiation therapy to patients, and employee failed to show that this reason was pretext for disability discrimination under ADA.

Motion granted.

West Headnotes

**[1] Civil Rights ⚖1218(3)**
78k1218(3) Most Cited Cases
(Formerly 78k173.1)

Former employee with temporary back injury was not disabled within meaning of ADA, where physician released employee to work without restrictions except that she would have to work part-time to allow her to attend physical therapy sessions, injury did not substantially limit employee's ability to work, although she asked for and received help from co-workers when she needed to lift objects, and employee's back condition was not of particularly long duration and did not have permanent or long-term impact. Americans with Disabilities Act of 1990, §§ 3(2), 101(8), 42 U.S.C.A. §§ 12102(2), 12111(8); 29 C.F.R. § 1630.2(h), (i), (j)(1, 2).

**[2] Civil Rights ⚖1218(6)**
78k1218(6) Most Cited Cases
(Formerly 78k173.1)

Former employee with temporary back injury did not show that employer viewed her as disabled within meaning of ADA, despite evidence that employer knew of employee's lifting limitations which were confined to only one aspect of her radiation therapist position and that supervisor had shown concern that she could hurt herself if she touched a door, where record showed that employer and co-workers knew of no other limitations on employee's ability to work. Americans with Disabilities Act of 1990, §§ 3(2)(C), 101(8), 42 U.S.C.A. §§ 12102(2)(C), 12111(8); 29 C.F.R. § 1630.2(h), (i), (j)(1, 2).

**[3] Civil Rights ⚖1220**
78k1220 Most Cited Cases
(Formerly 78k173.1)

Under ADA, employer who terminated employee with temporary back injury proffered legitimate, nondiscriminatory reason for employee's termination, by stating that she had made repeated errors in preparation and administration of potentially dangerous radiation therapy to patients. Americans with Disabilities Act of 1990, §§ 3(2), 101(8), 42 U.S.C.A. §§ 12102(2), 12111(8); 29 C.F.R. § 1630.2(h), (i), (j)(1, 2).

**[4] Civil Rights ⚖1221**
78k1221 Most Cited Cases
(Formerly 78k173.1)

Former employee with temporary back injury failed to show that employer's proffered reason for terminating her, that she had made repeated errors in preparation and administration of potentially dangerous radiation therapy to patients, was pretext for disability discrimination under ADA, where there was no evidence that employee was not at least partially responsible for six treatment errors attributed to her before her back injury and five errors after injury, although other employee's were not discharged for similar errors, none of them made errors with same frequency as employee, employee was disciplined for excessive errors prior to her back injury, and she admitted that she believed that she was discharged due to errors and not because of her injury. Americans with Disabilities Act of 1990, §§ 3(2), 101(8), 42 U.S.C.A. §§ 12102(2), 12111(8); 29 C.F.R. §

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
23 A.D.D. 1225
**(Cite as: 1996 WL 684407 (D.Conn.))**

Page 2

1630.2(h), (i), (j)(1, 2).

**[5] Civil Rights ⚖1221**
78k1221 Most Cited Cases
(Formerly 78k173.1)

Former employee with temporary back injury failed to show that her injury was motivating or substantial factor in her discharge, and, thus, failed to state mixed motive claim of disability discrimination under ADA, where employer stated that employee was terminated for repeated errors in preparation and administration of potentially dangerous radiation therapy to patients, employee was disciplined for excessive errors prior to her back injury, and employee admitted that she believed that she was discharged due to errors and not because of her injury. Americans with Disabilities Act of 1990, §§ 3(2), 101(8), 42 U.S.C.A. §§ 12102(2), 12111(8); 29 C.F.R. § 1630.2(h), (i), (j)(1, 2).

**[6] Federal Courts ⚖18**
170Bk18 Most Cited Cases

Court would not exercise supplemental jurisdiction to hear former employee's claims against former employer under Connecticut law, where court had granted summary judgment to employer on employee's ADA claims. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; 28 U.S.C.A. § 1367(a), (c)(3).

*RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

NEVAS, District Judge.

*1 The plaintiff, Rosalie Stronkowski ("Stronkowski"), brings this action against her former employer St. Vincent's Medical Center ("St. Vincent's" or "the Hospital") alleging that her termination violated the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12213 ("ADA"), and various state statutory and common laws.

Presently pending is St. Vincent's Motion for Summary Judgment. For the following reasons, St. Vincent's motion [doc. # 20] is GRANTED.

*STANDARD*

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the moving party is entitled to judgment as a matter of law. Rule 56(c), Fed. R. Civ. P.; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986). The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970). After discovery, if the party against whom summary judgment is sought "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

The substantive law governing the case identifies those facts that are material on a motion for summary judgment. *See Anderson,* 477 U.S. at 258. A court must grant summary judgment "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact ....'" *Miner v. Glen Falls,* 999 F.2d 655, 661 (2d Cir. 1993) (citation omitted). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.) (internal quotation marks and citation omitted), *cert. denied,* 506 U.S. 965 (1992).

In assessing the record to determine whether a genuine dispute as to a material fact exists, the court is required to resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. *See Anderson,* 477 U.S. at 255. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849 (1991).

*FACTS*

The following facts are undisputed. Stronkowski was employed by St. Vincent's as an Oncology Radiation Therapist in the Radiology-Oncology Unit of the Hospital's Radiology Department from May 15, 1986 until her termination on March 8, 1994. (*See* Def.'s Statement Mat. Facts, ¶ 1 [hereinafter "Def.'s Mat. Facts"].)

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
23 A.D.D. 1225
**(Cite as: 1996 WL 684407 (D.Conn.))**

Page 3

Radiation Therapists treat cancer patients utilizing machines capable of administering high doses of radiation. (*Id.* ¶ 2.) They are responsible for proper physical placement of the patient, which may include the use of boards or retractors to stabilize treatment areas. (*Id.* ¶ 3.) Therapists also set up the treatment machines by calculating and programming the "field size" of the treatment area, calibrating the prescribed dosage, and placing devices such as trays containing lead blocks to direct the radiation to the proper area. (*Id.* ¶ 4.) The foregoing procedures are designed to insure that the proper dosage of radiation is delivered to the area of the body requiring treatment. (*Id.* ¶ 5.) In light of the consequences of a mistake in any part of the process, treatments are planned and practiced first with the use of a simulator. (*Id.* ¶ 6.)

\*2 In 1993, St. Vincent's Radiology Department experienced several significant changes. A new Director of Radiology, Judy Dunn ("Dunn"), was hired, (*id.* ¶ 7.), and the Department underwent expansion, both in terms of its physical location and in the acquisition of new equipment. (*Id.* ¶ 9.) In April of 1993, a new treatment machine was acquired, the GE Linear Accelerator ("Saturn 41"), which is more computerized and capable of delivering higher doses of radiation than the 4MEV treatment machine previously used in the Department. (*Id.* ¶ 10.)

Between August 25th and September 8th of 1993, St. Vincent's documented four treatment errors by Radiation Therapists. (*See* Def.'s Ex. C at 1-4 ["Treatment Misadministration Reports"].) With the exception of one report, each identified Stronkowski as the only treating Therapist involved. (*Id.*)

On September 13, 1993, St. Vincent's attributed another error to Stronkowski. (*Id.* at 5) Thereafter, Dunn informed Stronkowski that she would be on probation for the next two months. (*See* Def.'s Mat. Facts ¶ 12; Pl.'s Ex. G-3 at 2-3.) Stronkowski then began looking for other employment. (*See* Def.'s Mat. Facts ¶ 13.)

On October 6, 1993, after another treatment error was attributted to Stronkowski, (*see* Def.'s Ex. C. at 6), Stronkowski received a written warning from Dunn. (*See* Pl.'s Ex. G-1; Def.'s Mat. Facts ¶¶ 14-15) The warning referenced the six treatment errors attributed to Stronkowski over the six-week period preceding the warning, indicated that Stronkowski was on "2-month observation for clinical competency," and that "future violation [sic] of this type will result in discharge and or suspension depending on severity." (*See* Pl.'s Ex. G-1.) When Dunn gave Stronkowski the warning, she told her that the next time she made a mistake she would be fired. (Dep. Rosalie Stronkowski [[[hereinafter "Stronkowski Dep."] at 145-46.) Less than a week after receiving the written warning, Stronkowski injured her back and was out of work until February of 1994. (*See* Def.'s Mat. Facts ¶ 19.)

During her leave of absence, Stronkowski challenged her written warning through the Hospital's internal grievance procedure. (*Id.* ¶ 20.) The three-step grievance process culminates in a hearing before an Appeals Committee comprised of the President of the Hospital and four disinterested employees. (*See* Def. Mat. Facts ¶ 21.) The decision of the Appeals Committee is final and binding. (*Id.* ¶ 22.)

Throughout her grievance, Stronkowski argued that she did not make the treatment errors or that the errors made should be attributed to others, the machinery had not been functioning properly, the department had received inadequate training on the Saturn 41, she should not have been disciplined for incidents documented in "Treatment Misadministration Reports" of which she was unaware, her October 6, 1993 error would not have occurred if another technician had double-checked her work, and that other technicians had made similar mistakes but had not received warnings. (*Id.* ¶ 23.)

\*3 Dunn denied Stronkowski's first-step grievance and noted that the number of Stronkowski's treatment errors was "excessive" in comparison to other staff members. (*Id.* ¶ 24; Pl.'s Ex. G-14.)

Stronkowski then pursued her grievance to the second step by presenting it to Richard D'Aquila ("D'Aquila"), Executive Vice-President and Chief Operating Officer of the Hospital. (*See* Def.'s Mat. Facts ¶ 27.) D'Aquila denied Stronkowski's second step grievance and noted that Stronkowski was "primarily responsible" for the six errors under review, that the "errors made were of sufficient

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
23 A.D.D. 1225
(Cite as: 1996 WL 684407 (D.Conn.))

Page 4

frequency and significance to warrant a written reprimand" and that her supervisors could have suspended her. (*See* Pl.'s Ex. G-11 at 1-2.)

Stronkowski then received a hearing before the Appeals Committee. (*See* Def. Mat. Facts ¶ 30.) The Appeals Committee denied her third-step grievance and noted "[t]he Committee felt that errors had been made by you over the time period in question. While you offered to the Committee various reasons that these errors were committed, you did not deny their existence. As the Technologist responsible for the Patients [sic] Treatment, you are accountable for the procedures being followed." (*See* Def.'s Ex. D.)

On February 3, 1994, Stronkowski's physician released her to return to regular duty at the Hospital for four hours per day and indicated that she must continue physical therapy everyday until her next doctor's appointment. (*See* Def.'s Mat. Facts ¶ 32; Def.'s Ex. E.) On February 7, 1994, she was restored to her prior position on a part-time basis. (*See* Def.'s Mat. Facts ¶ 37.)

On March 8, 1994, Betty Olsen ("Olsen") and Stronkowski were treating a patient. (*See* Stronkowski Dep. at 121-123.) Stronkowski had set up the treatment machine and indicated to Olsen that she had set it up correctly. (*Id.*) After the patient was turned for treatment on the other side, however, they discovered that the wrong tray had been inserted, resulting in a misadministration of radiation to the patient. (*Id.*) Thereafter, Dunn suspended Stronkowski pending a decision regarding discharge. (*See* Def.'s Mat. Facts ¶ 49; Stronkowski Dep. at 125.)

On March 11, 1994, Olsen prepared an "Employee Disciplinary Action Form" discharging Stronkowski. (*See* Pl.'s Ex. G-4.) Therein, Olsen stated that Stronkowski's discharge was due to five treatment errors "with potential for compromised patient care" by Stronkowski since her return to work in February. (*Id.*)

On August 25, 1994, Stronkowski filed a charge of discrimination with the Connecticut Commission on Human Rights and Opportunities ("CHRO") alleging that she was terminated because of her back injury. (*See* Def. Mat. Facts ¶ 51.) The CHRO dismissed the charge on November 22,

1994, (*id.* ¶ 52), stating:
there is no reasonable possibility that further investigation will result in finding [sic] of reasonable cause inasmuch as it was determined that your termination was due to mis-administration of radiation. A written warning was issued to you on October 7, 1993 one week prior to your injury... [A]nother incident of misadministration occurred on March 8, 1994.
\*4 (*See* Def.'s Ex. K.)

On December 22, 1994, Stronkowski filed this action against St. Vincent's alleging discriminatory discharge under the ADA (Count One), breach of implied contract (Count Two), negligent infliction of emotional distress (Count Three), retaliatory discharge under Connecticut's Worker's Compensation Act Conn. Gen. Stat. § 31-290a (Count Four), discriminatory discharge under Conn. Gen. Stat. § 46a-60 (Count Five), and intentional infliction of emotional distress (Count Six).

*DISCUSSION*
I. *Count One - Americans with Disabilities Act*

St. Vincent's argues that summary judgment is warranted on Stronkowski's ADA claim because she has failed to establish that she suffered from a disability cognizable under the Act and has not demonstrated that St. Vincent's legitimate reasons for terminating her employment were a pretext for discrimination. The court agrees.

The ADA prohibits an employer from discriminating against a "qualified individual with a disability because of the disability ... in regard to [the] terms, conditions and privileges of employment." 42 U.S.C.A. § 12112(a) (West 1995). Circuit courts have consistently applied the burden-shifting framework of Title VII and ADEA cases as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) and its progeny to ADA cases involving employers who disclaim any reliance on an employee's disability in making employment decisions. *See, e.g., Price v. S-B Power Tool*, 75 F.3d 362, 364-65 (8th Cir. 1995), *petition for cert. filed*, 64 USLW 3765 (1996); *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995), *reh'g denied*, 77 F.3d 481 (5th Cir. 1996); *Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div.*, 60 F.3d 153, 156-158 (3rd

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
23 A.D.D. 1225
**(Cite as: 1996 WL 684407 (D.Conn.))**

Page 5

Cir. 1995); *DeLuca v. Winer Indus., Inc.,* 53 F.3d 793, 797-98 (7th Cir. 1995); *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 57 (4th Cir. 1995). Furthermore, the Second Circuit has adopted the *McDonnell Douglas* framework for cases brought under the Rehabilitation Act of 1973, 29 U.S.C. § 701-796, in similar circumstances. *See Teahan v. Metro-North Commuter R.R. Co.,* 951 F.2d 511, 514 (2d Cir. 1991), *cert. denied,* 506 U.S. 815 (1992). [FN1]

> FN1. ADA claims are to be adjudicated in a manner consistent with relevant decisions interpreting the Rehabilitation Act. *See Ennis,* 53 F.3d at 57; *Venclauskas v. Connecticut Dept. of Public Safety Div. of State Police,* 921 F. Supp. 78, 81 n. 1 (D. Conn. 1995).

Accordingly, to sustain a claim for discriminatory discharge the plaintiff has the initial burden of establishing a prima facie case of discrimination under the ADA. *McDonnell Douglas,* 411 U.S. at 801. If the plaintiff meets this burden, then the burden shifts to the defendant "to articulate some legitimate, non-discriminatory reason" for the employee's discharge which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the reason for the discharge. *Id.; St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507 (1993). Finally, should the defendant meet this burden of production, the plaintiff must then prove by a preponderance of the evidence that the legitimate reasons offered by the employer were not its true reasons, but were a pretext for discrimination. *McDonnell Douglas,* 411 U.S. at 804; *Texas Dep't Community Affairs v. Burdine,* 450 U.S. 248, 252-53 (1981).

A. *Prima Facie Case*

*5 To establish a prima face case of discriminatory discharge under the ADA the plaintiff must show that 1) she belongs to the class of persons protected by the ADA - a "qualified individual with a disability," 2) she was performing her duties satisfactorily, 3) she was discharged, and 4) her discharge occurred under circumstances giving rise to an inference of discrimination on the basis of her membership in that class. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir. 1994) (Title VII); *Ennis,* 53 F.3d at 58 (ADA); *Duprey v. Prudential Ins. Co.,* 910 F. Supp. 879, 884 (N.D.N.Y. 1996) (ADA; citing *Chambers*).

1. *Protected Class - Disabled*

A "qualified individual with a disability" is defined by the ADA as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C.A. § 12111(8) (West 1995). A "disability", in turn, is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." *Id.* § 12102(2).

The regulations promulgated by the Equal Employment Opportunity Commission ("EEOC") further define the terms included within the definition of "disability." The term "physical or mental impairment" has been broadly defined by the regulations as:

(1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or

(2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h) (1991). The regulations define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* § 1630.2(i). The term "substantially limits" is defined as:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
23 A.D.D. 1225
(Cite as: 1996 WL 684407 (D.Conn.))

Page 6

activity.
*Id.* § 1630.2(j)(1). Finally, relevant factors to consider in determining whether an individual is "substantially limited in a major life activity" include: "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact of or resulting from the impairment." *Id.* § 1630.2(j)(2).

*6 [1] Stronkowski argues that she suffered from an actual disability as defined by section 12102(s)(A) because her back injury and its resulting limitations constituted a physical impairment that substantially limited her major life activity of working. (*See* Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. at 18-20.) The court disagrees.

Even assuming that Stronkowski's back condition constitutes a physical impairment, *see* 29 C.F.R. § 1630.2(h), she has not demonstrated that her condition "substantially limited" her ability to work. *See* 42 U.S.C. § 12102(2)(A). First, the record does not indicate that Stronkowski was unable to perform her job or was "*[s]ignificantly restricted* as to the condition, manner or duration" in her performance. *See* 29 C.F.R. § 1630.2(j)(1)(ii). Her physician's release does not indicate any restrictions other than part-time work and a need for physical therapy everyday. (*See* Def.'s Ex. E.) Her March 28, 1994 statement to the Connecticut Department of Labor, Unemployment Division, confirms that she returned to work without restrictions and that her part-time hours were merely designed to accommodate her physical therapy, not to accommodate any inability to perform for long hours:

> My doctor release [sic] me back to work in February, 1994 with no restrictions, but part-time so I could have the time to get my physical therapy in at the time. However, if it had [not] been for the physical therapy, I would have return [sic] to work-full time in February 1994.

(*See* Def.'s Ex. F.) Moreover, to the extent that Stronkowski did have some trouble lifting at work, she asked for and received assistance from co-workers when needed so that she could perform her duties as a Therapist. (*See* Stronkowski Dep. at 244-46.) *See also Wernick v. Federal Res. Bank,* No. 93 Civ. 2606 (KTD), 1995 WL 598973, slip op. at *2 (S.D.N.Y. Oct. 10, 1995) ("An impairment does not substantially limit a person's ability to work if it disqualifies her from only a narrow range of jobs.") (citing *Heilweil v. Mount Sinai Hosp.,* 32 F.3d 718, 723 (2d Cir. 1994), *cert. denied,* 115 S. Ct. 1095 (1995)). Finally, even though Stronkowski notes that in February 1994 she had some difficulty with swimming, climbing stairs, driving, and that her pain medication sometimes caused her to tire and require a nap, (*see* Stronkowski Dep. at 242-43, 247), the record as demonstrated above does not reveal that these difficulties "substantially restricted" her ability to commute to work, to perform her duties, or to work for extended periods. In fact, Stronkowski indicates that if she was unable to drive, her fiancé would do so for her. (*Id.* at 247-48.)

Second, Stronkowski's back condition was not of a particularly long duration and does not appear to have had a permanent or long-term impact. *See* 29 C.F.R. § 1630.2(j)(2). Stronkowski concedes that, although her condition was difficult, it continued to improve with time, (*see* Pl.'s Resp. Def.'s Mat. Facts [hereinafter "Pl.'s Resp."] ¶¶ 35, 36), such that by March 28, 1994 she was "able" to work full-time, for "any hours" and was "willing [to] travel fifty miles one way to accept suitable work." (*See* Def.'s Ex. F.)

*7 The court notes that the Rehabilitation Act and ADA

> assure[] that truly disabled, but genuinely capable, individuals will not face discrimination in employment because of stereotypes about the insurmountability of their handicaps. It would debase this high purpose if the statutory protections available to those truly handicapped could be claimed by anyone whose disability was minor and whose relative severity of impairment was widely shared. Indeed, the very concept of an impairment implies a characteristic that is not commonplace and that poses for the particular individual a more general disadvantage in his or her search for satisfactory employment.

*Venclauskas,* 921 F. Supp. at 81 (quoting *Forrisi v. Bowen,* 794 F.2d 931, 934 (4th Cir. 1986)). Thus, temporary injuries, like Stronkowski's injury, without substantial limitations and permanent effects, do not warrant the protections of the ADA. *See, e.g., Rakestraw v. Carpenter Co.,* 898 F. Supp. 386, 389-91 (N.D. Miss. 1995) (employee's nonpermanent back injury was not a "disability under the ADA); *Jones v. Alabama Power Co.,* No. CV 94-PT-0094-S, 1995 WL 238338, at *13-16

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
23 A.D.D. 1225
**(Cite as: 1996 WL 684407 (D.Conn.))**

Page 7

(N.D. Ala. Jan. 3, 1995) (same; Rehabilitation Act), *aff'd,* 77 F.3d 498 (11th Cir. 1996); *Paegle v. Department of Interior,* 813 F. Supp. 61, 64-65 (D.D.C. 1993) (same; Rehabilitation Act); *Visarraga v. Garrett,* Nos. C-88-2828 FMS (CW), C-90-0984 JPV (CW), 1993 WL 209997, at *4 (N.D. Cal. July 2, 1992) (same; Rehabilitation Act).

[2] Next, Stronkowski contends that, irrespective of her actual disability, she is within the class protected by the ADA because St. Vincent's regarded her as having a disability. *See* 42 U.S.C. § 12102(2)(C). The court disagrees.

Stronkowski's contention is predicated on concerns articulated to Stronkowski by Dunn that if Stronkowski touched a door that she would hurt her back. (*See* Pl.'s Resp. at 24; Stronkowski Dep. at 248.) Beyond this concern articulated by Dunn and St. Vincent's general knowledge that Stronkowski had sustained a back injury for which she sought therapy and had occasionally requested assistance lifting tables, the record reveals that St. Vincent's employees knew nothing more about her limitations. For example, Stronkowski concedes in her deposition that she does not remember discussing her limitations with Dunn, Olsen, or other Therapists and doctors, (*see* Stronkowski Dep at 243-44), does not recall whether anyone at St. Vincent's observed any limitations or signs of pain exhibited by her, (*id.* at 244-45), and that her physical condition, apart for her need for therapy, was not discussed at weekly meetings. (*Id.*)

Thus, St. Vincent's knowledge about Stronkowski's limitations is confined to one aspect of her job - lifting - and is insufficient to demonstrate that St. Vincent's regarded Stronkowski as having a disability. *See Venclauskas,* 921 F. Supp. at 82 (in order to fall under the "regarded as" definition of disability under the ADA, "the plaintiff must prove that the defendant considered the plaintiff's impairment to foreclose not simply a particular job, but the type of employment involved generally"). *See also* C.F.R. § 1630.2(j)(3)(i) ("substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs.... The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working").

*8 Accordingly, because the court concludes that Stronkowski was not a "qualified individual with a disability" under the ADA, summary judgment is appropriate on her ADA claims in Count One.

B. *Legitimate Non-discriminatory Reason*

[3] Assuming *arguendo,* that Stronkowski is a "qualified individual with a disability" and that she has met the rest of her *prima facie* case, St. Vincent's has effectively rebutted any presumption of discrimination by articulating "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Burdine,* 450 U.S. at 257. Its well-documented reason for discharging Stronkowski - her repeated errors in the preparation or administration of potentially dangerous radiation therapy to patients - is legitimate and non-discriminatory. (*See* Pl.'s Ex. G-4.) *See also Duprey,* 910 F. Supp. at 887 (plaintiff's failure to perform her job duties to the satisfaction of her supervisors constituted legitimate, non-discriminatory reason for discharge).

C. *Pretext*

Once an employer has produced evidence of a non-discriminatory reason for its actions, the plaintiff must satisfy the ultimate burden of persuasion of proving that intentional discrimination, rather than the reason proffered by the employer, was the true reason for the discharge. At this stage, "'the factual inquiry proceeds to a new level of specificity,'" *Hicks,* 509 U.S. at 516 (quoting *Burdine,* 450 U.S. 248, 255 (1981)), and
> [t]o defeat a properly supported motion for summary judgment, plaintiff must produce sufficient evidence to support a rational finding that [(1)] the legitimate, non-discriminatory reasons proffered by the employer were false, and [(2)] that more likely than not the employee's [disability] was the real reason for the discharge.

*Viola v. Philips Med. Sys. No. America,* 42 F.3d 712, 717 (2d Cir. 1994) (quoting *Woroski v. Nashua Corp.,* 31 F.3d 105, 110 (2d Cir. 1994) citing *Hicks,* 509 U.S. at 510-12, 516).

[4] The court concludes that Stronkowski has failed to meet this burden. First, there is nothing in the record to suggest that Stronkowski was not solely, or at least partially, responsible for the six treatment errors attributed to her before her injury in October

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
23 A.D.D. 1225
(Cite as: 1996 WL 684407 (D.Conn.))

Page 8

of 1993, (*see* Def.'s Ex. C at 1- 6), and the five errors attributed to her after her return to work in February of 1994. (*See* Pl.'s Ex. G-4.) Even though other Radiation Therapists were not discharged for making similar errors, none did so with the same frequency as Stronkowski. (*See id.;* Def.'s Ex. C.) Moreover, Stronkowski has failed to connect any favoritism given to other Therapists to her disability. For example, she has surmised that the favorable treatment given Olsen was the result of Olsen's longer tenure and her relationship with a doctor employed by the Hospital, (Stronkowski Dep. at 233-35.), not a predilection against her disability or Olsen's lack of a disability. Finally, even if St. Vincent's erroneously attributed some errors to Stronkowski, that alone does not establish a discriminatory motive. *See, e.g., Duprey,* 910 F. Supp. at 887- 88 ("even if defendants fired plaintiff for a bad reason, that does not constitute evidence that they fired her for a discriminatory reason."); *Cianfrano v. Babbitt,* 851 F. Supp. 41, 48 (N.D.N.Y. 1994) (stating that an employer's stated reason may be a good reason, a bad reason, a reason based on erroneous facts, or ... no reason at all, as long as its action is not for discriminatory reasons.") (citations and internal quotations marks omitted).

*9 Second, the timing of the disciplinary actions taken against Stronkowski dispels any notion that St. Vincent's relied on Stronkowski's protected status in making its employment decisions. Indeed, St. Vincent's began to discipline Stronkowski due to a series of treatment errors and warned her that another might result in discharge *before* she sustained her back injury. The CHRO expressly relied on this fact as a basis to dismiss her administrative complaint for lack of reasonable cause. (*See* Def.'s Ex. K.) *See also Leveen v. Stratford Housing Authority,* 629 F. Supp. 228, 233 (D. Conn. 1986) ("no reasonable cause determination" by EEOC provides "some evidence" that plaintiff's allegations of discrimination were without merit). Moreover, although though she was discharged four weeks after her return from medical leave, Stronkowski's discharge occurred only three days after a treatment error on March 8, 1994, after four similar errors since her return, and was expressly predicated on these errors.

Finally, Stronkowski's own admissions belie a finding of discriminatory intent. For example, she concedes that, before her injury, her "superiors undertook a campaign intended to illegally squeeze Plaintiff out her position, (*see* Pl.'s Resp. at 2), that in conjunction with her October 1993 written warning she "believed she would be fired for any mistake however trivial" (*see* Pl.'s Statement Mat. Facts ¶ 29), and that she "had no other choice but to believe that [she] would be fired for just being human." (*See* Stronkowski Aff. ¶ 22.) Moreover, Stronkowski admits in her deposition that she believed that she was discharged because of her errors. (*See* Stronkowski Dep. at 223.)

[5] Stronkowski maintains that, even if her "pretext" claim fails, a "mixed-motives" analysis of her ADA claim precludes summary judgment. The court disagrees. "A 'mixed motives' claim[] alleges that an adverse employment decision stemmed from both legitimate and illegitimate considerations." *Towles v. Textron Lycoming,* No. 3:94CV1818(PCD), slip op. at 5 (D. Conn. June 20, 1996) (citing *De la Cruz v. New York City Human Res. Admin. Dep't Soc. Servs.,* 82 F.3d 16, 23 (2d Cir. 1996)). To establish such a claim the "plaintiff must initially proffer evidence that an impermissible criterion was *in fact* a 'motivating' or 'substantial' factor in the employment decision." *De la Cruz,* 82 F.3d at 23 (emphasis in original) (quoting *Price Waterhouse v. Hopkins,* 490 U.S. 228, 258 (1989)). For the reasons articulated above, Stronkowski has failed to meet this burden. *See Towles,* slip op. at 5 (concluding that plaintiff's "mixed motives" argument failed for the same reasons as her pretext argument).

Accordingly, even assuming *arguendo* that Stronkowski has established a *prima facie* case of discrimination, the court concludes that summary judgment is warranted on her ADA claim in Count One because she has failed to demonstrate that her discharge was motivated by her disability.

II. *State Law Claims*

*10 [6] In addition to her ADA claim, Stronkowski also brings various state law claims pursuant to the court's supplemental jurisdiction. *See* 28 U.S.C. § 1367(a). Because the court grants summary judgment as to Stronkowski's ADA claim, it declines to exercise supplemental jurisdiction over her remaining state claims in Counts Two through Six. *See id.* § 1367(c)(3) (district court may decline to exercise supplemental jurisdiction over state

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
23 A.D.D. 1225
**(Cite as: 1996 WL 684407 (D.Conn.))**

Page 9

claims when it has "dismissed all claims over which it has original jurisdiction.").

*CONCLUSION*

For the foregoing reasons, St. Vincent's Motion for Summary Judgment [doc. # 20] is hereby GRANTED as to Count One. The court declines to exercise its supplemental jurisdiction over the remaining state claims and Counts Two through Six are therefore dismissed.

The Clerk of the Court shall enter judgment accordingly.

SO ORDERED.

1996 WL 684407 (D.Conn.), 23 A.D.D. 1225

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
(Cite as: 2001 WL 837717 (Conn.Super.))

Page 1

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut.

Kenneth FORSYTHE,
v.
John AMBROGIO et al.

No. CV970404059S.

June 29, 2001.

RULING ON MOTIONS FOR SUMMARY JUDGMENT (# 124 AND # 127)

LAGER.

*1 This is an action in two counts in which the plaintiff Kenneth Forsythe ("Forsythe") alleges that the defendant John Ambrogio ("Ambrogio"), in his capacity as chief of police of the Town of Hamden, intentionally inflicted emotional distress and discriminated against him for filing a claim for workers' compensation benefits in violation of General Statutes § 31-290a. See Complaint dated August 11, 1997. The plaintiff makes the same claims against the defendant Town of Hamden ("Hamden") under a theory of vicarious liability. See Amended Complaint as to Town of Hamden dated December 29, 1997. Ambrogio has moved for summary judgment on the complaint against him (# 124). Hamden has also moved for summary judgment (# 127). For the reasons stated below, the court grants Ambrogio's motion for summary judgment on the complaint. Since the action against Hamden is premised on a theory of vicarious liability, the court grants Hamden's motion for summary judgment as well.

Summary judgment "shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Practice Book § 17-49. "In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party ." (Internal quotation marks omitted.) *Hertz Corp. v. Federal Ins. Co.,* 245 Conn. 374, 381, 713 A.2d 820 (1998). The moving party has the burden of demonstrating the absence of a genuine issue of material fact, but the party opposing the motion must provide evidence to demonstrate the existence of such an issue, *Appleton v.. Board of Education,* 254 Conn. 205, 209, 757 A.2d 1059 (2000); *Maffucci v. Royal Park Ltd. Partnership,* 243 Conn. 552, 554-55, 707 A.2d 15 (1998).

Ambrogio has submitted extensive documentation in support of his motion for summary judgment including numerous interoffice memoranda, a statement given by Forsythe on June 3, 1997, correspondence, the minutes of a June 11, 1997 meeting of the Hamden Board of Police Commissioners, the transcript of Forsythe's deposition taken on March 17, 2000 and Ambrogio's affidavit dated December 14, 2000. Forsythe has not submitted any affidavits or other proof in opposition, but does cite to and rely upon certain pages of his deposition in his memorandum in opposition to the motion for summary judgment. [FN1]

FN1. In the memorandum, the following pages of transcript were cited: pages 39, 40, 43, 50, 51, 52, 53, 54, 55, 59, 62, 79. Counsel for Forsythe represented that these citations as well as any facts asserted in the memorandum are the evidence upon which he relies to indicate a genuine issue of material fact. The memorandum also referred to two pages of the plaintiff's responses to supplemental interrogatories and requests for production, but these were not provided to the court.

"In order to surmount a motion for summary judgment, a party must demonstrate that there exists a genuine issue of material fact ... Demonstrating a genuine issue requires a showing of evidentiary facts or substantial evidence outside the pleadings from which material facts alleged in the pleadings can be warrantably inferred ... A material fact is one that will make a difference in the result of the case ... To establish the existence of a material fact, it is not enough for the party opposing summary judgment merely to assert the existence of a