# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

### AFFIDAVIT OF ILLEGAL DISCRIMINATORY PRACTICE

DATE:

CASE NO.: 0136354
76aa13159

My name is Lauri Labonia

and I reside at 411 Mansfield Grove Road, East Haven, CT 06512

The Respondent is Christian Shelton.

whose business address is 173 Alps Road, Branford, CT 06405

I was
(X) discharged
( ) suspended
( ) placed on probation
( ) earning a different rate of pay
( ) demoted
( ) warned
( ) given poor evaluation
( ) denied a raise
( ) less trained
( ) denied an office
(X) harassed

( ) not hired/not promoted
( ) not rented a dwelling
( ) denied sale of dwelling
(X) aiding and abetting
( ) denied union representation
( ) constructively discharged
(X) retaliated
( ) not hired/reinstated due to a BFOQ
( ) not hired due to disability
(X) not reinstated due to a disability

on an on-going and continuous basis to 12/14/00 and believe that my:
( ) race
( ) color
(X) sex
( ) pregnancy
( ) ancestry
( ) age
  DOB:
( ) religion
( ) national origin
( ) marital status
( ) physical disability
( ) mental retardation
( ) religious creed
( ) familial status
( ) mental disorder
( ) alienage
(X) previously opposed, filed or assisted
( ) learning disability
( ) creed
( ) sexual orientation

was in part a factor in this action. I believe that the respondent violated the following Connecticut General Statutes Sections enforced through Section 46a-58(a) and acts listed below:

( ) 46a-60(a)(1)      ( ) Title VII of the Civil Rights Act of 1964,
( ) 46a-60(a)(4)           as amended by the Civil Rights Act of 1991
( ) 46a-60(a)(3)      ( ) Age Discrimination in Employment Act of
( ) 46a-60(a)(5)           1967, 29 U.S.C. 621-634

RECEIVED
STATE OF CONNECTICUT
FEB 15 2001
Comm. On Human Rights & Opportunities
CENTRAL REGION

( ) 46a-60(a)(7)( )( )( )( )( )
( ) 46a-60(a)(8)( )( )( )( )( )
( ) 46a-64( )( )( )
( ) 46a-64c(a)( )( )( )
( ) 46a-64c(a)(4)(A)
( ) 46a-64c( )( )
( ) Sec. 3(1) of PA 91-58

( ) Americans With Disabilities Act, 42 U.S.C. Title I
( ) Equal Pay Act of 1964
( ) Sec. 504 of Rehabilitation Act of 1973, as amended
( ) Title VIII of Civil Rights Act of 1968, as amended by Fair Housing Amendment Act of 1988 (U.S.C. 3600-6620)

## THE PARTICULARS OF MY COMPLAINT ARE AS FOLLOWS:

1. My name is Lauri Labonia, and I reside at 411 Mansfield Grove Road, East Haven, CT 06512.

2. The Respondents are Christian Shelton, Dan Pellecchia, Bateman Food Service, aka Compss, Inc., Gardenside Terrace, aka Duran, LLC, all of 173 Alps Road, Branford, CT 06405.

3. The Respondents employ more than 15 persons.

4. I am female and I was temporarily disabled because of a physical assault by Respondent Dan Pellechia. just prior to my termination.

5. I was harassed by Respondent Dan Pellecchia on several occasions. I complained about the harassment many times to my superior, Christian Shelton and Kim Maturo.

6. I was terminated on December 14, 2000 in retaliation for complaining about sex discrimination, drug use and for exercising my legal right to file criminal charges against Respondent Pellechia.

7. I began working for the respondent in January 2000, as wait staff, and was thereafter promoted to Dining Room Manager.

8. All of my performance evaluations were satisfactory prior to my termination, and I had previously received two increases in salary.

9. As Dining Room Manager I supervise all wait staff. All of my staff are women with the exception of one male.

10. On several occasions prior to my termination, I made complaints to my supervisor about the improper and unlawful distribution and use of narcotics on the work premises, by employees.

11. My supervisor advised me on several occasions not to be concerned with the above mentioned conduct. He assured me that the working conditions would change soon.

12. On several occasions prior to my termination, I made complaints to my employer about the abusive and harassing conduct of Dan Pellecchia to the women wait staff including name calling and treating us in a condescending manner.

13. On or about December 3, 2000, while I was working at Gardenside, I asked Dan Pellecchia about the unbearable working conditions, the heat in the kitchen, whereupon he physically grabbed me, shook me, and held me against the wall in the kitchen while yelling at me.

14. Mr. Pellecchia was advised to get away from me, and was escorted out of the building. There were several witnesses to the assault.

15. My supervisor was notified of such event and I was advised to go home.

16. Because of my obvious condition, I was advised to stay home for a few days.

17. During this period, my employer contacted me several times and inquired about what I was planning to do about the assault. I was harassed on at least three occasions while out for the temporary disability.

18. Soon after my return, I filed a criminal complaint against Dan Pellecchia for assault, unlawful restraint and breach of peace with the Branford Police Department.

19. Subsequent to my complaint, the Officer informed me that he interviewed Christian Shelton, and Dan Pellecchia's boss regarding my complaint of criminal conduct. In addition, I asked co-workers to describe what they had witnessed.

20. Soon thereafter, I received a call from the new Director of dining Services who informed me that I was fired and advised me that I would receive written notification by mail.

21. I received notification of my termination stating that I was terminated in part for making malicious statements regarding a co-worker and for instructing co-workers to act in a disloyal and uncooperative manner (describe to the police what they witnessed).

22.    At all times pertinent, each Respondent aided and abetted the others in their discriminatory practices.

# NOTARIZATION

I request the Connecticut Commission on Human Rights and Opportunities investigate my complaint, secure for me my rights as guaranteed to me under the above cited laws and secure for me any remedy to which I may be entitled.

Laurie Labonia, being duly sworn, on oath, states that she is the Complainant herein; that she has read the foregoing complaint and knows the content thereof; that the same is true of her own knowledge, except as to the matter herein stated on information and belief and that as to these matters she believes the same to be true.

Dated at New Haven, Connecticut, this _5th_ day of _February_, 2001.

_Laurie LaBonia_

Subscribed and sworn to before me this _5th_ day of _February_, 2001.

_Patricia A. Affie_
Notary Public
~~Commissioner of the Superior Court~~
**PATRICIA A. AFFIE**
*NOTARY PUBLIC*
**MY COMMISSION EXPIRES JULY 31, 2003**

1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT



------------------------------x
LAURI LABONIA,                :
                              :
            Plaintiff         :
                              :
     VS                       :
                              : 3:01 CV 02399 (RNC)
DORAN ASSOCIATES, LLC, ET AL, :
                              :
            Defendants        :
------------------------------x

Deposition of LAURI LABONIA, taken pursuant to the Rules of Practice held at the Law Offices of Bingham McCutchen, One State Street, Hartford, CT, before Debra A. Chasse, LSR, License No. 00055, a Notary Public in and for the State of Connecticut, on Wednesday, March 26, 2003, at 10:03 a.m.

BEECHER & HORVATH REPORTING ASSOCIATES
73 Millbrook Road
North Haven, CT 06473
(203) 230-0010

BEECHER & HORVATH

1   you to go to the police department." And I said, "Mr.
2   Shelton told me not to do that, he's an attorney, that
3   there'd be a slap on the wrist." He argued with me. He
4   said, "I want you to call the police station, let them
5   know what happened," and I did. I called the police
6   station that day.
7      Q   Which police station?
8      A   Branford police.
9      Q   Do you have any documents substantiating that you
10   called the police that day?
11      A   I tried to get documents but the police said all
12   the phone conversations are taped and if I really needed
13   it, it would be up to my attorney. He didn't write any
14   final report.
15      Q   Have you ever made any efforts to obtain this tape
16   recording of the phone call?
17      A   No.
18      Q   But it's your position there is a phone call -- a
19   tape recording of a phone call existing that reveals your
20   complaint to the police about this incident the same day
21   or day after?
22      A   It was the same day.
23      Q   When did you actually go to the police?
24      A   Well, it was a while back. I kept asking Mr.

BEECHER & HORVATH

1    Q    Was it the same day?

2    A    It wasn't the same day I talked to Mr. Shelton
3    about it, no.

4    Q    When do you remember Mr. Shelton telling you that
5    Mr. Pellecchia had been fired?

6    A    It might have been a day or two before that.

7    Q    Before you went to the police?

8    A    Right.

9    Q    Do you remember when it was that you first went to
10   the police?

11   A    It was -- I think it was December 11th, 12th,
12   13th, somewhere around there. The officer told me he
13   knows the dates. All I know is that I got fired the next
14   day after I went.

15   Q    Is that your testimony, that you were fired the
16   next day after you went to the police?

17   A    One or two days afterwards, yes.

18   Q    How do you know that?

19   A    Well, because everything was fine until I went to
20   the police. I mean, everything was fine, and then the
21   next thing I know I get a phone call at 20 of 2 in the
22   afternoon saying I'm terminated. I was like, "For what?"

23   Q    When was the phone call?

24   A    That I was terminated?

BEECHER & HORVATH

```
 1      Q    Do you have any other beliefs as to why you were
 2   fired by Gardenside?
 3      A    Well, as far as what?  I don't understand.
 4      Q    In the entire universe do you have any other
 5   beliefs as to why you were fired by Gardenside, besides
 6   the fact that you went to the police to complain about
 7   this?
 8      A    No, I don't see why I should have been fired.
 9      Q    What is your factual support for your belief that
10   Gardenside fired you because you went to the police about
11   this incident?
12      A    I don't know.  It was just ironic that I went to
13   the police and the next thing I was fired.  What do you
14   want me to think?
15      Q    Besides the timing that leads you to think that,
16   do you have any factual support for this belief?
17      A    Well, I've never gotten written up, never got any
18   verbal warnings, written warnings.  What do you want me to
19   believe?  I mean, if I was never disciplined, I never had
20   a written or -- what do you want me to believe?
21      Q    Is there anything else that leads you to believe
22   that you were fired because you went to the police to
23   report the incident about Mr. Pellecchia?
24      A    That's what I believe, that I got fired because of
```

BEECHER & HORVATH

1    A    Right.

2    Q    Underneath it says 12/14. Do you see that?

3    A    Right.

4    Q    Next to that time of report and it says 15:30, which would be 3:30 in the afternoon?

6    A    Right.

7    Q    It was around 3:30 in the afternoon that you went to the police; correct?

9    A    No, and 12/14 is not correct either.

10    Q    You're saying it's wrong?

11    A    Well, yes, because after I got fired, they probably have this on the taped line, too, when I got fired, I called up the police officer and told him that I got fired and I wanted to know what he said to Mr. Shelton and Kim Maturo and blah, blah, blah, blah, blah, and I went down to the police station and I said, "I want the date and the report of when you went there," and he said it was the Wednesday before, or whatever, and he told me these copies are not written on the same day all the time. He could have done this on the 13th and copied it and wrote it on the 14th.

22    Q    Do you think that's what happened?

23    A    Exactly what happened.

24    Q    Do you have anything to support that?

1   waited so long to make the complaint," and then it says,
2   "She told me she was discouraged by the management,
3   specifically Chris Shelton, about calling the police."
4   Let me know if you see that in the report.
5       A    Yeah, I see it.
6       Q    Did you tell them that essentially?
7       A    Yes.
8       Q    Tell me everything Chris Shelton did to discourage
9   you from calling the police.
10      A    He told me it wasn't a good idea and he apologized
11  to me, and he was going to get to the bottom of it, and he
12  was very sympathetic, and he said he was going to take
13  care of everything, and by all means he was going to be
14  disciplined. He will tell me the final outcome of the
15  investigation. He will keep me up to date on what
16  happens, and he's not going to drop it. There's no need
17  to call the cops. We can do our own investigation. I'm
18  an attorney, sometimes they get a slap on the hand, and
19  it's not going to do you any good. I can go through his
20  employer and sit and talk to his boss and that was that,
21  and I don't think he personally wanted the cops there
22  because of the people that lived there.
23      Q    He didn't want to upset the residents?
24      A    That's what I would think, yeah.

1  Q   My question is this, and I know this gets a little
2  tricky and complicated because we're talking about a phone
3  call conversation, but I'm only asking you now if you know
4  whether on the 13th in that meeting Megan told the other
5  three what's listed as No. 2.  Do you know?
6  A   I don't know, no.
7  Q   Now, let's go back to the phone call itself.  In
8  that phone call with Megan the previous day, December
9  12th, did you talk about the subject of forging a
10 document?
11 A   No, that was old news.
12 Q   I thought you started to say that in that phone
13 call you talked about the subject in No. 2?
14 A   It was just the whole thing but not forging.
15 That's old news.
16 Q   I'm pretty sure if I look at this transcript --
17 A   Her name was probably mentioned, but we weren't
18 saying marketing -- this is old gossip news.  This went
19 around the whole building.  I can give you 12 people in
20 the place, and they'll all tell you everything on the
21 list.  I don't understand the question you're asking me.
22 Q   I'll ask it again.
23 A   This is old gossip through the whole building.
24 This is like old news.

BEECHER & HORVATH

1        MS. WESTBROOK: Let him pose a question to
2    you.
3    Q    In your phone call with Megan Moran on December
4    12th, did you talk about Chris Shelton and forging of
5    documents?
6    A    I don't recall. I think that was prior to the
7    phone conversation.
8    Q    What was prior to the phone conversation?
9    A    The gossip in the building. I don't think that
10   happened on the phone. I think Megan stored it in her
11   brain from all the gossip in the building. I think that
12   it was everything she listened to throughout the building
13   and everybody else's gossip that it all came to a boil.
14   Q    Your testimony is in your phone call of the 12th
15   of December with Ms. Moran you didn't talk about Chris
16   Shelton and forging the documents at all?
17   A    I don't recall talking about that in that phone
18   conversation that day, no.
19   Q    Let's look at No. 3. Do you know whether or not
20   Mrs. Moran on December 13, 2000, told the other three
21   individuals, Mr. Shelton, Ms. Rivas, and Ms. Maturo, that
22   you had asked her not to help Gardenside Terrace anymore?
23   A    I never told her not to help Gardenside --
24        MS. WESTBROOK: Answer the question.

BEECHER & HORVATH

```
1    A    No.

2    Q    You don't know, one way or another, whether Ms.
3    Moran actually reported this; do you?

4    A    No.

5    Q    The next sentence in No. 3, do you know whether
6    Ms. Moran on December 3rd told the other three individuals
7    that you had relayed to her everybody on the dining
8    staff's tenure and rate of pay?

9    A    No, everybody in the dining staff knew everybody's
10   rate of pay.  No.  Old news.

11   Q    Different questions.  You need to answer my
12   question, not your question; is that understood?

13   A    That's understood.

14   Q    My question is whether you know whether Ms. Moran
15   reported this to the three others.  Do you know one way or
16   the other?

17   A    No.  This is bullshit.

18   Q    What was that?

19   A    Nothing.  Nothing.

20   Q    What did you just say?

21   A    I didn't say anything.

22   Q    Actually, you did.

23   A    I said, "This is just bullshit."

24   Q    You know when you first said you didn't say
```

BEECHER & HORVATH

1   anything, that wasn't true; was it?
2   A   What wasn't true?
3   Q   It was a lie.
4   A   What was a lie?
5   Q   I asked you what you had said and you said nothing
6   and, in fact, you said bullshit; true?
7   A   True.
8   Q   You were lying; right?
9   A   No, I wasn't lying.
10  Q   How so?
11  A   I wasn't talking to you.
12  Q   I didn't ask whether you were talking to me.
13  A   Oh, God, here we go.
14  Q   Well, you're under oath. Do you want to tell the
15  truth?
16  A   Yes. I said bullshit.
17      MR. COHEN: Well, do you want to stop
18      here? We're in the middle of a document.
19  Q   No. 3, the last sentence talks about Megan
20  saying, as I read this -- the rolling of the eyes and
21  gestures during each question, if you want to make it move
22  along, cut it out.
23      MS. WESTBROOK: There's no question
24      pending. You don't have to respond.

BEECHER & HORVATH

1   Q   Let's understand something. You brought this
2   lawsuit. I have a right to ask you questions. If you
3   want to prolong it, I'll prolong it. I don't care.
4       No. 3, Megan stated it was her opinion that this
5   was an effort to antagonize her towards Gardenside
6   Terrace. Do you know whether Megan said anything to that
7   effect to Mr. Shelton, Ms. Rivas, and Ms. Maturo on the
8   13th of December, 2000?
9   A   No.
10  Q   Was that a subject that was discussed in your
11  phone call the previous day with Mrs. Moran?
12  A   I don't recall.
13  Q   In that phone call the previous day did you say
14  anything to Megan Moran that would suggest that she not
15  help or assist Gardenside Terrace anymore?
16  A   No.
17  Q   And in that phone call the previous day, did you
18  and Megan discuss the tenure and rate of pay of the dining
19  staff workers?
20  A   No. We discussed the raises that everybody got
21  that she didn't get.
22  Q   So far at the end of No. 3 -- 1, 2, and 3, it's
23  your testimony that in your phone call with Ms. Moran you
24  didn't talk about any of these things?

1   A   There might have been why she didn't get a raise
2   we talked about.
3   Q   Other than that, is there anything in Nos. 1 to 3
4   that you and Ms. Moran talked about in your phone call on
5   December 12th?
6   A   This is old news, no.
7   Q   That's not an answer to my question. Old news or
8   new news is not an answer to my question. My question is
9   simply whether in numbers 1 to 3 is there anything else
10  that you and Ms. Moran talked about in the phone call?
11  A   No, I don't recall. I think it was basically just
12  what happened to me.
13  Q   That's not the answer to the question. Let's
14  listen to my question.
15  A   All right.
16  Q   In Nos. 1 to 3 is there anything else that is
17  described in Nos. 1 to 3 that you and Ms. Moran actually
18  talked about in your phone call of December 12, 2000?
19  A   From 1 to 3?
20  Q   Yes, from 1 to the end of 3.
21  A   1, no; 2, no; and 3, no.
22  Q   So was she making this up?
23  A   No, it's old news.
24  Q   If Ms. Moran told Mr. Shelton, Ms. Rivas and Ms.

BEECHER & HORVATH

1  Maturo that you had said these things in Nos. 1 to 3 in
2  that phone call, was she making that up?
3      A   No, it's old news. It's gossip throughout the
4  building. What else do you want me to say? It's old
5  news. It's the gossip through the building.
6      Q   Let's listen to the question.
7      A   Okay. Here we go.
8      Q   If Ms. Moran told Mr. Shelton and Ms. Rivas and
9  Ms. Maturo that in the phone call of December 12, 2000 you
10 said everything that's listed in Nos. 1 to 3 in that phone
11 call, was she making that up?
12     A   I did not have 1 through 3 talked about on that
13 phone call.
14     Q   So she was making it up that you said these
15 things?
16     A   No, this 1, 2, and 3 was gossip through the
17 building. It did not happen on the day of the phone call.
18 It was old news, gossip through the building.
19     Q   If Ms. Moran told these individuals that you had
20 said these things in the phone call of December 12, 2000,
21 she was making that up?
22     A   No, I think she was storing all the gossip and
23 bull crap that went with it through the building and let
24 it all out on that day.

BEECHER & HORVATH

Case 3:01-cv-02399-MRK   Document 64-2   Filed 11/18/2003   Page 19 of 19
LaBonia vs Doran Associates, LLC, et al
7/30/2003                                                    Laurie LaBonia

Page 366

1    Q.   Did he ever do anything to you other than
2    speak in a way that was nasty or cruel?
3    A.   When he put his hands on me.
4    Q.   Other than that occasion on or about November
5    3, other than that occasion when he put his hands on
6    you and other than speaking to you in a way that was
7    nasty or cruel, demeaning, calling you an idiot or
8    stupid or words to that effect, did he ever do anything
9    else that was inappropriate?
10   A.   No.
11   Q.   Did he ever say anything to you that you
12   found inappropriate other than saying things like
13   referring to you as stupid or dumb?
14   A.   Like I said, it's whatever came out of his
15   mouth.
16   Q.   No, but I'm trying to -- I need -- you
17   brought a lawsuit against my client and you brought a
18   lawsuit against Mr. Pellechia, who's also my client,
19   and I'm entitled to know what he did.
20   A.   Just he was -- everything out of his mouth
21   was nasty, cruel, not professional.
22   Q.   And now I'm trying to get you to tell me what
23   it was that he said that was cruel or unprofessional.
24   A.   Stupid and dumb and you're an idiot and, you
25   know, nothing -- let's put it this way, nobody could do