Case 3:01-cv-02399-MRK    Document 64-3    Filed 11/18/2003    Page 1 of 19
LaBonia vs Doran Associates, LLC, et al
7/30/2003                                                            Laurie LaBonia

```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
 2
                VOLUME III - Page 313 to 407
 3
 4      - - - - - - - - - - - - - - - - -

        LAURIE LABONIA
 5      vs.                           No. 301CV2399(RNC)
        DORAN ASSOCIATES, LLC, et al
 6      - - - - - - - - - - - - - - - - -
 7
 8
 9
10                DEPOSITION OF:  LAURIE LaBONIA
                  DATE:  July 30, 2003
11                HELD AT:  FEDERAL COURTHOUSE,
                  141 Church Street, New Haven, CT
12
13
14
15
16
17
18
19
20
21
22                   Jayne Ciccotelli, LSR
              Brandon Smith Reporting Service, LLC
23                     44 Capitol Avenue
                       Hartford, CT  06106
24                      (860) 549-1850
25
```

                                                    COPY

Case 3:01-cv-02399-MRK   Document 64-3   Filed 11/18/2003   Page 2 of 19
LaBonia vs Doran Associates, LLC, et al
7/30/2003                                              Laurie LaBonia

Page 360

1  you have a nice day, I mean.

2  Q.  And that caused you extreme emotional upset?

3  A.  Yeah, I thought it was rude.

4  Q.  I'm not asking you if you thought it was
5  rude, did it cause you extreme emotional upset?

6  A.  Yes, I thought it was very unprofessional and
7  very sarcastic and, yes, it bothered me a lot.

8  Q.  Did you seek any kind of psychiatric,
9  mental-health treatment as a result of that
10 conversation with Jean Raveis?

11 A.  No.

12 Q.  Did you ever engage any kind of mental health
13 clinician to treat anything that you might be
14 experiencing after December 14 of 2000?

15 A.  No.

16 Q.  So you have not seen any kind of mental
17 health clinician -- I'm sorry, strike that.

18      You have not seen or communicated with any
19 kind of mental health clinician since --

20 A.  Doctors, you're talking about?

21 Q.  Any -- have you sought any kind of treatment
22 for any kind of emotional or psychiatric upset since
23 December 14 of 2000?

24 A.  After December 14, yes, I was having anxiety
25 attacks and I seen my doctor, was on medication for

Case 3:01-cv-02399-MRK   Document 64-3   Filed 11/18/2003   Page 3 of 19
LaBonia vs Doran Associates, LLC, et al
7/30/2003                                                    Laurie LaBonia

Page 361

1   them.
2       Q.   Okay.  Other than getting medication from
3   your general practitioner for the anxiety attacks, did
4   you seek any other kind of treatment for any other
5   emotional upset after December 14 of 2000?
6       A.   No.
7       Q.   And your general practitioner's name, again,
8   please.
9       A.   I have to give you a whole list because it's
10  whoever's at Yale health Plan at the time.
11      Q.   Did you ever speak with anybody at the Yale
12  Health Plan specifically about the conversation you had
13  with Jean Raveis when she communicated to you your
14  termination?
15      A.   No.  Oh, my doctor.
16      Q.   You did?
17      A.   Yes.
18      Q.   You told your doctor about that conversation?
19      A.   Yeah.
20      Q.   You sure about that?
21      A.   Yeah.  I told my doctor a lot of things.
22      Q.   That would be recorded in his or her notes?
23      A.   I don't think they write everything down.
24      Q.   But you're certain that --
25      A.   He'd have to be there a long time.

Page 362

1    Q.    You're certain --

2    A.    Yeah.

3    Q.    -- you're certain that you communicated --

4    A.    I might have mentioned it to her.

5    Q.    I'm not asking -- see now, this is where I'm asking you to be very careful. Okay? This is a very precise question.

         Are you certain that you told one of your doctors about the conversation you had in which Jean Raveis communicated to you that you were terminated?

11   A.    Probably, yes.

12         MR. CASEY: This might be a convenient time to take a break.

14         VIDEOGRAPHER: Off record, 11:10 a.m.

15         (Break taken)

16         VIDEOGRAPHER: We're back on record, 11:20 a.m.

18   Q.    Ms. LaBonia, I know that you testified to a similar line of questioning when you were examined by Mr. Cohen, but I'm going to ask you slightly different questions and I ask you to be patient with me on this and, hopefully, it will not be too lengthy.

         I want you to list for me the instances where Dan Pellechia did anything to you that you thought was done because of your sex, and let me start the

Case 3:01-cv-02399-MRK   Document 64-3   Filed 11/18/2003   Page 5 of 19
LaBonia vs Doran Associates, LLC, et al
7/30/2003                                                    Laurie LaBonia

Page 363

1  questioning by asking it this way, what, if anything,
2  did Dan Pellechia ever say to you that suggested to you
3  that he had a bias against you because you are a woman?
4       A.   He really only talked to one other male very
5  mean and nasty and not the other males, but, I mean --
6  so he just, general, his nastiness towards people. But
7  I really never seen him be really nasty to like the
8  chefs. One incident he had with the dishwasher but I
9  wasn't present at that time, I just heard about it. He
10 was just nasty, call you names, stupid, idiot, why are
11 you dumb, you know, just nasty.
12      Q.   Other than calling -- and I'm now focusing on
13 just you, not others, just you, just Dan Pellechia's
14 treatment of you, on how many occasions did he say or
15 do something to you that you thought was inappropriate?
16      A.   I don't know how many exactly. There was a
17 few I did go to Mr. Shelton and complain about the way
18 he talked to people and me.
19      Q.   No, no, not people, just -- again, I
20 understand from your earlier testimony that you spoke
21 with Shelton about how Pellechia was talking to people
22 generally. I'm just now focusing on you and only you.
23      A.   I went to Chris Shelton on several occasions
24 on how Dan talked to he.
25      Q.   And I'm not asking you about how many times

Case 3:01-cv-02399-MRK   Document 64-3   Filed 11/18/2003   Page 6 of 19
LaBonia vs Doran Associates, LLC, et al
7/30/2003                                                    Laurie LaBonia

Page 364

1   you went to Chris Shelton, I'm asking you something
2   different. How many times did Dan Pellechia say or do
3   something to you that you thought was inappropriate? A
4   couple minutes ago you said a few times.
5       A.   Well, in the beginning, it was, you know it
6   was maybe five or six times but then I was told to
7   block him out and ignore him. I really basically tried
8   to do that so I was trying to ignore some of the things
9   he did or said, because that's what I was told to do.
10  Bite your tongue, is what I was told to do.
11      Q.   I'm not asking now about your reaction; I'm
12  not asking you about your trying to block things out of
13  your mind or bite your tongue. I'm asking about
14  something very different.
15           I'm asking about how many times, and then I'm
16  going to go through each occasion, Dan Pellechia said
17  or did something to you that you thought was
18  inappropriate. You mentioned "a few," you mentioned
19  "five or six times;" is that about right?
20           MR. WILLIAMS: Well, I'm going to object
21  the form of that. She said five or six times in the
22  beginning, not five or six times in total.
23      Q.   Well now I'm asking you, I'm asking for a
24  total. How many times in total --
25      A.   Basically, everything out of his mouth was

Brandon Smith Reporting Service

99d27928-4941-4b84-b2c6-5b622a0eb043

Page 365

1  not right so in the course of an eight hour day,
2  probably everything that came out of his mouth, so
3  that's all I can --
4       Q.   But you didn't walk around right next to him?
5       A.   No.
6       Q.   You didn't interact with him that much at
7  work?
8       A.   I tried to stay away but, of course, we were,
9  I was in and out of the kitchen, he was in the kitchen.
10      Q.   If he was talking to himself in an agitated
11 way or talking to somebody else in an agitated way or
12 saying that a dishwasher or a waitress was stupid, I'm
13 not asking you about those things. I'm asking you
14 about something very narrow.
15           How many times during the course of the
16 roughly speaking one month that you and Dan Pellechia
17 overlapped at Garden Side, how many times did he say or
18 do something to you that you thought was inappropriate?
19      A.   Every time he opened his mouth so as many
20 times as he talked to me in a day, if he talked to me
21 six times, everything out of his mouth was nasty and
22 cruel. So, I mean, whenever he talked to me, he wasn't
23 nice.
24      Q.   Every single day?
25      A.   Every single day.

Page 366

1    Q.   Did he ever do anything to you other than
2    speak in a way that was nasty or cruel?
3    A.   When he put his hands on me.
4    Q.   Other than that occasion on or about November
5    3, other than that occasion when he put his hands on
6    you and other than speaking to you in a way that was
7    nasty or cruel, demeaning, calling you an idiot or
8    stupid or words to that effect, did he ever do anything
9    else that was inappropriate?
10   A.   No.
11   Q.   Did he ever say anything to you that you
12   found inappropriate other than saying things like
13   referring to you as stupid or dumb?
14   A.   Like I said, it's whatever came out of his
15   mouth.
16   Q.   No, but I'm trying to -- I need -- you
17   brought a lawsuit against my client and you brought a
18   lawsuit against Mr. Pellechia, who's also my client,
19   and I'm entitled to know what he did.
20   A.   Just he was -- everything out of his mouth
21   was nasty, cruel, not professional.
22   Q.   And now I'm trying to get you to tell me what
23   it was that he said that was cruel or unprofessional.
24   A.   Stupid and dumb and you're an idiot and, you
25   know, nothing -- let's put it this way, nobody could do

Case 3:01-cv-02399-MRK   Document 64-3   Filed 11/18/2003   Page 9 of 19
LaBonia vs Doran Associates, LLC, et al
7/30/2003                                              Laurie LaBonia

Page 367

1  anything right in his eyes.
2      Q.   So he was very critical of the way you did
3  your job, is that what you're saying?
4      A.   Me and everybody.
5      Q.   I'm just focusing on you now, Ms. LaBonia.
6      A.   Yes.
7      Q.   Other than being critical of the way you did
8  your job and using inappropriate terms like you're dumb
9  or your stupid, was there anything else that he ever
10 did or said that you found objectionable?
11     A.   I think I answered that, whatever came out of
12 his mouth, I found it nasty and objectionable.  I
13 didn't like the way he talked to me.
14     Q.   Do you have a memory of any particular thing
15 he said to you that was objectionable other than
16 calling you stupid or dumb?
17     A.   Just the way he talked to me in general.
18     Q.   Do you have a memory of any of the specific
19 words he used that you found objectionable?  And I want
20 precise words that he used now.
21     A.   Stupid, dumb, what are you an idiot.  Just,
22 just very -- like nothing was ever done right or just
23 -- I can't -- just everything was wrong.
24     Q.   Okay.  I've got it.  I understand.  And I'm
25 just -- I'm not trying to get you to change your

Page 368

1    testimony, I just want to know what your testimony is,
2    and I'm now trying to understand was there anything
3    else.  I'm not saying it was right of him, the fact
4    that he was saying that everything was wrong, the fact
5    that he said, you know, that you were dumb or you were
6    stupid is inappropriate, if he did that.
7        A.   I agree.
8        Q.   It's your word against his.  I just want to
9    know what your testimony is.
10            Was there anything else that he did other
11   than finding fault in an unprofessional way with you?
12       A.   Putting his hands on me.
13       Q.   Okay, yes, I'm sorry, and other than that
14   occasion.  That was it?
15       A.   Mm-hmm.
16       Q.   Is that a yes?
17       A.   Yes.
18       Q.   So just so the record is entirely clear, you
19   had two complaints about Dan Pellechia, one, the
20   physical confrontation when he put his hands on you
21   and, two, the fact that he persistently found fault
22   with the way you did your job and communicated that in
23   an unprofessional way; is that a fair statement?
24       A.   Yes.
25       Q.   And those are the only two things that you

Case 3:01-cv-02399-MRK   Document 64-3   Filed 11/18/2003   Page 11 of 19
LaBonia vs Doran Associates, LLC et al
7/30/2003                                                    Laurie LaBonia

Page 377

1   Q.   Who is Mr. Shelton's boss?
2   A.   I think his father.
3   Q.   With respect to the incident where
4   Mr. Pellechia put his hands on you in the workplace,
5   that was something that happened at work, correct?
6   A.   Yes.
7   Q.   And it happened as a result of a dispute
8   between you and Mr. Pellechia about how hot or cold the
9   kitchen area was at work, correct?
10  A.   It basically wasn't a dispute between me and
11  Dan at the time, it was Dan and the other wait staff
12  that were arguing about the heat in the kitchen, and I
13  was the one who said, Dan, just open the back door and
14  let the air flow in.  So it basically wasn't our
15  dispute, at that time.
16  Q.   But my question is, the confrontation arose
17  in the workplace, correct?
18  A.   Yes.
19  Q.   As a result of things that were happening in
20  the workplace?
21  A.   Yes.
22  Q.   And it didn't have anything to do with
23  anything outside the workplace, correct?
24  A.   Correct.
25  Q.   You didn't know Dan Pellechia outside the

Case 3:01-cv-02399-MRK   Document 64-3   Filed 11/18/2003   Page 12 of 19
LaBonia vs Doran Associates, LLC, et al
7/30/2003                                                    Laurie LaBonia

Page 385

1   of emotional harm?
2        A.   Yeah, I'm very upset that it happened.  I
3   think it could have been avoided, as many times as I
4   went to Mr. Shelton.  Obviously, it wasn't dressed with
5   Dan Pellechia or maybe this incident wouldn't have
6   happened, you know, they could have told him to calm
7   down, remove himself from, remove himself from the
8   building.
9        Q.   You're talking now about what the company did
10  or didn't do.  I'm focusing on your explaining to me in
11  complete terms the different kinds of emotional upset
12  that you've experienced as a result of your experience
13  with Mr. Pellechia.  You've mentioned three things,
14  that you fear and avoid conflict, secondly, that you
15  were angry with yourself for not being able to protect
16  yourself and, third, that you were upset that it
17  happened.  Were there any other ways in which you were
18  harmed emotionally as a result of your experience with
19  Mr. Pellechia?
20       A.   Yes, I think that the whole thing could have
21  been avoided if someone took action and I don't think
22  -- it bothers me every day that I went to my employer
23  on numerous occasions and nothing was done.
24       Q.   Are there any other ways in which you were
25  harmed emotionally by your experience with Dan

Case 3:01-cv-02399-MRK   Document 64-3   Filed 11/18/2003   Page 13 of 19
LaBonia vs Doran Associates, LLC, et al
7/30/2003                                                        Laurie LaBonia

Page 386

1   Pellechia?
2       A.   Well, I don't, I don't like the fact that I
3   don't have a backbone now and I fear everything.
4       Q.   But you've already made that point, is there
5   anything else?
6       A.   I just feel that something should have been
7   done.  I think about it like every day.  If -- I just
8   feel my boss let me down.  I went to him; I told him;
9   he knew it.  All I heard from him was bite your tongue,
10  I'm getting out of the contract.  And I just feel that
11  he didn't protect me or listen to me, ignored the whole
12  situation, and I do think back, God forbid if it was
13  worse than it was.  I mean, thank God it wasn't, but I
14  mean anything could have happened, worse, he could have
15  choked me to death.  I mean, I don't know what
16  possibly -- and that bothers me, I always think back on
17  what could have happened if those two people didn't
18  come in the room and get him off me, and there's a lot
19  of things that go through my mind like that.  I fear to
20  this day that if I see him he's going to hurt me or do
21  something to me.  I mean, if I seen him on the street
22  right now, I'd probably run the other way.
23      Q.   Have you experienced any other kind of
24  emotional upset than what you've described as a result
25  of your experiences with Dan Pellechia?

Page 391

```
 1       Q.   I know, but now I want to know --
 2       A.   And I think it was all in one, that's why --
 3       Q.   But who, who retaliated against you because
 4  of anything having to do with Pellechia or your
 5  complaints abouts Pellechia?
 6       A.   Well, whoever decided -- I don't, I don't --
 7  you mean that I got fired?
 8       Q.   No, no, no.  First of all, let me back up.
 9            Do you believe that there was any retaliation
10  other than the fact that you were fired, is that the
11  form of retaliation that you think occurred?
12       A.   Well, I think that, like I said, I think Dan
13  calling people stupid, idiot, more so to the girls than
14  he did to the chefs and the dishwashers.
15       Q.   That's discrimination, that's not
16  retaliation.
17       A.   I don't what -- so I don't --
18       Q.   Retaliation is when an employer or an agent
19  of an employer takes adverse action against you because
20  you asserted your rights.
21       A.   Well, I think that because I called the cops,
22  I think that's why I got fired.
23       Q.   And who engaged in that retaliation, what
24  person?
25       A.   Well, the people that signed the termination
```

Brandon Smith Reporting Service

99d27928-4941-4b84-b2c6-5b622a0eb043

Page 395

1    having anxiety attacks, true?  That's true, correct?
2         A.   Right.
3         Q.   And you were allowed to do that, true?
4         A.   Right.
5         Q.   Besides going home early when you felt you
6    were having anxiety attacks, while you were employed at
7    Garden Side, did you ask for any other kind of
8    accommodation for your anxiety attacks of any kind?
9         A.   Well, just the fact that I went in to
10   complain about things Dan were doing, I guess I was
11   asking for situations to stop.  I mean, maybe I should
12   have got on my hands and knees and begged, I don't
13   know, but I didn't ask for -- I just asked could you
14   talk to him, could you have him stop doing this, stop
15   talking to the girls like that, if that's what you mean
16   by "asking."
17        Q.   What precisely did you ask on those
18   occasions?
19        A.   Oh, I asked him to talk to Dan Pellechia,
20   calm him down, tell him not to be so nasty and
21   disrespectful and unprofessional, and all I got was
22   bite your tongue, I'm getting out of this contract,
23   everything's going to be all right, just ignore him.
24   But there was lots of times I couldn't ignore him and I
25   constantly went to Mr. Sheldon and asked him to have it

Page 396

1   stop.
2       Q.   If I recall your testimony from last time,
3   the times where you went to ask to have it stopped was
4   with Mr. Shelton, Chris Shelton, correct?
5       A.   Right.
6       Q.   And I believe you may have testified there
7   were also occasions you made the request to Kim Maturo;
8   is that true?
9       A.   Yes, Mr Sheldon wasn't in the building at the
10  time, I would ask Kim to please have him stop.
11      Q.   On these occasions when you went to see
12  Mr. Shelton or Ms. Maturo to complain about
13  Mr. Pellechia's behavior, and you said to ask to have
14  it stopped, what else did you say to Ms. Maturo or
15  Mr. Shelton about what was going on?
16      A.   I just told them exactly what was going on.
17      Q.   Which was that Mr. Pellechia was not treating
18  you properly, correct?
19      A.   He was rude, you know, nasty, just loud,
20  nasty. I can't explain it. Just not nice.
21      Q.   Is there anything else that you said to
22  Ms. Maturo or to Mr. Shelton during those meetings?
23      A.   Well, I, I -- no, I just -- basically,
24  whatever was happening that day that Dan did or
25  something that was going on, I walk in the office and

Page 401

1   hopefully done.

2            VIDEOGRAPHER: Off record, 12:22.

3            (Break taken)

4            VIDEOGRAPHER: Back on record, 12:24.

5            MR. COHEN: I have nothing further.

6            MR. WILLIAMS: Just a couple of

7   questions.

8

9                    CROSS-EXAMINATION

10  BY MR. WILLIAMS:

11

12      Q.   You have told both of the attorneys that you

13  repeatedly made complaints about the way Mr. Pellechia

14  was behaving. Did you ever express that he was

15  treating the women differently from the men?

16           MR. CASEY: Objection to form.

17      Q.   Go ahead.

18      A.   Yeah, because he did it more to the women,

19  there was only one other person that he did it to, the

20  dishwasher, on one occasion, therefore he did it every

21  day to the waitresses and myself, so I don't know how

22  you would put that. I guess yeah.

23      Q.   Well, the question is did -- I understand

24  that you have said that you felt that, did you express

25  that to the people you complained to about him?

Page 402

```
 1      A.   Yeah, I basically was telling Mr. Shelton he
 2   called us stupid, he called idiots, he called us dumb,
 3   but he wasn't saying it to Chris the chef or the other
 4   chef or just --
 5      Q.   Okay.
 6      A.   -- to us.  I don't know why but.
 7      Q.   One other question.  At one point, counsel
 8   asked you whether the behavior of Mr. Pellechia over
 9   the period of time that you had to deal with him
10   affected you in any of your major life activities, my
11   question is, did you know what he meant when he used
12   the phrase "major life activities"?
13      A.   No.
14              MR. WILLIAMS:  I have no further
15   questions.
16              MR. CASEY:  Let me follow-up on that.
17
18                    RE-EXAMINATION
19   BY MR. CASEY:
20
21      Q.   As a result of your interaction with
22   Mr. Pellechia, was there anything in your day-to-day
23   activities that you historically were able to do that
24   you could no longer do?
25      A.   I, like I told you, I was, you know,
```

Case 3:01-cv-02399-MRK    Document 64-3    Filed 11/18/2003    Page 19 of 19
LaBonia vs Doran Associates, LLC    al
7/30/2003                                                    Laurie LaBonia

Page 403

1   sometimes I couldn't sleep at night and I was exhausted
2   the next day constantly thinking about it. And after
3   that happened with Dan, I was worried sick that like he
4   was going to like come kill me or something. I was
5   very paranoid, I hate to admit that, but very paranoid.
6   You know, I was nervous. I couldn't sleep. You know,
7   I was just a nervous wreck.
8       Q.   I understand that you were nervous and had
9   difficulty sleeping.
10      A.   Me and my husband, you know, just like stupid
11  little things -- I can't explain what I'm saying to
12  you. Just, it just wasn't good.
13      Q.   I understand you were anxious and fearful,
14  had difficulty sleeping and you lost some weight.
15      A.   I was upset.
16      Q.   Was there any day-to-day activity that you
17  carry on in your life, like putting on your clothes --
18      A.   Yeah, I got depressed about losing my job.
19      Q.   Let me finish.
20           -- did you have difficulty brushing your
21  teeth?
22      A.   Well, if I was depressed, I didn't get out of
23  bed so I guess I didn't brush my teeth. But I was very
24  depressed about losing my job. I loved my job. I
25  mean, I don't know how else to explain this to you