## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

LAURI LABONIA,                          :
                                        :
            Plaintiff,                  :
                                        :
v.                                      :      NO.  3:01CV2399 (MRK)
                                        :
DORAN ASSOCIATES, LLC, ET AL.           :
                                        :
            Defendants.                 :

## MEMORANDUM OF DECISION

Plaintiff Lauri Labonia has sued Defendants Doran Associates, LLC, d/b/a Gardenside Terrace ("Doran"), Christian B. Shelton, Compass Group U.S.A., Inc., d/b/a Bateman Food Service ("Compass"), and Dan Pellachia for, among other things, employment discrimination on the basis of her sex and disability in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.* and the Americans with Disabilities Act of 1990, 42 U.S.C. § 1211 *et seq.* ("ADA"). *See* Complaint [doc. #1] ("Compl."). Pending before the Court are Motions for Summary Judgment by the Compass Group and Daniel Pellachia [doc. #57] and Doran Associates and Christian Shelton [doc. #60].

### I.  Procedural History

On May 30, 2002, the Court dismissed several of the counts in the Complaint. *See* Motion to Dismiss [doc. #18]. The counts that were dismissed were: Count Two against Mr. Shelton on the claim of discriminatory discharge; Count Four against Doran and Mr. Shelton for

1

intentional infliction of emotional distress; and Count Five against Doran and Mr. Shelton for negligent infliction of emotional distress. *See id.*

At argument on the Defendants' motions for summary judgment, several other claims were resolved. For example, Ms. Labonia informed the Court that she no longer pursued her ADA claim. Accordingly, the Court entered judgment in favor of all Defendants on Count One of the Complaint insofar as it asserted claims against the Defendants under the ADA. Ruling and Order [doc. #79], at 1. The Court also granted Compass and Mr. Pellachia summary judgment on Ms. Labonia's Title VII claims under Count One and on her Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §§ 46a-60(a) *et seq*. discrimination claims under Count Two because of Ms. Labonia's concession that neither Compass nor Mr. Pellachia was her employer within the meaning of Title VII and CFEPA. *Id.* The Court further granted Mr. Shelton summary judgment on all remaining statutory claims against him for the reasons set forth in the Court's motion to dismiss ruling. *Id.* at 1-2. Finally, at argument, Ms. Labonia agreed that she had not adequately pleaded a First Amendment retaliation claim in her Complaint.

At this juncture, there are no claims remaining against Mr. Shelton, and no federal claims remaining against Compass and Mr. Pellachia. Therefore, as Ms. Labonia acknowledged before the Court, the only claims remaining in the case are as follows: Count One against Doran for hostile work environment and retaliation on the basis of Ms. Labonia's sex in violation of Title VII; Count Two against Doran for sex discrimination in violation of the CFEPA; Count Three against Compass, and Mr. Pellachia for assault and battery; Count Four against Compass and Mr. Pellachia for intentional infliction of emotional distress; and Count Five against Compass and Mr. Pellachia for negligent infliction of emotional distress. At oral argument the Court instructed

2

the parties to submit supplemental briefing regarding certain questions, including their positions

on the Court's exercise of supplemental jurisdiction over the state law claims in the event the

Court granted Defendants summary judgment on all federal claims.  The parties having submitted

supplemental briefs,[1] the Court will address the remaining issues in this case.

## II.  Factual Background

The relevant facts are drawn from Compass' and Mr. Pellachia's Local Rule 56 Statement

of Undisputed Facts [doc. #59] ("Compass and Pellachia Statement"), Doran Associates' and

Christian Shelton's Local Rule 9(c)1 Statement [doc. #62] ("Doran and Shelton Statement"),

Plaintiff's Consolidated Local Rule 56(a)2 Statement [doc. #64] ("Plaintiff Statement"), as well

as the exhibits the parties submitted in conjunction with their briefs.[2]  Unless otherwise indicated,

the facts are undisputed, and all ambiguities are construed in favor of Ms. Labonia.

Ms. Labonia began working as a waitress for Doran at its Gardenside Terrace assisted-

living facility in January 2000,.  Gardenside Terrace provides, among other things, dining

facilities to elderly individuals.  Compass and Pellachia Statement ¶¶ 1, 2; Plaintiff Statement, §

---

[1] The following supplemental briefs were filed: Supplementary Memorandum of Defendant Doran in Support of Motion for Summary Judgment [doc. #80]; Supplemental Memorandum of Law in Support of Compass Group's and Daniel Pellachia's Motion for Summary Judgment for Lack of Subject Matter Jurisdiction [doc. #81]; and Plaintiff's Supplemental Memorandum of Law [doc. #82].

[2] Doran and Mr. Shelton included in their exhibits several notes written by employees in which they express their negative impressions of Mr. Pellachia.  *See* doc. #61, Exs. ## 4-7.  The notes are not sworn testimony, and the employees who wrote them did not subsequently file affidavits.  The Court will not, therefore, consider the contents of the notes, especially since Ms. Labonia addresses the matters contained therein, and the Court must, for the purposes of the motions for summary judgment, review the record in the light most favorable to Ms. Labonia.

A ¶¶ 1, 2; Doran and Shelton Statement ¶ 1.  Mr. Shelton, an employee of Doran, has been the

Executive Director of Gardenside Terrace since it opened in November 1999.  Doran and Shelton

Statement ¶ 62; Plaintiff Statement § B ¶ 2.  In April 2000, Mr. Shelton promoted Ms. Labonia

from waitress to dining room supervisor, and also granted Ms. Labonia a pay increase.  Compass

and Pellachia Statement ¶ 12; Plaintiff Statement § A ¶ 12; Doran and Shelton Statement ¶ 3.  As

dining room manager, Ms. Labonia supervised a waitstaff of about six individuals, all of whom

were female with the exception of one male waiter, Robert Lord.  Doran and Shelton Statement ¶

4; Plaintiff Statement, § B ¶ 4.

During Ms. Labonia's employment by Doran, Gardenside Terrace contracted with another

company, Bateman Food Service, a division of Compass Group USA (hereinafter "Compass"),

for supervision of its dining services.  Doran and Shelton Statement ¶ 6; Plaintiff Statement, § B

¶ 6.  The Director of Dining Services for Gardenside Terrace has always been a Compass

employee, while the other dining staff at Gardenside Terrace, such as Ms. Labonia, were

employees of Doran.  Doran and Shelton Statement ¶ 7; Plaintiff Statement § B ¶ 7.  At the time

Ms. Labonia was promoted to dining room manager, the Director of Food Services was Robert

Plaumann, a Compass employee.  Doran and Shelton Statement ¶ 8; Plaintiff Statement, § B ¶ 8.

Mr. Plaumann resigned in October 2000, and Compass replaced him with Mr. Pellachia.  Doran

and Shelton Statement ¶ 11; Plaintiff Statement § B ¶ 11.

When Mr. Pellachia started working at Gardenside Terrace, Mr. Shelton cautioned Ms.

Labonia that he was a tough person, and that she should "bite [her] tongue" and "bear with him."

Doran and Shelton Statement ¶ 13; Plaintiff Statement, § B ¶ 13.  According to Ms. Labonia, at

the time, Mr. Pellachia was only expected to be at Gardenside Terrace for three weeks, at which

point Doran's contract with Compass would expire. Labonia Depo. at 84. Ms. Labonia also acknowledged that she did not regard Mr. Pellachia as her supervisor, Doran and Shelton Statement ¶ 12; Plaintiff Statement, § B ¶ 12; she controlled the waitstaff and he controlled the kitchen staff. Doran and Shelton Statement ¶ 12; Plaintiff Statement, § B ¶ 12.

According to Ms. Labonia, within a few days of his arrival, Mr. Pellachia "went off on one of the dishwashers." Doran and Shelton Statement ¶ 14; Plaintiff Statement, § B ¶ 14. All of the dishwashers were male. Doran and Shelton Statement ¶ 15; Plaintiff Statement, § B ¶ 15. Ms. Labonia asserts that Mr. Pellachia "just didn't know how to talk to people," that he was "just rude to everybody." Doran and Shelton Statement ¶ 16; Plaintiff Statement, § B ¶ 16.

On or about November 3, 2000, an incident occurred between Mr. Pellachia and Ms. Labonia. Doran and Shelton Statement ¶ 41; Plaintiff Statement, § B ¶ 41; Deposition of Lauri Labonia [doc. #61], Ex. 3, at 107 ("Labonia Depo."). Ms. Labonia submitted a written statement to Gardenside Terrace recounting the November 3, 2000 incident as follows:

> I was working my usual shift at Gardenside Terrace . . . After the breakfast meal was served I entered the kitchen to use the telephone. I was on the phone with my mother. During the conversation a waiter came in complaining about the heat (temperature) in the kitchen area. At this time, Dan Pellachia approached [] and I suggested he open the rear door for some ventilation. He immediately begain yelling and threw off his chef hat grabbing me by both my arms and began shaking me violently. At this point I told him to take his hands off me at which time he reach over and hung up the phone. He had me against the wall preventing me from exiting the kitchen. Office personnel entered the kitchen and he was ordered to get away from me and go into another office, which he did.

Labonia Incident Report [doc. #61], Ex. 9. Ms. Labonia denied at her deposition that Mr. Pellachia's behavior toward Ms. Labonia on November 3, 2000, or at any other time, was sexual in nature, and she further confirmed that she was never subjected to any sexually inappropriate

conduct while she was employed by Gardenside.  Compass and Pellachia Statement ¶¶ 21, 22;

Plaintiff Statement, § B ¶¶ 21, 22; Labonia Depo. at 123-24.

Mr. Shelton arrived at the scene within 15 or 20 minutes of the November 3 incident.

Doran and Shelton Statement ¶ 56; Plaintiff Statement, § B ¶ 56.  Mr. Shelton immediately

undertook an investigation.  Doran and Shelton Statement ¶ 57; Plaintiff Statement, § B ¶ 57.  He

asked Mr. Pellachia for his account of the event and then sent Mr. Pellachia home.  Doran and

Shelton Statement ¶¶ 58-59; Plaintiff Statement, § B ¶¶ 58-59.  Mr. Shelton apologized to Ms.

Labonia, who had briefly stepped outside, and told her that Mr. Pellachia should never have

touched her.  Mr. Shelton added that Mr. Pellachia's behavior would not be tolerated and that he

would get to the bottom of it.  Doran and Shelton Statement ¶¶ 60-62; Plaintiff Statement, § B ¶¶

60-62.  Mr. Shelton told Ms. Labonia to go home with pay, and stated, "Believe me, Dan

Pellachia will be disciplined for this," and that Mr. Pellachia "would never be back."  Doran and

Shelton Statement ¶¶ 63, 64; Plaintiff Statement, § B ¶¶ 63, 64.

According to Ms. Labonia, Mr. Shelton did his best to investigate the situation,  Doran

and Shelton Statement ¶ 69; Plaintiff Statement, § B ¶ 69, and he was very sympathetic toward

her.  Labonia Depo. at 135.  Mr. Shelton and Kimberly Maturo, Office Manager for Gardenside

Terrace since its opening in November 1999, gave Ms. Labonia three days off with pay – an

allowance Ms. Labonia admits, to her knowledge, had never before been granted to any

employee.  Doran and Shelton Statement ¶¶ 72-73; Plaintiff Statement, § B ¶¶ 72-73; Affidavit

of Kimberly A. Maturo [doc. #61], Ex. 8, ¶ 2.  Ms. Labonia was not disciplined in any way for

the incident with Mr. Pellachia.  Doran and Shelton Statement ¶ 74; Plaintiff Statement, § B ¶ 74.

On the other hand, as a result of the November 3, 2000 incident, Mr. Pellachia was replaced by

Jean Rivas, and Mr. Pellachia never returned to Gardenside Terrace; nor did Ms. Labonia and Mr. Pellachia ever again interact other than in the context of this lawsuit.  Compass and Pellachia Statement ¶ 25; Plaintiff Statement, § A ¶ 25, § B ¶ 77.  According to Ms. Labonia, Mr. Shelton discouraged her from calling the police about the incident, in part because Mr. Shelton did not want to upset the residents of the assisted living facility.  Doran and Shelton Statement ¶¶ 70-71; Plaintiff Statement, § B ¶¶ 70-71.

Ms. Labonia did not report to work after Monday, December 11, 2000 because she was ill.  Doran and Shelton Statement ¶ 78; Plaintiff Statement, § B ¶ 78.  On Tuesday, December 12, a co-worker, Megan Moran, called Gardenside Terrace and left a message stating that she would like to meet with Mr. Shelton and Ms. Maturo regarding a phone call she had received from Ms. Labonia.  Doran and Shelton Statement ¶ 79; Plaintiff Statement, § B ¶ 79.  Ms. Labonia admits that she spoke with Ms. Moran on the phone for about a half-hour on or about December 12, 2000.  Doran and Shelton Statement ¶ 85; Plaintiff Statement § B  ¶ 85.  On December 13, 2000, Ms. Moran met with Mr. Shelton, Ms. Maturo, and Ms. Rivas.  Doran and Shelton Statement ¶ 80; Plaintiff Statement § B ¶ 80.  At this December 13 meeting, Ms. Maturo learned that Ms. Labonia had called Ms. Moran on her cell phone on December 12 and that Ms. Labonia had:

> proceeded to verbally attack Gardenside Terrace and some of its employees, and to reveal private information about co-workers.  Among other things, [Ms. Moran] said that [Ms. Labonia] had said: that [Ms. Moran] should not help Gardenside Terrace in any way; that the Director of Clinical Service was a cocaine user; and that another co-worker was a drug-dealer.  According to [Ms. Moran], [Ms. Labonia] also proceeded to reveal the rate of pay for every member of the dining staff.

Maturo Affidavit [doc. # 61], Ex. 8, ¶ 12.

On the morning of December 14, 2000, Mr. Shelton asked Ms. Rivas to telephone Ms.

7

Labonia to inform her that her employment at Gardenside Terrace was terminated and, with Mr.

Shelton present, Ms. Rivas called Ms. Labonia to notify her of the termination decision and that

Ms. Labonia would receive a letter setting forth the reasons for the decision.  Doran and Shelton

Statement ¶¶ 96-98; Plaintiff Statement, § B ¶¶ 96-98; Affidavit of Christian B. Shelton [doc. #

61], Ex. 11.

On or about December 14,  Ms. Labonia visited the Branford Police Department to file a

complaint against Mr. Pellachia, and Officer Michael Bonfiglio drafted a police report detailing

the complaint which is dated December 14, 2000 at 3:30 P.M.:

> Ms. Labonia came to police headquarters to complain that she was assaulted at her
> place of employment, Gardenside Terrace.  She told me this incident occurred
> 11/03/00 on Friday, after the breakfast meal was served.  Ms. Labonia said that
> she got into an argument with the kitchen manager, Dan Pellachia.  Ms. Labonia
> said that the kitchen was very hot and she suggested to Dan Pellachia that they
> open a door for some ventilation.  Ms. Labonia said that Dan Pellachia began
> screaming and yelling at her and threw off his Chef's hat and grabbed both her
> arms and began to shake her.  She also said that she was on the telephone at this
> time, and that Dan Pellachia reached over her and hung up the phone.  Ms.
> Labonia claims that Mr. Pellachia was in front of her and would not allow her
> away from the wall.  The complainant said that this was witnessed by several
> employees.  Ms. Labonia also claimed that she had marks on her arms from where
> Mr. Pellachia alleged to have grabbed her.  I asked her if she took any
> photographs of that she said that she did not.  I asked the complainant why she
> waited so long to make the complaint.  She told me that she was discouraged by
> the management, specifically Chris Shelton about calling the police.  I explained
> to Ms. Labonia that she should have called immediately and she replied that she
> thought that her bosses were going to handle it internally and Ms. Labonia then
> said that she originally wanted to have him arrested, but again was discouraged by
> the management of Gardenside Terrace.

*See* Branford Police Department Case/Incident Report [doc. #61], Ex. 15.

Ms. Labonia believes the sole reason for her termination was in retaliation for her

complaint to the police about the November 3, 2000 incident involving Mr. Pellachia.  Doran and

Shelton Statement ¶104; Plaintiff Statement, § B ¶ 104.

### III. Summary Judgment Standard

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A genuine issue of fact exists when "a reasonable jury could return a verdict for the nonmoving party," and facts are material to the outcome if the substantive law renders them so.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).  If the moving party carries its burden, the party opposing summary judgment "may not rest upon mere allegations or denials," rather, the opposing party must "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The Court must draw all ambiguities and inferences in favor of the plaintiffs. *See Anderson*, 477 U.S. at 255.  However, to defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50.

Courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question.  Because direct evidence of an employer's discriminatory intent will rarely be found, 'affidavits and depositions must be

9

carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citations omitted) (quoting *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994)). However, "[s]ummary judgment is appropriate even in discrimination cases," *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000), since "a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp*, 118 F.3d at 110.


## IV.  Title VII Claims

The single federal cause of action remaining in this case is Ms. Labonia's Title VII claim against Doran. In Count One of her Complaint, Ms. Labonia sues Doran pursuant to Title VII for a sexually hostile work environment and for retaliation on the basis of Ms. Labonia's complaint to the police about the November 3, 2000 incident with Mr. Pellachia.

### A.  Sexually Hostile Work Environment

In order to prevail on her claim that she was subjected to a hostile work environment on the basis of her sex, a plaintiff must demonstrate "conduct (1) that is 'objectively' severe or pervasive – that is [conduct that] creates an environment that a reasonable person would find hostile or abusive [the 'objective' requirement], (2) that the plaintiff 'subjectively' perceive[s] as hostile or abusive [the 'subjective' requirement], and (3) that creates such an environment because of plaintiff's sex . . . [the 'prohibited causal factor' requirement]." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001). In addition, since Ms. Labonia admits that Mr. Pellachia was not her supervisor, but, at most, a co-worker, "she must also show (4) that [the defendant] is responsible for the continued hostility of the work environment." *Id.*

10

"To establish hostile work environment, plaintiff[] . . . must show harassing behavior 'sufficiently severe or pervasive to alter the conditions of [their] employment.'" *Pennsylvania State Police v. Suders*, 124 S. Ct. 2342, 2347 (2004) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). "Proving the existence of a hostile work environment involves showing both objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (citation and quotation marks omitted).

In her deposition, Ms. Labonia stated that during the month Mr. Pellachia was at Gardenside Terrace, Mr. Pellachia was critical of everyone, including herself. Labonia Depo. at 367. However, Ms. Labonia testified that, prior to the November 3, 2000 incident, Mr. Pellachia's arrival at Gardenside Terrace in October 2000 had not affected her job in any way, "[b]ecause, like I said . . . I had my dining room, he had his kitchen, and as far as I knew, he was only there for three weeks, and the contract was over, so it wouldn't have affected my job." Labonia Depo. at 93-94. On typical days, Ms. Labonia says she did not interact or talk much with Mr. Pellachia. Labonia Depo. at 95. When Ms. Labonia informed Mr. Shelton about the staff's disaffection with Mr. Pellachia, she stated that Mr. Shelton would say, "'Tell them another three weeks. We're trying to get out of the contract. Bite your tongue. I know, I know, I know, bear with me.' And I would go back and tell them and that's what we would do." Labonia Depo. at 89. After that, Ms. Labonia stated that she stayed out of the situation, since Mr. Pellachia was in a different department and Mr. Shelton had presumably taken charge of the matter. *Id.*

The Second Circuit has cautioned that, "'[b]ecause the crucial inquiry focuses on the

11

nature of the workplace environment as a whole, a plaintiff who herself experiences

discriminatory harassment need not be the target of other instances of hostility in order for those

incidents to support her claim.'"  *Dawson v. County of Westchester*, 373 F.3d 265, 272-73 (2d

Cir. 2004) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)).  While it is

perhaps a close question, the evidence in this case suggests, and a reasonable trier of fact could

find, that during his three weeks at Gardenside Terrace, Mr. Pellachia's domineering and taunting

conduct towards the employees in general created a hostile and harassing atmosphere sufficient

to satisfy the objective and subjective prongs of a Title VII hostile work environment claim.

Moreover, the November 3, 2000 incident of physical abuse may well have been severe enough,

standing alone, to alter the conditions of Ms. Labonia's employment.  *Ferris v. Delta Air Lines,

Inc.,* 277 F.3d 128, 136 (2d Cir. 2001) (single egregious instance of abusive behavior can

constitute hostile working environment).

       Thus, for present purposes, the Court will assume that Plaintiff has presented sufficient

evidence of persistent and abusive conduct by Mr. Pellachia and that such conduct objectively

and subjectively altered the terms and conditions of Ms. Labonia's employment.  More

problematic for Ms. Labonia, however, in surviving summary judgment on her hostile work

environment claim are the third and fourth prongs the Second Circuit identified in *Brown* – that

is, her need to satisfy the "prohibited causal factor requirement" and to demonstrate that [Doran]

is responsible for the continued hostility of the work environment.  *Brown*, 257 F.3d at 252.

       The Second Circuit noted in *Cruz* that it is not necessary that "offensive remarks or

behavior be directed at individuals who are members of the plaintiff's own protected class.

Remarks targeting members of other minorities, for example, may contribute to the overall

hostility of the working environment for a minority employee." 257 F.3d at 570. However, in order to sustain a Title VII hostile work environment claim, it is not enough that a plaintiff was subjected to a hostile and antagonistic work environment. "It is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through such concrete deprivations as being fired or being denied a promotion, is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic." *Brown*, 257 F.3d at 252 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79-80 (1998)). Establishing the existence of a hostile or antagonistic environment is, therefore, only a necessary, and not a sufficient, basis for imposing Title VII liability; a plaintiff can prevail under Title VII only if she also establishes that the hostility or abuse was *because of* the plaintiff's sex – that is, that sex discrimination animated, or was the cause of, the hostile environment.

Bad behavior that is sex-neutral on its face, or directed at both men and women alike cannot, without a showing of discriminatory intent, support a Title VII sex discrimination claim. *See Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999) ("A plaintiff must [] demonstrate that she was subjected to the hostility because of her membership in a protected class. In other words, an environment which is equally harsh for both men and women . . . does not constitute a hostile working environment under the civil rights statutes."); *see also Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002) ("Facially neutral incidents may be included . . . among the 'totality of circumstances' that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on sex. But this requires some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory."). This is because "Title VII is not 'a general civility code.'" *Holtz v.*

*Rockefeller & Co., Inc.*, 258 F.3d 62, 75 (2d Cir. 2001) (quoting *Oncale*, 523 U.S. at 81).  As the Second Circuit has explained, "[e]veryone can be characterized by sex, race, [or] ethnicity . . . and many bosses are harsh, unjust, and rude.  It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination.  Otherwise, the federal courts will become a court of personnel appeals."  *Alfano*, 294 F.3d at 378.

"Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at *discriminat[ion]* . . . because of . . . sex."  *Oncale*, 523 U.S. at 80 (emphasis in original); *see also Dawson*, 373 F.3d at 274 ("[I]n a gender-based hostile work environment case . . . the crucial question is not simply whether the remarks to which plaintiff[] were subjected were of an explicitly sexual nature.  It is rather whether the workplace atmosphere, considered as a whole, undermined plaintiff[]'s ability to perform [her] job[], compromising [her] status as equals to men in the workplace."); *Macri v. Newburgh Enlarged City Sch. Dist.*, No. 01 Civ. 1670 (MBM), 2004 WL 1277990, at *7 (S.D.N.Y. June 8, 2004) ("Incidents that are sex-neutral on their face may be considered in a hostile work environment claim as long as there is some basis for inferring that the incidents were actually discriminatory.") (citing *Alfano*, 294 F.3d at 378); *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 464 (6th Cir. 2000) ("[W]hile [plaintiff] recites a litany of perceived slights and abuses, many of the alleged harassing acts cannot be considered in the hostile environment analysis because [plaintiff] has not shown that the alleged harassment was based upon his status as a male . . . In Title VII actions [] it is important to distinguish between harassment and discriminatory harassment in order to 'ensure that Title VII does not become a general civility code.'") (quoting *Faragher v. City of Boca Raton*, 524 U.S.

14

775, 788 (1998)) (citation omitted)).  As the Seventh Circuit has put it, "[i]f the workplace is unsavory for any reason other than hostility generated on the basis of race, gender, ethnicity, or religion, no federal claim is implicated.  In short, personality conflicts between employees are not the business of the federal courts."  *Vore v. Indiana Bell Tel. Co., Inc.*, 32 F.3d 1161, 1162 (7th Cir. 1994).

Measured by these standards, Ms. Labonia's claim must fail, for the record in this case displays a lack of evidence from which a reasonable trier of fact could infer the critical linkage between Mr. Pellachia's alleged conduct and the sex of Ms. Labonia.  As to the November 3, 2000 incident, Ms. Labonia explicitly denies that there were any sexual overtones to Mr. Pellachia's conduct.  Labonia Depo. at 123.  She also denies that Mr. Pellachia or anyone at Gardenside Terrace ever acted or spoke in a sexual manner towards her.  *Id.* at 123-24.  Throughout most of her deposition testimony, Ms. Labonia essentially casts Mr. Pellachia as an equal-opportunity tormentor, bullying and badgering both men and women alike.  Ms. Labonia thus describes the plight of David Goodman, a dishwasher whom Mr. Pellachia teased relentlessly, Labonia Depo. at 87; she also testified to complaints from the male chefs about Mr. Pellachia's rudeness, *id.* at 89, and Fred Moore's exasperation with Mr. Pellachia, which prompted him to tell Ms. Labonia that he, Mr. Moore, "didn't know if he could take much more of [Mr. Pellachia]." *Id.* at 94.  She also testified to the dining hall staff's general perception that Mr. Pellachia was just plain mean and rude.  *Id.*  According to Ms. Labonia, at least one male employee even referred to Mr. Pellachia as "Hitler."  *Id.* at 98-99.

The Second Circuit has cautioned district courts that "[t]he inquiry into whether ill treatment was actually sex-based discrimination cannot be short-circuited by the mere fact that

both men and women are involved.  For it may be the case that a co-worker or supervisor treats

both men and women badly, but women worse." *Brown*, 257 F.3d at 254.  Apparently seeking to

fit within this language from *Brown*, Ms. Labonia suggested toward the latter part of her

deposition that, while Mr. Pellachia treated both men and women badly – calling workers of both

sexes "stupid, idiot" – he more often spoke in such a deprecating manner to females.  Labonia

Depo. at 391, 401.  However, despite repeated questioning from defendants' counsel, Ms.

Labonia was unable to offer, either at her deposition or through counsel at oral argument, any

specific instances where Mr. Pellachia treated women more harshly than men, or even specific

instances in which he addressed women in a manner that reflected animosity towards them on the

basis of their sex.  That omission is telling for Ms. Labonia had no difficulty whatsoever relating

numerous specific instances of verbal abuse or mistreatment by Mr. Pellachia, most of which –

and the most egregious examples at that – involved men.  *See* Labonia Depo. at 87, 89, 94, 98-

100.

       In order to defeat summary judgment, Ms. Labonia cannot simply rely on generalizations

or  conclusory claims without providing at least some supporting facts.  *See Davis v. New York*,

316 F.3d 93, 100 (2d Cir. 2002) (noting that "reliance upon conclusory statements or mere

allegations is not sufficient to defeat a summary judgment motion"); *see also Cary v. Crescenzi,*

923 F.2d 18, 21 (2d Cir. 1991) (nonmovant's "bald assertion, completely unsupported by

evidence," did not satisfy burden in opposing motion for summary judgment).  Courts have not

hesitated to grant summary judgment in Title VII hostile work environment cases where, as here,

the plaintiff fails to advance specific evidence of a causal connection between a plaintiff's sex

and an alleged abusive environment.  *See Brennan*, 192 F.3d at 319 (rejecting plaintiff's claim of

a hostile work environment based on general rude behavior when there was otherwise no evidence of sex discrimination to support the view that women were treated worse than men); *see also O'Dwyer v. Snow*, No. 00 Civ. 8918 (LTS), 2004 WL 444534, at *13 (S.D.N.Y. Mar. 10, 2004) (granting summary judgment on hostile work environment claim due to absence of evidence, other than plaintiff's conclusory allegations, that a male employee received better treatment than female plaintiff or that any disparity of treatment was attributable to plaintiff's sex); *see also Calire v. Taylor Staffing Servs.*, No. 02 CV 0166E (SR), 2004 WL 625274, at *4 (W.D.N.Y. Feb. 17, 2004) (summary judgment granted on hostile work environment claim for lack of sufficient evidence that, for example, the alleged harassing incidents implicated plaintiff's sex); *Liegey v. Ellen Figg, Inc.*, No. 02 Civ. 1492 (DC), 2004 WL 74135, at *1 (S.D.N.Y. Jan. 16, 2004) (denying summary judgment because, while plaintiff alleged that employer treated both men and women poorly, plaintiff presented evidence that female employees were treated worse on the basis of their sex by, for instance, by making lewd and sexual remarks and obscenities to plaintiff and other female employees); *Manessis v. New York City Dept. of Transp.*, No. 02 Civ. 359 (SAS), 2003 WL 289969, at *6 (S.D.N.Y. Feb. 10, 2003) ("In analyzing hostile work environment claims, facially discriminatory neutral incidents may be included in the 'totality of circumstances' as long as there is some circumstantial basis for inferring that facially discriminatory neutral incidents were actually discriminatory.").

Viewing the evidence in the light most favorable to Ms. Labonia, the Court concludes that no reasonable juror could find that the hostile work environment created by Mr. Pellachia was *because of* Ms. Labonia's sex within the meaning of the Second Circuit case law. *See Brown*, 257 F.3d at 252 ("[A]n employment discrimination plaintiff faced with a properly

17

supported summary judgment motion must 'do more than simply show that there is some metaphysical doubt as to the material facts.' She must come forth with evidence sufficient to allow a reasonable jury to find in her favor") (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 586) (citation omitted).[3]  Accordingly, the Court grants Doran summary judgment on Ms. Labonia's hostile environment claim.

### B.  Retaliation

Ms. Labonia also brings a Title VII retaliation claim against Doran.  Section 704(a) of Title VII makes it unlawful to retaliate against an employee, "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a

---

[3]  Ms. Labonia is also required to "demonstrate a specific basis for imputing the conduct creating the hostile work environment to the employer." *Feingold,* 366 F.3d at 150 (citing *Alfano*, 294 F.3d at 373).  Since it is undisputed that Mr. Pellachia was not Ms. Labonia's supervisor, Doran, her employer "will generally not be liable unless the employer either provided no reasonable avenue of complaint or knew of the harassment but did nothing about it." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766 (2d Cir. 1998) (internal quotation marks and citation omitted).  Ms. Labonia testified that Compass, not Doran, assigned Mr. Pellachia to his position at Gardenside Terrace, and that Mr. Pellachia was expected to remain at Gardenside for only three weeks, at which time the contract between Doran and Compass would expire.  *See* Labonia Depo. at 84, 94.  Doran, therefore, did not hire Mr. Pellachia.  In discussing other employees' complaints about Mr. Pellachia, Ms. Labonia testified that "like I said, I didn't get involved.  It was up to them [the other employees] to go to Mr. Shelton." Labonia Depo. at 89.  While it appears that on at least one occasion Ms. Labonia spoke to Mr. Shelton about Mr. Pellachia, according to Ms. Labonia, Mr. Shelton promised her that "the whole Bateman system is going to be out of there in 3 weeks," and he asked Ms. Labonia to "inform the rest of the staff of the change and what was happening."  *Id.* at 84.  Ms. Labonia testified that "I told the employees they're getting rid of Bateman, it's just a contract thing, give him a few weeks, *and we said okay.*" *Id.* at 84-85 (emphasis added).  There is therefore no evidence to suggest that Doran deprived Ms. Labonia of a reasonable avenue of complaint, or that Doran ignored her complaints involving Mr. Pellachia.  This is particularly true with regard to the November 3, 2000 incident, since it is undisputed that Mr. Shelton immediately told Mr. Pellachia to leave Gardenside Terrace and took steps to prevent him from returning.  Ms. Labonia herself acknowledged that Mr. Shelton was sympathetic toward her, acted immediately to address the situation, and also gave her time off with pay to recover from the incident.

charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a); *Deravin v. Kerik*, 335 F.3d 195, 203 (2d Cir. 2003).  "The 'objective of this section is [] to forbid an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice.'"  *Fitzgerald v. Henderson*, 251 F.3d 345, 358 (2d Cir. 2001) (quoting *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 291-92 (2d Cir. 1998) (citation omitted).  "In order to 'establish a prima facie case of retaliation, an employee must show (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action.'"  *Feingold*, 366 F.3d at 156 (quoting *Quinn*, 159 F.3d at 769); *Fitzgerald*, 251 F.3d at 358.  Since there is no dispute that termination is a disadvantageous employment action, Ms. Labonia need only satisfy the first and third prongs in order to sustain her *prima facie* case of Title VII retaliation.

The first prong of Ms. Labonia's *prima facie* burden is to show that she engaged in protected activity or opposition that was known to her supervisors when they decided to terminate her employment.  Ms. Labonia contends that she was terminated from Gardenside Terrace as a result of her police complaint against Mr. Pellachia for the November 3, 2000 incident.  Though the Second Circuit appears not to have addressed this issue, other courts have held that under appropriate circumstances, the filing of a police report can constitute protected activity under Title VII's "opposition" clause.  For example, in *Worth v. Tyer*, 276 F.3d 249, 265 (7th Cir. 2001), the Seventh Circuit found plaintiff's complaint to the police to constitute protected activity, because the plaintiff alleged in her police complaint (which charged battery) that her supervisor touched her breast while she was in her office.  Similarly, in *EEOC v. Dinuba*

*Medical Clinic*, 222 F.3d 580, 586 (9th Cir. 2000), the Ninth Circuit upheld a district court's

determination that the filing of a criminal complaint for assault and battery constituted protected

activity because the victim reported to the police that she was subjected to the battery because of

her sex and also because the district court had found that the assault was the culmination of other

discriminatory acts.  And in *Dewitt v. Lieberman*, 48 F. Supp. 2d 280 (S.D.N.Y. 1999), the

district court held that the filing of a criminal complaint constituted protected activity, because

the female employee's complaint charged her supervisor with sexual harassment.  *Id.* at 293.

Unlike these cases, Ms. Labonia's police complaint against Mr. Pellachia was not for

sexual harassment or for any other conduct based on Ms. Labonia's sex.  *See* Branford Police

Department Case/Incident Report [doc. #61], Ex. 15.  Indeed, Ms. Labonia has explicitly denied

in deposition testimony that the alleged November 3, 2000 assault was sexual or discriminatory

in nature.  Labonia Depo. at 123.  However, attempting to characterize her police report as

protected activity contemplated in the aforementioned cases, Ms. Labonia argues that Mr.

Pellachia's "assault was itself the culmination of a sexually hostile working environment

permitted to continue" and that her "police complaint, thus, was a complaint about the Title VII

and CFEPA violation."  Consolidated Brief in Opposition to Motions for Summary Judgment

[doc. #65] at 17.  The Court is unpersuaded.

The Second Circuit recognizes that "a plaintiff may state a *prima facie* claim for

retaliation even when her primary claim for discrimination is insufficient to survive summary

judgment."  *Wimmer v. Suffolk County Police Dept.*, 176 F.3d 125, 136 (2d Cir. 1999).

However, in order to state such a claim, Ms. Labonia must have had a "'good faith, reasonable

belief' that the underlying practice was unlawful."  *Id.* at 135 (quoting *Reed v. A.W. Lawrence &*

*Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)).  In the absence of any evidence of a sexually hostile environment, "[Ms. Labonia] could not have reasonably believed that [s]he was opposing an employment practice because the evidence does not address [] discrimination in an employment practice."[4]  *Wimmer*, 176 F.3d at 136 (citing *Manoharan v. Columbia Univ. College of Physicians & Surgeons*, 842 F.2d 590, 594 (2d Cir. 1988) (holding that plaintiff could not have held a reasonable belief where he "neither pointed out discrimination against particular individuals nor discriminatory practices by [the employer]"); *see Serrano v. Schneider, Kleinick, Weitz, Damashek & Shoot, P.C.*, No. 02 Civ. 1660 (DC), 2004 WL 345520, at *4 (S.D.N.Y. Feb. 24, 2004) ("The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination.").  Because Ms. Labonia's opposition (as reflected by her police complaint) "was not directed at an unlawful *employment practice* of [her] employer," her claim of retaliation is not cognizable under Title VII.  *Wimmer*, 176 F.3d at 135 (emphasis in original).

---

[4] The precise issue presented in *Wimmer* was "whether a complaint of retaliation for opposing discrimination by co-employees against non-employees is cognizable under Title VII." *Wimmer*, 176 F.3d at 135.  In reaching its conclusion that there must be an employment relationship between the person who experiences the discriminatory hostility and the employer alleged to be responsible for the discriminatory environment, the Second Circuit observed, in language that applies to this case, that "[the plaintiff] testified that he never heard a racial epithet directed toward himself or any other member of the Department during his employment.  In the absence of such evidence, [the plaintiff's] claim of retaliation is not cognizable under Title VII because his opposition was not directed at an unlawful *employment practice* of his employer." *Id.* (emphasis in original) (citing *Silver v. KCA, Inc.*, 586 F.2d 138, (9th Cir. 1978)) ("The specific evil at which Title VII was directed was not the eradication of all discrimination by private individuals, undesirable though that is, but the eradication of discrimination by employers against employees.") (citation omitted).  As for any possible claim that Ms. Labonia may assert regarding any discriminatory treatment of other women, she has provided no supporting evidence.  *See Wimmer*, 176 F.3d at 136 ("Because [the plaintiff] did not introduce evidence that minority employees of the Department felt that they worked in a racially hostile environment, [the plaintiff] could not reasonably have believed that he was protesting an unlawful hostile work environment.").

Moreover, even if Ms. Labonia's police complaint about Mr. Pellachia's assault could properly be characterized as "protected activity," Ms. Labonia has not provided evidence from which a reasonable jury could find or infer that Doran was aware of her complaint to the police before it decided to terminate her.  Ms. Labonia testified that she first called the police on November 3, 2000, following the incident.  Labonia Depo. at 137.  However, Ms. Labonia admits that she did not actually visit the police station to file a report until December 12 or 13 of 2000.  *Id.* at 139-40.[5]  Even if Ms. Labonia placed an earlier call or even filed a complaint before December 14, she offers no evidence, other than rank speculation, that Mr. Shelton or Ms. Maturo was aware of Ms. Labonia's complaint when they decided to terminate Ms. Labonia.  Mr. Shelton and Ms. Maturo have submitted affidavits in which they state that they were unaware at the time they decided to terminate Ms. Labonia that Ms. Labonia had called the police or filed a police complaint against Mr. Pellachia.  *See* October 30, 2003 Affidavit of Christian B. Shelton [doc. # 61], Ex. 11; *see also* October 27, 2003 Affidavit of Kimberly A. Maturo [doc. #61], Ex. 12.[6]

---

[5]  Even though the police report is dated December 14 at 3:30 pm, Ms. Labonia claims that the police reported is wrong and that she visited the police station a day or two before December 14.  Labonia Depo. at 139, 150-52.

[6]  Ms. Labonia never argued or suggested in her brief or at argument that she was terminated because she called the police on November 3, 2000, immediately following the incident with Mr. Pellachia.  Also, in the portion of Ms. Labonia's deposition in which she addresses the reason why she believes she was terminated, she focuses exclusively on police complaint she filed on or about December 13, 2000 as the reason for her termination.  The following exchange illustrates this:

Q: Do you remember when it was that you first went to the police?
A: It was – I think it was December 11th, 12th, 13th, somewhere around there . . .
All I know is that I got fired the next day after I went.
Q: Is that you testimony, that you were fired the next day after you went to the

A causal connection between a complaint and termination can be satisfied by temporal proximity between the two. *Feingold*, 366 F.3d at 156-57 (citing *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 224 (2d Cir. 2001)). However, here, there is no evidence in the record that Mr. Shelton, Ms. Maturo, or any other decision maker at Doran was at all aware that Ms. Labonia had called the police or intended to file a police complaint at the time the decision was made to terminate her. In the absence of such evidence, a jury would be forced to speculate

---

> police?
> A: One or two days afterwards, yes.
> Q: How do you know that?
> A: Well, because everything was fine until I went to the police. I mean, everything was fine, and then the next thing I know I get a phone call at 20 of 2 in the afternoon saying I'm terminated . . .

Labonia Depo. at 139.

Ms. Labonia was also asked at her deposition why she waited so long to go to the police, as the police officer who took her statement commented in the police report. *See* Branford Police Department Case/Incident Report [doc. #61], Ex. 15. She replied, and the resulting dialogue was:

> A: I should have, but I put my trust into [] Mr. Shelton, that he would take care of it. I trusted him to take care of it. He promised me he would.
> Q: You could have made the choice to go earlier?
> A: Yes, but I was waiting for the investigation, and he kept on telling me they're still doing the investigation.
>           . . .
> Q: You had the ability to go to the police earlier but you didn't; true?
> A: Right but I didn't . . .

Labonia Depo. at 155. The record, therefore, contains no evidence or allegations that Ms. Labonia was terminated for any reason other than her report to the police on or about December 13, 2000. And the record contains no evidence to suggest that either Mr. Shelton or Ms. Maturo was aware of either the police report or the call to the police Ms. Labonia claims to have made in November.

23

about a causal link, something a jury cannot do, especially since it is part of Ms. Labonia's *prima facie* burden to demonstrate "a causal connection between the protected activity and the adverse employment action.'" *Feingold*, 366 F.3d at 156.

Finally, even assuming Ms. Labonia has satisfied her *prima facie* burden of showing retaliation, thereby shifting the burden to Doran to state a legitimate non-discriminatory reason for Ms. Labonia's termination, *Feingold*, 466 F.3d at 157; *see Coffey v. Dobbs Int'l Servs.*, 170 F.3d 323, 326 (2d Cir. 1999) (stating that *McDonnell Douglas* burden-shifting analysis applies to Title VII retaliation claims), Doran proffers such a legitimate non-discriminatory reason. Doran explains that the decision to terminate Ms. Labonia resulted from a meeting between Mr. Shelton, Ms. Maturo, Ms. Rivas, and Ms. Moran on December 13, 2000 during which Ms. Moran apprised them of the contents of a December 12, 2000 phone conversation with Ms. Labonia.[7] Reply Memorandum of Defendants Doran and Shelton in Support of Motion for

---

[7] A memo signed by Mr. Shelton, Ms. Rivas, Ms. Maturo, and Ms. Moran, dated December 13, 2000 recorded the events surrounding Ms. Moran's report of her phone conversation with Ms. Labonia, stating, in part:

[On Wednesday, December 13, 2000], Megan Moran, Kim Maturo, Jean Rivas and [Mr. Shelton] met [] at approximately 3:15 p.m. Megan informed us that she was called on her cell phone by Lauri [Labonia] on Tuesday and was told the following:

1) Mary Beth Paturzo, RN, Director of Clinical Services, was an active drug user and was snorting cocaine.
2) Chris Shelton made Ethel Anne Chorney, Director of Marketing, forge documents regarding Ethel Anne's qualifications in order to assist Gardenside Terrace's accreditation with the Joint Commission for the Accreditation of Healthcare Organization's Survey.
3) Requested that Megan not help or assist Gardenside Terrace anymore as she was being taken advantage of. Lauri then relayed to her each dining staff member's tenure and rate of pay. Megan stated that it was her opinion that this was an effort to antagonize her toward Gardenside Terrace.
4) Notice of lawsuits would be presented to Bateman Food Service, Gardenside Terrace, Dan Pellachia (personally), Kim Maturo (personally) and myself (personally) on Monday,

Summary Judgment [doc. #72] at 3.  Based upon Ms. Moran's report, Mr. Shelton decided to

terminate Ms. Labonia the next day, *id.*, and sent her a letter stating:

> The reasons for termination were the passing of confidential information about
> employee wages, instructing a staff member to act in a disloyal and uncooperative
> manner, and making false or malicious statements concerning the Clinical
> Director and a co-worker, all in violation of the Personnel Policy.

Termination Letter [doc. # 61], Ex. 13.[8]  Doran therefore had a legitimate, non-discriminatory

reason for its decision to terminate Ms. Labonia.

"Once the employer produces evidence of legitimate reasons for its actions, the burden

shifts back to the plaintiff to prove, by a preponderance of the evidence, that the real reason for

the adverse employment decision was discrimination." *Mandell v. County of Suffolk*, 316 F.3d

368, 381 (2d Cir. 2003).  "[P]roof of causation can be shown either: (1) indirectly, by showing

that the protected activity was followed closely by discriminatory treatment . . . ; or (2) directly,

through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v.*

*New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).  The Court has already

---

December 18, 2000.
5) Told Megan that Gardenside Terrace knew of Patty Sullivan's, RN, (former clinical
nurse) drug problem and that Patty quit and that Gardenside Terrace did not terminate her
and would not have terminated her.
6) Told Megan that Chris Marcisz, Cook, was selling drugs to Joe Reilly, Cook, and
Shaun Taylor (former dining staff member).
7) Told Megan that she (Lauri) had covered up the drug use by dining staff members and
that Chris Marcisz was passed out from an overdose in the kitchen at some point in the
past.

Memo for File [doc. #61], Ex. 10.

[8] The Gardenside Terrace termination policy indicates that an employee may be
involuntarily terminated for, among other things, "[p]assing information of confidential nature to
any unauthorized person or persons." *See* Termination [doc. #61], Ex. 14.

25

determined that Ms. Labonia has failed to demonstrate a causal link between protected activity and her termination. Additionally, Ms. Labonia has not provided any evidence, other than conclusory assertions, that she was the target of retaliatory animus by Doran. She even conceded that "[t]here's no facts that supports it. It's just what I think happened." Labonia Depo. at 147. Given Ms. Labonia's evidentiary shortcomings, no reasonable juror could conclude that Doran's legitimate, non-discriminatory reason for terminating Ms. Labonia was false, *and* that the real reason for Ms. Labonia's termination was retaliation for engaging in protected activity. Therefore, Doran is entitled to summary judgment on the Title VII retaliation claim. *See Monte v. Ernst & Young LLP*, No. 02 Civ. 6886 (LTS), 2004 WL 1780993, at *11 (S.D.N.Y. Aug. 10, 2004) (granting summary judgment on retaliatory discharge claim because plaintiff was unable to proffer facts to show that retaliatory animus was a motivating factor in decision to terminate plaintiff); *see also Diaz v. Weill Med. Ctr. of Cornell Univ.*, No. 02 Civ. 7380 (AJP), 2004 WL 285947 (S.D.N.Y. Feb. 13, 2004) (granting summary judgment on Title VII retaliation claim based upon plaintiff's failure to prove that defendant's legitimate reason for plaintiff's termination was pretextual); *Hunter v. St. Francis Hosp.*, 281 F. Supp. 2d 534, 547 (E.D.N.Y. 2003) (dismissing Title VII retaliation claim based on plaintiff's failure to demonstrate that defendant's legitimate reason for its adverse employment action was pretextual). Accordingly, Doran is entitled to summary judgment on Ms. Labonia's Title VII retaliation claim.

The remaining claim against Doran is sex discrimination in violation of the CFEPA in Count Two.[9] The Court having dismissed Ms. Labonia Title VII sex discrimination claim, and

---

[9] Plaintiff's Complaint is not entirely clear about whether Ms. Labonia sues Doran as a defendant in Count Three for common law assault and battery. However, Ms. Labonia's briefs address the state common law claims, including assault and battery, only with respect to

since Connecticut anti-discrimination statutes are "coextensive with [Title VII]," *Brittell v. Dep't of Corr.*, 247 Conn. 148, 164 (1998); *see Arnold v. Yale New Haven Hosp.*, 213 F. Supp. 2d 142, 151 (D.Conn. 2002), the Court grants Doran summary judgment on the CFEPA claim for sex discrimination in Count Two.

## V.  State Law Claims Against Compass and Pellachia

The remaining claims against Compass and Mr. Pellachia are: Count Three for common law assault and battery; Count Four for intentional infliction of emotional distress; and Count Five for negligent infliction of emotional distress.  The Court declines to exercise supplemental jurisdiction over the remaining state law claims against Compass and Mr. Pellachia.  There are no remaining federal claims in this case over which this Court has original jurisdiction.  "Under 28 U.S.C. § 1367(c)(3), district courts 'may decline to exercise supplemental jurisdiction over a claim under [§ 1367(a) ] if the district court has dismissed all claims over which it has original jurisdiction.'"  *Ametex Fabrics, Inc. v. Just In Materials, Inc.*, 140 F.3d 101, 105 (2d Cir. 1998). Nonetheless, a district court has discretion in determining whether to exercise supplemental jurisdiction involving weighing and balancing several factors, including considerations of judicial economy, convenience, and fairness to litigants.  *Purgess v. Sharrock*, 33 F.3d 134, 138

---

Compass and Mr. Pellachia.  *See* Consolidate Brief in Opposition to Motions for Summary Judgment [doc. #65] at 18-20; *see also* Supplemental Memorandum of Law [doc. #82] at 1.  And for good reason, since it is undisputed that Doran did not employ Mr. Pellachia; therefore, it is unlikely that Doran could be held responsible for his intentional torts.   In any event,  at argument, when the Court explicitly questioned Ms. Labonia's counsel about all of her claims, she did not contend that Ms. Labonia's assault and battery claim applied o Doran.  As a consequence, the Court concludes that Count Three for assault and battery applies only to Compass and Mr. Pellachia.

(2d Cir.1994). In this case, having dismissed all claims against Doran and Mr. Shelton, including all claims over which this Court had original jurisdiction, considerations of judicial economy, convenience, fairness, and comity do not weigh in favor of exercising supplemental jurisdiction over the remaining state law claims in this case. This is especially true since the remaining state law claims involve defendants – Compass and Mr. Pellachia – who were not parties to the discrimination claims over which the Court had original jurisdiction.

Therefore, the Court dismisses without prejudice the remaining state law claims against Compass and Mr. Pellachia. *See Barnes v. CCH Corp. System*, No. 01 Civ. 2575 (AKH), 2004 WL 1516791, at *8 (S.D.N.Y. July 7, 2004 (dismissing state law claims after summary judgment granted on all federal claims); *see also Braheney v. Town of Wallingford*, No. 3:00 Civ. 2468 (CFD), 2004 WL 721834, at *20-21 (D. Conn. Mar. 30, 2004) (declining to exercise supplemental jurisdiction over plaintiff's state law claims after court dismissed as a matter of law all federal claims over which it had original jurisdiction).

## VI. Conclusion

For the foregoing reasons, Doran Associates & Christian Shelton's Motion for Summary Judgment [doc. #60] is GRANTED. The Court declines to exercise supplemental jurisdiction over the remaining counts against Compass and Mr. Pellachia, all of which are based in state law: Count Three for assault and battery; Count Four for intentional infliction of emotional distress; and Count Five for negligent infliction of emotional distress. Therefore, since the Court previously dismissed Counts One and Two against Compass and Mr. Pellachia, the Compass Group's and Daniel Pellachia's Motion for Summary Judgment [doc. #57] is GRANTED without

prejudice to Ms. Labonia's pursuing her remaining state law claims in state court.

The Clerk is directed to close this case.

IT IS SO ORDERED.


/s/ _____Mark R. Kravitz_____
United States District Judge


Dated at New Haven, Connecticut: <u>August 25, 2004</u>.